IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

APPLIED CAPITAL, INC.,

       Plaintiff,

vs.                                      No. CIV 05-98 JB/ACT

FRANCIS GIBSON; GARY BELLINGER;
BRIAN AMBROSE; KIRK VOYLES;
HERITAGE COMMERCIAL SERVICES, INC.;
GERALD LEE SCOGIN, JR; GRIZZLY DRILLING, INC.;
JUSTIN HERMAN, NEW ENERGY CO., L.L.C., and
EDWARD L. PRESLEY,

       Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Plaintiff Applied Capital, Inc.'s Motion for

Partial Summary Judgment Against Defendant Francis Gibson on Applied Capital's Civil

Conspiracy, Fraud, Breach of Contract and Unjust Enrichment Claims, filed February 2, 2007 (Doc.

178). The Court held a hearing on the motion on July 31, 2007. The primary issue is whether there

are genuine issues of material fact that preclude the Court from entering summary judgment for

Applied Capital and against Gibson on liability. Because Gibson has not filed any response to

Applied Capital's Verified Fourth Amended Complaint, has not filed a written opposition to this

motion, and has not responded to Applied Capital's requests for admissions, there is no genuine

issue of material fact that precludes summary judgment with respect to liability, and the Court will

grant Applied Capital's motion in part. Because the Court also believes, however, that Applied

Capital is not yet entitled to all the damages it seeks, the Court will deny Applied Capital's motion

in part.

**FACTUAL BACKGROUND**

Because Gibson has not filed a response to Applied Capital's written motion, the material facts are undisputed.

Defendant Edward L. Presley has operated Defendant New Energy Company since 2001. New Energy holds leases for coal bed methane ("CBM") gas lying underneath tracts of land in Wyoming.  See  Verified Fourth Amended Complaint ¶10, at 2-3, filed June 30, 2006 (Doc. 120) ("Fourth Complaint"); Memorandum in Support of Plaintiff Applied Capital, Inc.'s Motion for Partial Summary Judgment Against Defendant Francis Gibson on Applied Capital's Civil Conspiracy, Fraud, Breach of Contract and Unjust Enrichment Claims, filed February 2, 2007 (Doc. 180)("Gibson Memo"), Exhibit 1, Deposition of Francis Gibson at 47:10-21 (taken December 10, 2004)("Gibson Depo."). For several years before 2004, Presley had been attempting to obtain financing for a project  for these tracts to drill into and extract the gas.  See id.

In late 2003 or early 2004, Gibson, Presley, Defendant Justin Herman, and Defendant Gerald Lee Scogin, Jr. met each other, although Presley and Scogin may have met at an earlier date. Memorandum in Support of Plaintiff Applied Capital, Inc.'s Motion for Partial Summary Judgment Against Defendants Edward L. Presley and New Energy Co., LLC on Applied Capital's Civil Conspiracy, Fraud, Breach of Contract and Unjust Enrichment Claims, filed February 2, 2007 (Doc. 182)("Presley Memo"), Exhibit 2, Deposition of Justin Wallace Herman at 15:4-12 (taken October 16, 2006) ("Herman Depo."); Presley Memo, Exhibit 4, Affidavit of Mark Burkhard ¶ 3, at 1 (executed February 1, 2007)("Burkhard Aff.").  Herman became the "financial director" of New Energy. See id.  Gibson was a director of Legato Staffing and Integration Services, LLC ("Legato"). See Gibson Depo. at 22:13-18; 22:25-23:2;  Burkhard Aff. ¶ 3, at 1. Scogin operated Grizzly.  See

Fourth Complaint ¶ 7, at 2.

These four individuals, each acting on his own behalf and on behalf of his company, developed a scheme to obtain the funds necessary to finance the CBM drilling project: Legato would "rent" ten million dollars from an individual named Benton. The ten million dollars would be invested in a "high yield investment program," or "HYIP," in Europe. The HYIP would generate profits on the order of 5% to 10%, or two to four million dollars, per month. These profits would be used to finance the drilling project. See Fourth Complaint ¶¶ 7, 9, 12, at 2-3; Presley Memo, Exhibit 1, Deposition of Edward Presley at 16:25-18:9, 62:18-64:8 (taken October 18, 2006)("Presley Depo.").

To undertake this project, however, these Defendants needed to come up with the initial "rent" as well as other expenses to start the HYIP program. See Presley Depo. at 16:25-18:9; 62:18-64:8; Fourth Complaint ¶¶ 7, 9, 12, at 2-3. They agreed to obtain that money from Applied Capital by factoring New Energy's purported purchase from Grizzly, and by Legato's immediate re-purchase from New Energy, of a drilling rig for $550,000.00. See Fourth Complaint ¶ 15, at 3-4; Presley Depo. at 18:5-9; Gibson Depo. at 36:6-38:2. Once the HYIP program was started, the profits would pay for future months' rent. See Fourth Complaint ¶ 15, at 3-4; Gibson Depo. at 36:6-38:2; Presley Depo. at 16:24-18:9, 62:18-64:8.

Presley and Herman contacted Applied Capital. They represented that they wanted to obtain funding for New Energy to purchase a natural-gas drilling rig from Grizzly and that, after acquiring the rig from Grizzly, New Energy immediately would re-sell the rig to Legato, which then would use the rig on New Energy's property to drill for natural gas. Applied Capital tentatively agreed to finance the transaction by in exchange for wiring $550,000.00 to Grizzly, and New Energy would assign to Applied Capital its invoice to Legato – in the amount of $625,000.00 – that was payable

in sixty days.  See Fourth Complaint ¶ 15, at 3-4; Burkhard Aff. ¶ 3, at 1-2.

On May 10 and 11, 2004, Presley and Herman submitted to Applied Capital documentation, which Gibson provided, concerning Legato's financial resources.  See Fourth Complaint ¶ 17, at 4. The documentation represented that Legato had over ten-million dollars in unrestricted funds and otherwise was in a financially strong position.  See id.; Gibson Depo. at 100:5-20. Presley's, Gibson's, and Herman's purpose in making these representations was to persuade Applied Capital to extend the financing for the rig.

Gibson, Presley, Herman, and Scogin acted recklessly. The representations were false: Legato was not financially strong, had zero unrestricted funds, and had negative net worth.  See Fourth Complaint ¶ 17, at 4; Gibson Depo. at 100:5-101:17, 105:2-107:25; Gibson Memo, Exhibit 3, Plaintiff's First Set of Requests for Admission to Gibson ("Requests for Admission"), Nos. 1-2, 36-40; Burkhard Aff. ¶ 5, at 2-3.

As a condition to providing the financing, Applied Capital required that Legato provide credit references.  On May 13, 2004, Gibson sent to Applied Capital, by facsimile transmission , two letters containing detailed representations about six- and seven-figure purchases of inventory and equipment that Legato had made on credit in the recent past.  For example, Gibson represented that Legato had purchased $600,00.00 in loose diamonds and watches from Ambrose or his company, Shine, Inc., in October 2003. See Fourth Complaint ¶¶ 20-24, at 5; Gibson Depo. at 92:15-94:23, 97:7-99:25, 100:12-102:14;  Requests for Admission, Nos. 4-5, 7-32; Burkhard Aff. ¶ 6, at 3. These representations were false. See id.

Applied Capital contacted the credit references by telephone, using the telephone numbers that Gibson had provided.  The credit references confirmed the false information that Gibson had provided.  For example, Gibson had asked Ambrose to tell Applied Capital that Gibson or Legato

had purchased $600,000.00 in loose diamonds and watches from Ambrose or Shine, Inc. in October 2003, even though this transaction did not occur.  See Fourth Complaint ¶¶ 22, 25-27, at 5-6; ; Gibson Depo. at 92:15-94:23, 97:7-99:25;  Requests for Admission, Nos. 15-20; Burkhard Aff.  ¶ 6, at 3.

Scogin, Presley, and Gibson executed and submitted to Applied Capital documentation to memorialize the sale of the rig from Grizzly to New Energy, and from New Energy to Legato.  In this documentation, these Defendants represented that: (i) they personally had inspected the rig; and (ii) within two business days following the wiring of the $550,000.00 from Applied Capital to Grizzly, Grizzly would deliver the rig to Legato's custody, at a location on New Energy's lease property in Wyoming.  Implicit, if not explicit in these representations, was the fundamental representation that the rig existed.  See Fourth Complaint ¶¶ 19, 28, 29, at 4, 6-7; Memorandum in Support of Plaintiff Applied Capital, Inc.'s Motion for Partial Summary Judgment Against Defendants Gerald Lee Scogin, Jr. and Grizzly Drilling, Inc. on Applied Capital's Civil Conspiracy, Fraud, Breach of Contract and Unjust Enrichment Claims, filed February 2, 2007 (Doc. 175)("Scogin Memo"), Exhibit 1, Deposition of Gerald L. Scogin, Jr. at 17-21 (taken December 30, 2004)("Scogin Depo."); Gibson Memo, Exhibit 2, Deposition of Kirk Gray Voyles at 17:14-21:5 (taken October 25, 2006)("Voyles Depo."); Requests for Admission, Nos. 1, 3, 6, 33-35; Burkhard Aff. ¶ 8, at 4.

These representations were false, and the Defendants knew their representations were false.  First, these Defendants had not inspected the rig, and they did not deliver the rig to the lease property.  See Fourth Complaint ¶¶ 28, 32, at 6, 8; Voyles Depo. at 17:14-21:5; Scogin Depo. at 35:2-4, 39:2-47:11; Gibson Depo. at 36:6-38:2; Requests for Admission,  Nos. 33-35, 46-49.

Second, the reason that the rig was not inspected or delivered is that Grizzly did not own

such a drilling rig.  Instead, Scogin's uncle owned the "EMSCO" drilling rig that all the sale documentation identified.  Scogin had contacted his uncle about buying the rig in 2003.  At that time, he had obtained pictures and a list of the rig's specifications, which, in turn, were provided first to Presley and then to Applied Capital.  Scogin did not, however, purchase or ever possess the rig.  Scogin's uncle sold the rig to a third party in June 2004.  See Fourth Complaint ¶ 16, at 4; Scogin Memo, Exhibit 2, Deposition of Charles Newton at 15:23-17:14, 19:1-21:5, 28:13-31:16, 33:1-39:25 (taken November 30, 2006)("Newton Depo."); Requests for Admission, No. 46; Presley Depo. at 35:2-13, 101:5-103:1.

The Defendant's misrepresentations about Legato's financial resources and creditworthiness, the existence of the rig, and, in general, the bona fides of the transaction were intended to deceive Applied Capital.  Applied Capital reasonably relied on these representations to its detriment in agreeing to extend the financing for the purchase of the fictitious rig.  Applied Capital  wired $550,000.00 to Grizzly's bank account on May 19, 2004.  See Fourth Complaint ¶¶ 30, 41, 45, 49, 54, at 7, 9-11; Requests for Admission,  Nos. 10-11, 17-18, 24-25, 33-32, 36-37, 47-49; Burkhard Aff. ¶¶ 7, 9, 10, at 3-5.

On May 27, 2004, in response to an inquiry from Applied Capital about the status of the performance of the transaction, Presley sent an email in which he represented to Applied Capital that the rig had been delivered to the lease property on May 26, 2004.  See Presley Memo, Exhibit 6, E-Mail Exchange between Ed Presley and Mark Burkhard (dated May 27, 2004)("May 27, 2004 E-mail").  Presley knew that this representation was false.  Applied Capital relied on this continued misrepresentation to its detriment.  See Fourth  Complaint ¶¶ 32, 34-56, at 8-11; Presley Depo. at 39:4-41:15; Burkhard Aff. ¶ 11, at 5-6.

Presley, Herman, Gibson, and Scogin had no intention of carrying out the course of action

outlined in the Closing Agreement.  The $550,000.00 was not used to pay Grizzly for the purchase of a drilling rig.  Instead, Scogin immediately wired $450,000.00 of the proceeds to New Energy's bank account.  See Scogin Depo. at 47:12-14.  Wire transfers and other payments  were made out to Herman ($58,600.00), to Gibson ($60,500.00), to Gibson's girlfriend, Amy Arial ($14,500.00), and the credit references ($25,000.00).  Presley kept the balance of the $450,000.00 for, among other purposes, paying for the expense of a trip to Zurich, Switzerland where he, his girlfriend, Amy Arial, and Gibson would meet with persons who were supposed to initiate the HYIP, as well as make other payments to these persons.  See Fourth Complaint ¶ 31, at 7; Scogin Depo. at 47:12-49:24; Requests for Admission,  No. 45; Gibson Depo. at 72:15-73:11; Presley Depo. at 95:5-101:1.

By July 10, 2004, sixty days from the effective date of the Closing Agreement, the funds were dissipated.  Legato defaulted on the $625,000.00 that was due, and to date, Applied Capital has not received payment.  Applied Capital has contacted Legato and demanded payment, but Applied Capital understands that the company is insolvent.  See Fourth Amended Complaint ¶ 33, at 8; Burkhard Aff. ¶¶ 7, 9, 10, 12, at 3-6.

## PROCEDURAL BACKGROUND

Applied Capital filed its Verified Fourth Amended Complaint, and served it on Presley and New Energy, on June 30, 2006. See Amended Certificate, filed July 5, 2006 (Doc. 121).  Presley and New Energy have not filed an answer to the Verified Fourth Amended Complaint.

Applied Capital served Gibson its Request for Admission on August 8, 2006. See Certificate of Service, filed August 8, 2006 (Doc. 127).  Gibson did not respond to Applied Capital's Request for Admission.

Applied Capital concurrently is moving for summary judgment against all of the remaining

Defendants:  Scogin/Grizzly, Presley/New Energy, Gibson, and Ambrose.[1]  Although the analysis

in each of these motions overlaps to an extent, the motions also vary in certain respects.  For this

reason, and also to comply with the Local Rules' page limitations on Exhibits, Applied Capital has

filed separate motions for each Defendant or Defendant group.  See Scogin Memo at 2.

## LAW REGARDING SUMMARY JUDGMENT

Summary judgment is appropriate when the court, viewing the record in the light most

favorable to the non-moving party, determines that there is no genuine dispute over a material fact

and that the moving party is entitled to judgment as a matter of law.  See Thrasher v. B&B Chem.

Co., 2 F.3d 995, 996 (10th Cir. 1993).  Where the record taken as a whole could not lead a rational

trier of fact to find for the non-moving party, there is no genuine issue for trial.  See Matsushita

Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  A plaintiff moving for summary

judgment "must prove each element essential of the claims upon which it seeks judgment by

undisputed facts."  Cabo Distrib. Co. v. Brady, 821 F.Supp. 601, 607 (N.D. Cal. 1992).

Before a district court may grant summary judgment and dismiss a case because a party fails

to respond to a summary judgment motion in violation of a local rule, the United States Court of

Appeals for the Tenth Circuit requires the district court to address the following factors: "[i] the

degree of actual prejudice to the defendant; [ii] the amount of interference with the judicial process;

[iii] the culpability of the litigant[. . .] ."  Hancock v. Okla. City, 857 F.2d 1394, 1396 (10th Cir.

1988).  The district court may dismiss a case for failure to respond to a summary judgment motion

"only when these aggravating factors outweigh[] the judicial system's strong predisposition to

_____

[1]See Transcript of Hearing at 2:14-3:11 (Bohnhoff)(taken July 31, 2007)("Tr."). The Court's citations to the transcript of the hearing refer to the Court Reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers. None of the defendants appeared at that hearing. Id. at 2:14-3:11.

resolve cases on their merits." Hancock v. Okla. City, 857 F.2d at 1396.

With regard to pro se litigants, the Tenth Circuit has cautioned district courts not to dismiss their suits on summary judgment merely because they have failed to comply with the technical requirements involved in defending such a motion. See Woods v. Roberts, No. 94-3159, 1995 WL 65457, at *2 (10th Cir. 1995). "District courts must take care to insure that pro se litigants are provided with proper notice regarding the complex procedural issues involved in summary judgment proceedings." Jaxon v. Circle K Corp., 773 F.2d 1138, 1140 (10th Cir. 1985)(internal quotations and citations omitted). "The rights of pro se litigants require careful protection where highly technical requirements are involved, especially when enforcing those requirements might result in a loss of the opportunity to prosecute or defend a lawsuit on the merits." Id.

## NEW MEXICO LAW ON CIVIL CONSPIRACY

"A civil conspiracy requires a combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means." Los Alamos Nat'l Bank v. Martinez Surveying Servs., LLC, 2006-NMCA-081, ¶ 21, 139 F.3d 201, 207 (internal quotations and citations omitted). The purpose of a civil-conspiracy claim is to "impute liability to make members of the conspiracy jointly and severally liable for the torts of any of its members." Seeds v. Lucero, 2005-NMCA-067, ¶ 12, 113 P.3d 859, 862 (internal quotations and citations omitted). In Seeds v. Lucero, the New Mexico Court of Appeals listed the elements of a civil conspiracy and compared a civil conspiracy to a criminal conspiracy:

> Civil conspiracy consists of showing [i] that a conspiracy between two or more individuals existed; [ii] that specific wrongful acts were carried out by the defendants pursuant to the conspiracy; and [iii] that the plaintiff was damaged as a result of such acts. Unlike a conspiracy in the criminal context, a civil conspiracy by itself is not actionable, nor does it provide an independent basis for liability unless a civil action in damages would lie against one of the conspirators. Without an actionable civil case against one of the conspirators, however, an agreement, no matter how

conspiratorial in nature, is not a separate, actionable offense.

Id. ¶ 18, 113 P.3d at 863-64 (internal quotations and citations omitted). "[A]n agreement by itself, without an independent, unlawful act, is not an improper means."  Los Alamos Nat'l Bank v. Martinez Surveying Servs., LLC, 2006-NMCA-081, ¶ 21, 139 F.3d at 207.

The intra-corporate immunity doctrine, under which no conspiracy can exist between a corporation and its agents, does not apply where the corporation conspires with a third party. See Zic v. Italian Gov't Travel Office, 130 F. Supp. 2d  991, 997 (citing Mehl v. Navistar Int'l Corp., 670 F. Supp. 239, 241 (N.D. Ill. 1987)). If an agent acted for his own benefit, there also may be liability.  Kerstien v. McGraw-Hill Companies, Inc., 7 Fed. Appx. 868, *6 (10th Cir. 2001)(noting that "a corporation and its employees do not constitute the requisite two or more persons if the employees are acting "on behalf of the corporation and not as individuals for their individual advantage."). See EEOC v. MTS Corp., 937 F. Supp. 1503, 1513 n.3 (D.N.M. 1996)(Hansen, J.)(citing Nevada state law and stating that, "[a]gents and employees of a corporation cannot conspire with their corporate principal or employer where they act in their official capacities on behalf of the corporation and not as individuals for their individual advantage."); Zic v. Italian Gov't Travel Office, 130 F. Supp. 2d at 997 (stating that the intra-corporate conspiracy doctrine does not apply where an individual agent acts out of self-interest); Nelson v. Fontenot, 784 F. Supp. 1258, 1261 (E.D. Tex. 1992)(noting that, while a corporation cannot conspire with itself, a conspiracy may be established where individual defendants are named and those defendants act outside the scope of their employment for personal reasons)(citing Garza v. City of Omaha, 814 F.2d 553, 556 (8th Cir. 1987)).

**NEW MEXICO LAW REGARDING FRAUDULENT MISREPRESENTATION**

To establish fraudulent misrepresentation, a party must demonstrate: "(i) a misrepresentation

of fact, (ii) either knowledge of the falsity of the representation or recklessness on the part of the party making the misrepresentation, [iii] intent to deceive and to induce reliance on the misrepresentation, and [iv] detrimental reliance on the misrepresentation." Cyprus Amax Minerals Co. v. Duran Sand & Gravel, Inc., No. 03-1473, 2006 WL 4079084, at *10 (D.N.M. May 31, 2006)(Browning, J.)(citing Williams v. Stewart, 2005-NMCA-061, ¶ 34, 112 P.3d 281, 290). See Saylor v. Valles, 2003-NMCA-037, ¶ 21, 63 P.3d 1152, 1158. ; UJI 13-1633 NMRA. "[A] plaintiff alleging fraud may recover such damages as are the direct and natural consequences of the reliance on a fraudulent representation." Williams v. Stewart, 2005-NMCA-061, ¶ 34, 112 P.3d at 290 (quoting Indus. Supply Co. v. Goen, 58 N.M. 738, 743, 276 P.2d 509, 512 (1954)). Therefore, a plaintiff may recover damages that are proximately caused by the fraudulent misrepresentation. See Cain v. Champion Window Co. of Albuquerque, LLC, 2007-NMCA-085, ¶ 25, 164 P.3d 90, 98.

## NEW MEXICO LAW REGARDING UNJUST ENRICHMENT

"New Mexico has long recognized actions for unjust enrichment[.  .  .] ." Ontiveros Insulation Co. v. Sanchez, 2000-NMCA-051, ¶ 11, 3 P.3d 695, 698-99 (citing Tom Growney Equip., Inc. v. Ansley, 119 N.M. 110, 112, 888 P.2d 992, 994 (Ct. App. 1994)).  To prevail on an unjust enrichment claim, a party must demonstrate that: "[i] another has been knowingly benefitted at one's expense [ii] in a manner such that allowance of the other to retain the benefit would be unjust." Ontiveros Insulation Co. v. Sanchez, 2000-NMCA-051, ¶ 11, 3 P.3d at 698-99.  "The theory has evolved largely to provide relief where, in the absence of privity, a party cannot claim relief in contract and instead must seek refuge in equity." Id.  See Credit Inst. v. Veterinary Nutrition Corp., 2003-NMCA-010, ¶ 21, 62 P.3d 339, 344; Hydro Conduit Corp. v. Kemble, 110 N.M. 173, 175, 793 P.2d 855, 857 (1990).  The New Mexico Supreme Court has stated that "[t]he general equity jurisdiction of the trial court is not available, although properly pleaded, because appellee in fact had

an adequate remedy at law." General Tel. Co. of Southwest v. State Tax Comm'n, 69 N.M. 403, 408 367 P.2d 711, 715 (1962).  See Sims v. Sims, 122 N.M. 618, 624 930 P.2d 153, 159 (1996) (stating "equity will not act if there is a complete and adequate remedy at law).  Cf. Lopez v. Kase, 1999 -NMSC- 011, ¶ 6, 975 P.2d 346, 348 (stating that the New Mexico Supreme Court "generally will not grant equitable relief by way of an extraordinary writ when there is an adequate remedy available to the petitioner at law, absent unusual and compelling circumstances.).

### NEW MEXICO LAW REGARDING PUNITIVE DAMAGES

Punitive damages are awarded to punish a defendant upon proof that he acted willfully, wantonly, maliciously, recklessly, oppressively, or fraudulently. See Tones v. El Paso Electric Co., 1999-NMSC-029, ¶ 27, 987 P.2d 386, 397, overruled on other grounds by Herrera v. Quality Pontiac, 2003-NMSC-018, 73 P.3d 181.  Moreover, "[p]unitive damages is an appropriate sanction for common law fraud."  Naranjo v. Paull, 111 N.M. 165, 172, 803 P.2d 254, 261 (Ct. App. 1990). "When seeking an award of punitive damages, the following elements should properly be considered: (1) the character of the defendant's act; (2) the nature and extent of the harm to the plaintiff that the defendant caused or intended to cause; and (3) the wealth of the defendant." Stanton v. Gordon Jewelry Corp., 108 N.M. 160, 161, 768 P.2d 888, 889 (1989).

### LAW REGARDING DEFAULT/SUMMARY JUDGMENT AND DAMAGES

This motion comes before the Court at an unusual stage of the proceedings. Gibson has not filed an answer to the Fourth Complaint.  Applied Capital has moved for summary judgment.  The Court will thus analyze the law both for default and for summary judgment.

### 1.    Default Judgment.

If the Court treats the motion as one for a default judgment, the Court may enter judgment for liquidated damages, but will need a hearing for unliquidated damages.  If the amount is

unliquidated, the Court will need to set a separate hearing and, if possible, should give notice to Gibson.  Thus, the primary issue is whether the damages that Applied Capital seeks are liquidated or unliquidated.

        **a.**       **New Mexico Law**.

With respect to awarding damages upon the issuance of a default judgment, New Mexico and federal law are essentially the same.  Rule 1-055B of the New Mexico Rules of Civil Procedure, and established case law, "clearly states that the trial court must hold a hearing to determine the amount of any unliquidated damages before it may enter a default judgment." DeFillippo v. Neil, 2002-NMCA-085, ¶ 19, 51 P.3d 1183, 1188 (citing Armijo v. Armijo, 98 N.M. 518, 520, 650 P.2d 40, 42 (Ct. App. 1982)("[W]here the claim for damages is unliquidated, it would be an abuse of discretion not to have a hearing and to put plaintiff to the test of presenting evidence to support the claim for damages.")). See also Rodriguez v. Conant, 105 N.M. 746, 749, 737 P.2d 527, 530 (1987) (stating that evidentiary hearing is required before an entry of default may be entered when plaintiff seeks unliquidated amount of damages) (citing Armijo v. Armijo, 98 N.M. at 520, 650 P.2d at 42).

While rule 1-055B does not expressly require that notice of such a hearing be given to the defaulting defendant, "the damages hearing must be regarded as a hearing on the application for default judgment and [] written notice must be given if the [defaulting] party has appeared in the action." Rodriguez v. Conant, 105 N.M. at 749, 737 P.2d at 530.  At a hearing to assess damages after the entry of a default, the defaulting defendant has the right to cross-examine the plaintiff's witnesses and to introduce affirmative evidence on the mitigation of damages. See Gallegos v. Franklin, 89 N.M. 118, 123-24, 547 P.2d 1160, 1165-66 (Ct. App. 1976). Thus, "a default judgment is not necessarily an admission of the amount of damages pled by plaintiff." Armijo v. Armijo, 98 N.M. at 520, 650 P.2d at 42.

"A punitive damage claim is not admitted by a default.  Neither is punitive damages provided for in Rule 55(b)."  Gallegos v. Franklin, 89 N.M. at 125, 547 P.2d at 1167 (remanding to the trial court to hold a hearing at which the parties may present evidence regarding compensatory and punitive damages). Cf. Eckhardt v. Charter Hosp. of Albuquerque, Inc., 1998 -NMCA- 017, ¶ 33, 953 P.2d 722, 730 (stating punitive damages against two or more defendants must be separately determined).

### b.        Federal Law.

Rule 55(b)(2) of the Federal Rules of Civil Procedure provides that if, in order to enable the court to enter judgment or to carry it into effect, it is necessary to take an account or to determine the amount of damages or to establish the truth of any averment by evidence or to make an investigation of any other matter, the court may conduct such hearings or make such referrals as it deems necessary. See Fed. R. Civ. P. 55(b)(2).  "A court may enter a default judgment without a hearing only if the amount claimed is a liquidated sum or one capable of mathematical calculation." H.B. Hunt v. Inter-Globe Energy, Inc., 770 F.2d 145, 148 (10th Cir. 1985)(citing Venable v. Haislip, 721 F.2d 297, 300 (10th Cir. 1983)).   If the damages sum is not certain or capable of easy computation, the court may hold whatever hearing or inquiry it deems necessary.  See Beck v. Atl. Contracting Co., 157 F.R.D. 61, 64 (D. Kan. 1994).  "Similarly, attorney's fees may not be awarded without a hearing to determine the amount."  H.B. Hunt v. Inter-Globe Energy, Inc., 770 F.2d at 148.

"Entry of default precludes a trial on the merits."  Olcott v. Delaware Flood Co., 327 F.3d 1115, 1119 n.3 (10th Cir. 2003).  Rule 55(b)(2) does not contain an inherent jury requirement; rather, it preserves the right to a jury only when statute requires.  See Olcott v. Delaware Flood Co., 327 F.3d at 1124.  At least where the parties have not requested a jury before entry of default, the "[d]efendants do not have a constitutional right to a jury trial following entry of default."  Id. Cf.

-14-

<u>Mitchell v. Bd. of County Comm'rs of the County of Santa Fe</u>, No. 05CV1155, at **18-23 (D.N.M. May 9, 2007)(Browning, J.)(discussing why a plaintiff may not unilaterally waive his jury demand for the purpose of the damages hearing under Fed. R. Civ. P. 38(d) when an appearing defendant has not agreed to that waiver) . None of the parties requested a jury in this matter.[2]

Regarding punitive damages, "[a] plaintiff cannot satisfy the certainty requirement simply by requesting a specific amount.  [The plaintiff] must also establish that the amount requested is reasonable under the circumstances." <u>Beck v. Atl. Contracting Co.</u>, 157 F.R.D. at 65.  A damages hearing may not be required before entering a punitive damages award, however, when the court is familiar with the defendant's conduct and otherwise has sufficient information with which to make a reasonable determination. <u>See</u> <u>James v. Frame</u>, 6 F.3d 307, 310-11 (5th Cir. 1993).

With regard to multiple defendants, "when one of several defendants who is alleged to be jointly liable defaults, judgment should not be entered against him until the matter has been adjudicated with regard to all defendants, or all defendants have defaulted."  <u>H.B. Hunt v. Inter-Globe Energy, Inc.</u>, 770 F.2d at 147 (citing <u>Frow v. DeLaVega</u>, 82 U.S. 552 (1872)). Such a procedure avoids inconsistent liability determinations among joint tortfeasors. <u>See</u> <u>H.B. Hunt v. Inter-Globe Energy, Inc.</u>, 770 F.2d at 147. The proper procedure is to enter default but not to enter judgment against the defaulter unless the plaintiff prevails against the appearing defendants when defendants are jointly liable and one defendant defaults. <u>See</u> <u>Frow v. DeLaVega</u>, 82 U.S. at 554; <u>Amazon, Inc. v. Dirt Camp, Inc.</u>, 273 F.3d 1271, 1274 n.1 (10th Cir. 2001).

   **2.**      **Summary Judgment.**

If the Court treats Applied Capital's motion as one for summary judgment, as it is labeled,

---

[2]<u>See</u> Transcript at 6:10-6:14.

then it is clear that the Court has the power to enter judgment on liability. The law is less clear about the Court's ability to enter summary judgment on damages. There does not, however, appear to be anything in the rules or in the caselaw that requires a court to treat damages issues differently from other factual issues, or that mandates a trial even where there is no genuine issue of material fact.

### a.   New Mexico Law.

Concerning the relationship between the awarding of damages and the granting of summary judgment, New Mexico and federal law also largely track each other. Rule 1-056C of the New Mexico Rules of Civil Procedure states that "[a] summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages." NMRA 1-056C. In Construction Contracting & Management, Inc. v. McConnell, 112 N.M. 371, 815 P.2d 1161 (1991), the Supreme Court of New Mexico implicitly acknowledged rule 1-056C's applicability by holding that, because partial summary judgment was granted as to the issue of liability only, absent revision or rescission of the partial summary judgment ruling, all that remained for the jury was to determine the extent of damages. See id. at 375, 815 P.2d at 1165.

### b.   Federal Law.

Rule 56(c) of the Federal Rules of Civil Procedure contains the same language as rule 1-056C: "A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages." Fed. R. Civ. P. 56(d). In Schnall v. Amboy National Bank, 279 F.3d 205 (3rd Cir. 2002), the United States Court of Appeals for the Third Circuit relied on that rule in holding that the plaintiff was entitled to partial summary judgment on the issue of liability and in remanding the case to determine the amount of damages to be awarded. See 279 F.3d at 219. See also Granite Rock Co. v. Bay Area Bldg. Material Teamsters Local 216, No. 89-15062, 1991 WL 133590, at *4 (9th Cir. July 22,1991)(discussing the

rule's operation and the holding of a trial to determine damages after the granting of partial

summary judgment on the issue of liability).

### NEW MEXICO LAW REGARDING JOINT CONTRACTS

Under New Mexico law, joint contracts create joint and several liability.  N.M.S.A. § 38-4-3

provides:

> All contracts, which by the common law are joint only, shall be held and construed
> to be joint and several; and in all cases of joint obligations or assumptions by
> partners and others, suit may be brought and prosecuted against any one or more of
> the parties liable thereon, and when more than one person is joined as defendant in
> any such suit, such suit may be prosecuted, and judgment rendered against any one
> or more of such defendants.

N.M.S.A. § 38-4-3.  See Economy Rentals, Inc. v. Garcia, 112 N.M. 748, 762, 819 P.2d 1306, 1320

(1991)(citing N.M.S.A. § 38-4-3 and Restatement (Second) of Contracts §§ 288, 289 (1981) in

discussing and defining joint contracts).

"Where there are more than one promisors in a contract, some or all of them may promise

jointly as a unit, or some or all of them may each promise severally, or some or all of them may

promise jointly and severally."  Restatement (First) of Contracts § 16.  A several promise may be

defined as follows: "Where two or more parties to a contract promise separate performances, to be

rendered respectively by each of them, [. . .] each is severally bound for the performance which he

promises and is not bound jointly with any of the others."  Douglas v. Bergere, 94 Cal. App. 2d 267,

270, 210 P.2d 727, 729-30 (1949)(quoting Restatement (First) of Contracts § 113).  "A joint and

several contract is a contract with each promisor and a joint contract with all, so that parties having

a joint and several obligation are bound jointly as one party, and also severally as separate parties

at the same time."  12 Williston on Contracts § 36:1 (4th ed.) (internal quotations omitted).

The Restatement (Second) of Contracts provides that where two or more parties to

a contract promise the same performance to the same promisee, each is bound for the

whole performance of the contract, whether his duty is expressed as joint, several, or joint and several.  It should be noted that the question whether two promisors promise the same or separate performances is distinct from the question whether two promisors of the same performance are bound by joint or by several duties or by both, although the two questions are sometimes confused.  The first question, what performances are promised, is entirely a question of interpretation of the promises, while the second question, distinguishing between joint and several duties, is primarily remedial and procedural.

Id. (quoting Restatement (Second) of Contracts §§ 288, 289)(internal quotations omitted).  "[W]hen uncertainty arises concerning the meaning of a contract, the language used by the parties is to be considered in the light of the surrounding circumstances and of the practical and mutual construction placed thereon as shown by their acts and conduct before any controversy has arisen between them." Douglas v. Bergere, 94 Cal. App. 2d at 270, 210 P.2d at 730.

## ANALYSIS

Applied Capital is entitled to judgment as a matter of law against Gibson.  There is no disputed issue of material fact that Gibson conspired with Presley, Scogin, Herman, Ambrose, and Gibson's, Presley's, and Scogin's respective companies to defraud Applied Capital into wiring Grizzly Drilling $550,000.00 in connection with a purchase transaction involving a fictitious drilling rig. Although, there is no disputed issue of material fact that Gibson personally or through his girlfriend, received $75,000.00 of the $550,000.00 that Applied Capital wired to Grizzly, the Court need not determine whether it would be unjust for him to retain this amount, because it finds Gibson conspired with his co-defendants to defraud Applied Capital.  It is unnecessary for the Court to grant Applied Capital further equitable relief when it has adequate remedy at law for its claims. See Sims v. Sims, 122 N.M. 618, 624, 930 P.2d 153, 159 (1996); General Tel. Co. of Southwest v. State Tax Comm'n., 69 N.M. 403, 408, 367 P.2d 711, 715 (1962).  The Court finds Gibson liable for civil conspiracy and fraudulent misrepresentation.

-18-

I.     **THE RECORD BEFORE THE COURT DOES NOT REVEAL A GENUINE ISSUE OF MATERIAL FACT ON ANY ISSUE RELATED TO LIABILITY.**

Gibson has  admitted all of the material allegations contained within the Verified Fourth Amended Complaint except those regarding the amount of Applied Capital's damages.  See Fed. R. Civ. P. 8(b)(6) ("An allegation--other than one relating to the amount of damages--is admitted if a responsive pleading is required and the allegation is not denied.").  Cf. Olcott v. Delaware Flood Co., 327 F.3d 1115, 1119 n.4 (10th Cir. 2003)(discussing that entry of summary judgment was appropriate after entry of default under rule 55(a) because "the court had not yet entered judgment by default pursuant to Fed. R. Civ. P. 55(b)"); Board of Trustees of the Boilermaker Vacation Trust v. Skelly, Inc., 389 F.Supp. 2d 1222, 1225 (N.D. Cal. 2005)(holding that a defendant against whom the clerk of court entered default under rule 55(a) for failure to answer was "deemed to have admitted the well-pleaded averments of the complaint except those as to the amount of damages" for purposes of default judgment).

Moreover, Gibson has admitted the substance of each request of admission.  See Fed. R. Civ. P. 36(a)(3) ("A matter is admitted unless, within 30 days after being served, the party to whom the request is directed serves on the requesting party a written answer or objection addressed to the matter and signed by the party or its attorney."); January 30, 2007, Memorandum Opinion and Order at 3 (Doc. 169)(ruling that, as a sanction for failure to cooperate with discovery, the Court will deem facts establishment against Gibson).

Finally, Gibson did not file a response, timely or otherwise, to this motion.  See Doc. 178.  Gibson has in effect consented to the granting of Applied Capital's partial summary judgment motion because of his failure to file a response in opposition to it.  See D.N.M.LR-Civ. 7.1(b) ("The failure of a party to file and serve a response in opposition to a motion within the time prescribed

for doing so constitutes consent to grant the motion."); D.N.M.LR-Civ. 7.6(a) ("A response must

be served within fourteen (14) calendar days after service of the motion.").

There are also specific rules related to materials for summary judgment with which Gibson

has made no effort to comply. "A party opposing the motions must file a written memorandum

containing a short, concise statement of the reasons in opposition to the motion with authorities."

D.N.M.LR-Civ. 56.1(b).

> A memorandum in opposition to the motion must contain a concise statement of the
> material facts as to which the party contends a genuine issue does exist. Each fact in
> dispute must be numbered, must refer with particularity to those portions of the
> record upon which the opposing party relies, and must state the number of the
> movant's fact that is disputed. All material facts set forth in the statement of the
> movant will be deemed admitted unless specifically controverted.

Id.

Nevertheless, because Gibson is apparently proceeding pro se, the Court has reviewed

Applied Capital's motion on the merits despite his consent. See Woods v. Roberts, No. 94-3159,

1995 WL 65457, at *2 (10th Cir. 1995); Hancock v. Okla. City, 857 F.2d 1394, 1396 (10th Cir.

1988); Jaxon v. Circle K Corp., 773 F.2d 1138, 1140 (10th Cir. 1985). This careful review also does

not reveal a factual issue. Presley filed his entire deposition. The Court acknowledges that Presley

testified that he never had absolute proof that the drilling rig existed, see Presley Depo. at 30:18-19,

that Applied Capital did not seem interested in confirming the rig's existence, see id. at 58:9-11, and

that Applied Capital was notified that the funds obtained from it would finance investment in the

HYIP,[3] see id. at 59:17-25, 91:8-24, but the Court does not believe that those assertions raise any

---

[3]At the hearing on this motion, Applied Capital stated that Presley has also made a general
statement that he was not part of the conspiracy.  The Court has, however, reviewed carefully
Presley's deposition and the remainder of the record before it and does not see any admissible
evidence that makes such a contention.  Accordingly, the Court does not believe that Presley has
shown a genuine issue of material fact whether he was part of the conspiracy.  In any case, any issue
about Presley's participation would not preclude granting summary judgment against Gibson.

genuine issue of material fact.  Presley's testimony does not contradict or discount the evidence Applied Capital presents concerning the Defendants' involvement in conspiring to defraud Applied Capital, in defrauding Applied Capital, in being unjustly enriched, and in breaching the Closing Agreement.  Presley's testimony does not undermine or contradict the fact that the Defendants provided fraudulent information to Applied Capital to induce it to provide the Defendants $550,000.00 or that Applied Capital has not received the $625,000.00 due it pursuant to the Closing Agreement.  The Court is not obligated to rely on what is, at most,  no more than a scintilla of evidence to block summary judgment.  The Court does not believe that, with all of Gibson's concessions, a reasonable jury would use Presley's limited testimony to override the undisputed facts that Applied Capital has presented and deny Applied Capital judgment against Gibson.

## II.    GIBSON CONSPIRED WITH THE OTHER DEFENDANTS TO DEFRAUD APPLIED CAPITAL.

The undenied allegations in Applied Capital's complaint, see Fed. R. Civ. P. 8(b)(6) ; the undenied requests for admission, see Fed. R. Civ. P. 36(a)(3) ; and the documents and deposition testimony attached to Applied Capital's summary judgment papers demonstrate that, as a matter of undisputed material fact, Gibson, acting on behalf of Legato, conspired with Presley and Herman (acting on behalf of New Energy), Scogin (acting on behalf of Grizzly), Ambrose, Voyles, and Heritage Commercial services to defraud Applied Capital out of $550,000.00 in the rig transaction.[4]

---

[4] The Court will not consider, for purposes of this motion, whether the Defendants conspired to breach the Closing Agreement.  In the Verified Fourth Amended Complaint for Fraud, Negligent Misrepresentation, Unjust Enrichment, Breach of Contract, Violation of the New Mexico Unfair Trade Practices Act, and Civil Conspiracy, Applied Capital premised its civil conspiracy claim on only one wrongful act: fraudulent misrepresentation.  See Fourth Complaint ¶¶ 64-71, at 13-14. Applied Capital did not, in the Verified Fourth Amended Complaint, state that its civil conspiracy claim was also based on breach of contract.  See id. ¶¶ 14-71, at 3-14.  The Court believes it would be unfair and prejudicial to allow Applied Capital to assert now that its civil conspiracy claim rests upon both fraudulent misrepresentation and breach of contract.  The Court will therefore not

In this case, there were two companies with Gibson acting as the link between them.  First, Gibson agreed with Presley, Herman, and Scogin to fraudulently induce Applied Capital into entering the rig transaction and also to breach the Closing Agreement; the $550,000.00 wire transfer from Applied Capital would be used not to buy, as represented, a drilling rig from Grizzly, but rather to make payments to the co-conspirators and fund the so-called HYIP program.  The deposition testimony of Ed Presley provides the most detailed explanation of the scheme.  <u>See</u> Presley Depo. at 15:18-19:24.  Second, Gibson agreed with Ambrose and Voyles, the bogus "credit references," that the references would provide false information about past transactions in which Legato had purchased equipment and other goods on credit.  Voyles has provided the most detailed and candid explanation of this scheme: but Gibson's request to and agreement with these individuals to defraud Applied Capital is evident from the fact that he was asking them to confirm commercial transactions that everyone -- involving Gibson -- acknowledges did not occur.  <u>See</u> Fourth Complaint, Exhibit 2, Letter from HSBC to Francis Gibson (dated April 27, 2004); Fourth Complaint, Exhibit 4, Letter from Francis Gibson to Jim Scott (dated May 12, 2004).

In conclusion, the undisputed facts show that Gibson, acting on behalf of Legato, conspired with Presley and Herman, acting on behalf of New Energy; Scogin, acting on behalf of Grizzly Drilling; Ambrose and; Voyles, acting on behalf of Heritage Commercial Services to defraud Applied Capital out of $550,000.00 in the rig transaction and breach the Closing Agreement.

## III.   <u>GIBSON AND HIS CO-CONSPIRATORS DEFRAUDED APPLIED CAPITAL</u>.

Because Gibson conspired with Presley and Herman (and New Energy), Scogin (and Grizzly), Ambrose, and Voyles (and Heritage Commercial Services), he is liable for not only his

---

consider whether the Defendants conspired to breach the Closing Agreement.

own fraudulent misrepresentations, but also for those of his fellow co-conspirators.  See Seeds v. Lucero, 2005-NMCA-067, ¶ 18, 113 P.3d at 863; Ettenson v. Burke, 2001-NMCA-003, ¶ 12, 17 P.3d at 445 ("The purpose of a civil conspiracy claim is to impute liability to make members of the conspiracy jointly and severally liable for the torts of any of its members.").

Gibson's and his co-conspirators' fraudulent misrepresentation can be grouped into several categories.  First, Gibson, Presley, and Herman sent Applied Capital several documents that represented generally that Legato had substantial assets and thus was capable of making the $625,000.00 payment that the Closing Agreement contemplated.  On May 10, 2005, Presley sent Applied Capital, by facsimile transmission, a statement by Gibson representing that Legato owned an unencumbered bank account with a balance of ten million dollars.  See Fourth Complaint ¶ 17, at 4; Gibson Depo. at 100:5-20.  On May 11, 2004, Herman sent Applied Capital, by facsimile transmission, a purported HSBC Bank statement for this account, again confirming the balance of ten million dollars.  See id.  On May 12, 2004, Gibson wrote Applied Capital that Legato was "on sound financial footing, as you know."   Fourth Complaint, Exhibit 4, Letter from Francis Gibson to Jim Scott (dated May 12, 2004).   As Gibson has admitted, however, Legato did not own the HSBC account, even assuming that it existed.  Moreover, the funds would not be available to Legato unless and until third party, Benton, agreed to lend them.  Even then, Legato's net worth still would be zero or less.  See Gibson Depo. at 100:21-101:17.

Second, Gibson, Ambrose, and Voyles falsely attested to Legato's creditworthiness by misrepresenting that Legato had successfully completed several substantial purchase of equipment and other goods on credit. See Fourth Complaint ¶¶ 22, 25-27, at 5-6;  Gibson Depo. at 92:15-94:23, 97:7-99:25;  Requests for Admission, Nos. 15-20; Burkhard Aff.  ¶ 6, at 3.  Gibson admits that the "purchase" which he listed in his two May 13, 2004 letters to Applied Capital did not happen. See

-23-

Fourth Complaint ¶¶ 21-27, at 5-6. Voyles acknowledges that he knew that Gibson was asking him

to lie when he called and solicited the credit reference, because Voyles had not sold anything to

Gibson or to Legato, and thus could not be in a position to give a reference.  <u>See</u> Response of

Plaintiffs to Defendants Voyles and Heritage Commercial Services, at 1-3, 9-13, 16-21, filed April

29, 2005 (Doc. 33); Voyles Depo. at 12:1-13:3. The situation was the same for Ambrose and the

other credit references identified in the May 12 letters; any request for a credit reference necessarily

was fraudulent, because neither Legato nor Gibson had bought anything from any of them.  <u>See</u>

Fourth Complaint ¶¶ 21-27, at 5-6.

      Third, Gibson and Presley misrepresented that they had inspected the drilling rig.  In his May

19, 2004 estoppel letter to Applied Capital, Gibson represented that Legato "has conducted all such

inspections of the Equipment [the rig] as it has deemed necessary and has found the Equipment to

be complete, in proper working order, and otherwise fully satisfactory to Legato," and that "Legato

has not relied upon any representation by New Energy or any other person with respect to the

condition of the equipment."  Fourth Complaint, Exhibit 6, Letter from Mark Burkhard to Francis

Gibson at 1-2 (dated May 19, 2004). Similarly, in the Bill of Sale that he attached to the May 19th

letter, Gibson acknowledged that "the Equipment is of Buyer's selection and has been inspected by

Buyer and is satisfactory to Buyer." <u>Id.</u> at 6.  In his deposition, however, Gibson admitted that he

had not seen the rig and stated that, in contradiction to his representation in the May 19th letter, he

did  no more than accept assurances that he supposedly received from New Energy's Presley and

Herman.  <u>See</u> Gibson Depo. at 43:10-44:21, 83:15-84:24; Requests for Admission, No. 33.

Similarly, Presley represented in Grizzly's May 5, 2004 invoice to New Energy, which he signed,

that he or his authorized representative had inspected the rig. <u>See</u> Burkhard Aff. ¶ 8, at 4. Moreover,

Presley admits that he did not see the rig and does not know if it exists. <u>See</u> Presley Depo. at 29:16-

22.

Fourth, Scogin, Presley, and Gibson misrepresented the material fact that Scogin's company, Grizzly Drilling, did not own the "250 EMSCO" drilling rig identified in Presley's May 10, 2004 letter, in the Closing Agreement, and in the invoice and in the Bill of Sale attached to Gibson's May 19, 2004 estoppel letter to Applied Capital, i.e., the drilling rig that was the subject of the simultaneous sales from New Energy, and then to Legato that Applied Capital financed. See Burkhard Aff. ¶ 8, at 4. Scogin and Grizzly, however did not own this rig. Scogin provided photographs and specifications of the rig to Presley in early 2004. See Presley Depo. at 35:2-13, 101:5-103:1. The May 2004 transaction documents incorporated the specifications, and Presley emailed the photographs to Applied Capital in December 2004. See Closing Agreement; Presley Memo, Exhibit 5, E-mail from Ed Presley to Jim Scott (dated December 14, 2004). When an investigator hired by Applied Capital located and interviewed Scogin later that month, he repeated his contention that the rig in the photograph was the rig that was sold in May 2004. See Scogin Memo, Exhibit 3, Deposition of Randy Bjorklund, at 5:7-11:11 (taken December 22, 2006)("Bjorklund Depo."). Scogin has not, however, so said–under oath and in admissible form–that he owned the rig. Under oath, however, Scogin's uncle has testified that he had owned the rig shown in the photograph since the 1990's. In 2003, Scogin asked his uncle about buying the rig. During the course of these discussions, the uncle gave Scogin the photograph and the rig's specifications, which are nearly identical to those set forth in the May 2004 transaction documents. They did not, however, come to terms, and the uncle kept the rig until June 2004, when he sold it to a third party. See Newton Depo. at 19:1-21:5; 20:8-10; 28:12-31:16; 34:6-39:25; 36:11-13; 37:12-25. Following Legato's default on the $625,000.00 invoice payment in July 2004, Scogin was not able to locate the rig.

Fifth, in Paragraph 5 of the Closing Agreement, Gibson, Presley, and Scogin misrepresented that Grizzly Drilling would deliver the rig to New Energy's project site within two days following Applied Capital's wiring of the funds.  See Fourth Complaint, Exhibit 3, Closing Agreement ¶ 5, at 3.  On May 27, 2004, Presley perpetrated this misrepresentation by assuring Applied Capital in an email that the rig had been delivered.  See Presley Memo, Exhibit 6, E-mail Exchange between Ed Presley and Mark Burkhard (dated May 27, 2004)("May 27, 2004 E-mail").  Scogin acknowledges that the rig was not delivered.  See Presley Depo. at 29:20-22; 41:4-15; Scogin Depo. at 37:17-38:9; Gibson Depo. at 43:15-16; 44:16-21; 83:15-84:24.  He contends that Presley called him almost immediately after Applied Capital wired the funds and instructed him not to deliver the rig.  See Scogin Depo. at 37:17-38:9.  At that point, Legato held title to the rig, and Presley had no authority to give instructions concerning its disposition.  Moreover, the rig did not exist.  See Newton Depo. at 19:1-21:5; 20:8-10; 28:12-31:16; 34:6-39:25; 36:11-13; 37:12-25 ; Presley Depo. at 35:2-13; 101:5-103:1. And the immediate post-wiring timing of the alleged communication and Presley's continued deception on May 29 is further evidence of the conspirators' shared intent not to deliver the rig, contrary to the representation and promise in the Closing Agreement.

Sixth, and more generally, Gibson, Herman, Scogin, and Presley misrepresented to Applied Capital that the subject of the Closing Agreement was the financing of a bona fide purchase of a drilling rig to be used on New Energy's drilling project.  Not only did the drilling rig not exist, but the money would not be used on the drilling project.  The co-conspirators agreed among themselves in advance that Scogin would kickback to New Energy $450,000.00 out of the $550,000.00 wire amount, and then the co-conspirators would divide up a portion of $450,000.00 among themselves and use the balance to fund that HYIP program.  See Fourth Complaint ¶¶ 15, 31, at 2-3, 7; Scogin Depo. at 47:12-14; Presley Depo. at 17:10-18:9; New Energy Co., LLC Find Report; Grizzly Drilling,

Inc. Corporate Checking Statement.

Applied Capital relied on these misrepresentations to its detriment.  It relied on the representation about Legato's financial condition in determining whether Legato would be capable of paying the $625,000.00 invoice that Applied Capital was purchasing in exchange for the $550,000.00 wire.  It relied on the representation about the existence, inspection, and delivery of the rig, because it was an asset that potentially could be located and liquidated in the event of a default. More generally, it relied on the fundamental bona fides of the transaction in deciding that New Energy, Grizzly Drilling, and Legato were legitimate companies with which it could do business. Based on these misrepresentations, Applied Capital extended $550,000.00 in credit to Legato. Applied Capital has been damaged because the debt remains unpaid.  See Burkhard Aff. ¶ 12, at 6.

## IV.   THE COURT NEED NOT DECIDE WHETHER GIBSON WAS UNJUSTLY ENRICHED.

Grizzly Drilling's and New Energy's bank accounts reflect the following transactions: Applied Capital wired $550,000.00 into Grizzly Drilling's bank account on May 19, 2004.  The following day, Scogin wired $450,000.00 into New Energy's bank account.  The same day, Presley wired $50,500.00 to Gibson and $14,500.00 to Amy Avail, Gibson's girlfriend. On May 26th, Presley wired another $10,000.00 to Gibson.  See Presley Depo. at 95:5-101:1.  These three cash transactions, totaling $75,000.00, were not gifts; Gibson knew that they were payments to him from the Applied Capital proceeds for his participation in the scheme.  See id.

To prevail on its unjust enrichment claim against Gibson, Applied Capital need only show that "(1) [Gibson] has been knowingly benefitted at [Applied Capital's] expense (2) in a manner such that allowance of [Gibson] to retain the benefit would be unjust."  Ontiveros Insulation Co., Inc. v. Sanchez, 129 N.M. 200, 203-204, 3 P.3d 695, 698-99 (Ct. App. 2000) (citing Restatement of the Law

of Restitutions §§ 1, 40, 41 (1937, as supplemented through 1988).  Although the undisputed facts

show that Gibson personally received $75,000.00 of Applied Capital's $550,000.00, it is unnecessary

for the Court to grant Applied Capital further equitable relief when it has an adequate remedy at law

for its claim.  See Sims v. Sims, 122 N.M. 618, 624, 930 P.2d 153, 159 (1996); General Tel. Co. of

Southwest v. State Tax Comm'n, 69 N.M. 403, 408, 367 P.2d 711, 715 (1962).  The Court has

already awarded Applied Capital $550,000.00 against Gibson on conspiracy and fraudulent

misrepresentation.  Accordingly, the Court need not decide whether Gibson was also unjustly

enriched.

## V.   NEW ENERGY, LEGATO STAFFING, AND GRIZZLY DRILLING BREACHED THE CLOSING AGREEMENT.

Preliminarily, the Court notes that Gibson, Presley, and Scogin are not parties to the Closing

Agreement and that therefore they cannot be held liable for its breach.  See Ettenson v. Burke, 2001-

NMCA-003, ¶ 25, 17 P.3d at 449 ("As a general rule, [the CEO] cannot be held personally liable for

the debts of the corporation or for its breach of contract."); Closing Agreement at 1 (stating that the

Closing Agreement is made by and among Applied Capital, Grizzly Drilling, Legato Staffing, and

New Energy).

The underlying facts show that New Energy, Grizzly Drilling and Legato Staffing breached

the Closing Agreement.  First, Legato Staffing did not pay Applied Capital $625,000.00 by July 10,

2004.  See Burkhard Aff. ¶ 12, at 6.  Second, in violation of paragraph 5 of the Closing Agreement,

the drilling rig was not delivered to New Energy's lease site.  See Scogin Depo. at 37:17-38:9. Third,

the $550,000.00 wire from Applied Capital was not used to pay, and was not intended to be used to

pay, Grizzly Drilling for the purchase of a drilling rig.  See id. at 47:12-14; 49:23-24; Newton Depo.

at 19:1-21:5; 28:12-31:16; 34:6-39:25; Fourth Complaint ¶¶ 15, 31 at 2-3, 7; Presley Depo. at 17:10-

18:9.  Furthermore, Scogin wired $450,000.00 of the sum Applied Capital provided to New Energy.

See Fourth Complaint ¶¶ 15, 31, at 2-3, 7; Scogin Depo. at 47:12-14; Presley Depo. at 17:10-18:9.

Bank records reflect that transfers and other payments were then made out to Herman ($58,600.00),

Gibson ($60,500.00), Gibson's girlfriend, Amy Arial ($14,500.00), and the credit references

($25,000.00).  See New Energy Co., LLC Find Report; Grizzly Drilling, Inc. Corporate Checking

Statement.  Presley kept the balance of the $450,000.00 for use in arranging the HYIP.  See Presley

Depo. at 17:10-18:9.

These actions breached the material terms of the Closing Agreement, see UJI 13-823 NMRA

(instructing that failure to perform substantial obligations of the contract constitutes breach), and

damaged Applied Capital, see Burkhard Aff. ¶ 12, at 6.  The non-existence and non-delivery of the

drilling  rig damaged Applied Capital, because there was  no asset available to liquidate to satisfy

Legato Staffing's payment obligation. See id.  Moreover, Applied Capital would not have entered

into the transaction if it had known that no rig existed and the sale was a sham. Because, however,

Gibson was not a party to the Closing Agreement and Legato Staffing is not a party to this litigation,

the Court will not enter summary judgment in favor of Applied Capital on the breach of contract

issue.

## VI.   THE COURT WILL RULE THAT GIBSON IS LIABLE TO APPLIED CAPITAL FOR PUNITIVE DAMAGES.

Finally, the Court will not enter summary judgment on an award of punitive damages against

Gibson.  Gibson's and his co-conspirators' actions in misleading Applied Capital into engaging in

the bogus rig transaction were willful, wanton, malicious, and fraudulent.  See, e.g., Kavenva v.

MDA Enterprises, Inc., 2005-NMCA-118, ¶¶ 26-28, 120 P.3d 854, 859-60 (upholding findings of

fraud when defendants induced the plaintiff into paying $30,000.00 down for construction of a

cottage on the plaintiff's property that defendants knew could not be permitted by the city because of the property's zoning). See Eckhardt v. Charter Hosp. of Albuquerque, Inc., 124 N.M. at 562, 953 P.2d at 735 ("To be liable for punitive damages, a wrongdoer must have some culpable mental state, and the wrongdoer's conduct must rise to a willful, wanton, malicious, reckless, oppressive, or fraudulent level."); Naranjo v. Paull, 111 N.M. at 172, 803 P.2d at 261 (holding that punitive damages are an appropriate sanction for fraudulent misrepresentation).

While the Court finds that the conduct of Gibson was willful, wanton, malicious, and fraudulent, it cannot, at this juncture, award punitive damages. The Court has not been provided information on the amount and reasonableness of the punitive damages Applied Capital seeks from Gibson. Without such information, the Court cannot make a punitive damages award. The Court will therefore deny Applied Capital's request for summary judgment on punitive damages.

**IT IS ORDERED** that the Plaintiff Applied Capital, Inc.'s Motion for Partial Summary Judgment Against Defendant Francis Gibson on Applied Capital's Civil Conspiracy, Fraud, Breach of Contract and Unjust Enrichment Claims is granted in part and denied in part. Summary judgment on liability is granted to Applied Capital and against Defendant Gibson on Applied Capital's claims for civil conspiracy and fraudulent misrepresentation. The Court also enters summary judgment in favor of Applied Capital on the issue of whether Gibson acted willfully, wantonly, maliciously, and fraudulently. Further, the Court awards Applied Capital $550,000.00 against Gibson. The Court notes that the outstanding Defendants are jointly and severally liable to Applied Capital for the $550,000.00. See Saiz v. Belen Sch. Dist., 113 N.M. at 400, 827 P.2d at 115 (stating that joint and several liability applies to intentional torts). The Court denies summary judgment to Applied Capital on its request for breach-of-contract damages, on the award and amount of punitive damages, and on attorneys' fees and expenses.

-30-

_____
UNITED STATES DISTRICT JUDGE

*Parties and Counsel*:

Henry M. Bohnhoff
Bryan J. Davis
   Rodey, Dickason, Sloan, Akin
   & Robb, P.A.
Albuquerque, New Mexico

      *Attorneys for the Plaintiff*

Francis Gibson
Hailey, Idaho

      *Defendant pro se*

Michael Alarid, Jr.
   The Alarid Law Firm, P.C.
Albuquerque, New Mexico

      *Attorneys for Defendant Gary Bellinger*

Gerald Lee Scogin, Jr.
Lawrenceville, Illinois

      *Defendant pro se*

Justin Herman
Pittsburgh, Pennsylvania

      *Defendant pro se*

Robert A. Johnson
   Johnson & Nelson, P.C.
Albuquerque, New Mexico

      *Attorneys for Defendants Kirk Voyles and*
        *Heritage Commercial Services, Inc.*

Brian Ambrose
Laguna Beach, California

     *Defendant pro se*

New Energy Co. LLC
Sheridan, Wyoming

     *Defendant pro se*

Edward Presley
New Energy Co. LLC
Sheridan,Wyoming

     *Defendant pro se*