# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

APPLIED CAPITAL, INC.,

       Plaintiff,

vs.                                                            No. CIV 05-98 JB/ACT

FRANCIS GIBSON; GARY BELLINGER;
BRIAN AMBROSE; KIRK VOYLES;
HERITAGE COMMERCIAL SERVICES, INC.;
GERALD LEE SCOGIN, JR.; GRIZZLY DRILLING, INC.;
JUSTIN HERMAN, NEW ENERGY CO., L.L.C., and
EDWARD L. PRESLEY,

       Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on: (i) Plaintiff Applied Capital, Inc.'s Motion for

Partial Summary Judgment Against Defendants Edward L. Presley and New Energy Co., LLC on

Applied Capital's Civil Conspiracy, Fraud, Breach of Contract and Unjust Enrichment Claims, filed

February 2, 2007 (Doc. 181)("Plaintiff's Motion"); (ii) Defendant Edward L. Presley's Motion to

Dismiss Defendant from this Action, or in the Alternative, Such Relief the Court Finds Appropriate

to Resolve the Matter Between the Parties, filed February 12, 2007 (Doc. 188)("Presley's Motion");

and (iii) Plaintiff's Motion to Strike, or in the Alternative Response in Opposition to, Defendant

Edward L. Presley's Motion to Dismiss Defendant from this Action or in the Alternative Such Relief

the Court Finds Appropriate to Resolve this Matter Between the Parties, filed February 20, 2007

(Doc. 189)("Plaintiff's Motion to Strike").  The Court held a hearing on these three motions on July

31, 2007.  See Transcript of Hearing (taken July 31, 2007)("Tr.")[1]  The primary issues are: (i) whether the Court should strike Presley's motion to dismiss because he is in default and has no standing to raise the affirmative defense of settlement to Applied Capital's claims; (ii) whether there has been a settlement of Applied Capital's claims; and (iii) whether Applied Capital is entitled to summary judgment on liability.  Because the Court concludes that it should not strike Presley's motion, but also concludes that there either was not a settlement agreement or that there was a settlement agreement with a condition subsequent that was never met, the Court will deny Applied Capital's motion to strike and Presley's motion to dismiss, will proceed to the motion for summary judgment, and will grant Applied Capital judgment in part and deny judgment in part.

## FACTUAL BACKGROUND

Because Presley and New Energy have not filed any response to Applied Capital's motion for summary judgment that complies with D.N.M. LR-Civ. 56.1, and have not contested Applied Capital's statement of undisputed material facts, the facts are undisputed.

Presley has operated New Energy since 2001.  See Memorandum in Support of Plaintiff Applied Capital, Inc.'s Motion for Partial Summary Judgment Against Defendants Edward Presley and New Energy Co., LLC on Applied Capital's Civil Conspiracy, Fraud, Breach of Contract and Unjust Enrichment Claims, filed February 2, 2007 (Doc. 182)("Presley Memo"), Exhibit 1, Deposition of Edward L. Presley at 6:12-13; 7:3-4 (taken October 18, 2006)("Presley Depo."); Verified Fourth Amended Complaint for Fraud, Negligent Misrepresentation, Unjust Enrichment, Breach of Contract, Violation of the New Mexico Unfair Trade Practices Act, and Civil Conspiracy ¶ 10, at 2-3, filed June 30, 2006 (Doc.120)("Fourth Complaint").  New Energy holds leases for coal

---

[1]The Court's citations to the transcript of the hearing refer to the Court Reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

-2-

bed methane ("CBM") gas lying underneath tracts of land in Wyoming.  See Memorandum in Support of Plaintiff Applied Capital, Inc.'s Motion for Partial Summary Judgment Against Defendant Francis Gibson on Applied Capital's Civil Conspiracy, Fraud, Breach of Contract and Unjust Enrichment Claims, filed February 2, 2007 (Doc. 180)("Gibson Memo"), Exhibit 1, Deposition of Francis Gibson at 47:10-21 (taken December 10, 2004)("Gibson Depo.").   Presley had been attempting to obtain financing to drill in, and extract the gas from, these tracts before 2004. See id.

In late 2003 or early 2004, Presley, Defendant Francis Gibson, Defendant Justin Herman, and Defendant Gerald Lee Scogin, Jr. met each other. See Presley Memo, Exhibit 2, Deposition of Justin Wallace Herman at 15:1-2 (taken October 16, 2006)("Herman Depo."); Memorandum in Support of Plaintiff Applied Capital, Inc.'s Motion for Partial Summary Judgment Against Defendants Gerald Lee Scogin, Jr. and Grizzly Drilling, Inc. on Applied Capital's Civil Conspiracy, Fraud, Breach of Contract and Unjust Enrichment Claims, filed February 2, 2007 (Doc. 175)("Scogin Memo"), Exhibit 1, Deposition of Gerald L. Scogin, Jr. at 19:8-10; 21:10-15 (taken December 30, 2004)("Scogin Depo.").   Herman was referred to as New Energy's "financial director." Presley Memo, Exhibit 2, Deposition of Justin Wallace Herman at 15:4-12 ("Herman Depo."); Presley Memo, Exhibit 4, Affidavit of Mark Burkhard ¶ 3, at 1 (executed February 1, 2007)("Burkhard Aff."). Gibson was a director of Legato Staffing and Integration Services, LLC ("Legato Staffing"). See Burkhard Aff. ¶ 3, at 1; Gibson Depo. at 22:13- 18; 22:25-23:2. Scogin operated Defendant Grizzly Drilling, Inc. ("Grizzly Drilling"). See Fourth Complaint ¶ 7, at 2.

Gibson, Herman, Presley, and Scogin developed a program to obtain the funds necessary to finance the CBM drilling project: Legato Staffing would "rent" ten million dollars from an individual named Ray Benton or Ray Benson; the ten million dollars would be invested in a "high

yield investment program" ("HYIP") in Europe; the HYIP would generate profits on the order of five to ten percent, or two to four million dollars, per month; and those profits would be used to finance the drilling project. See Presley Depo. at 16:25-18:9; 62:18-64:8; Fourth Complaint ¶¶ 7, 9, 12, at 2-3. To undertake this program, however, Gibson, Herman, Presley, and Scogin needed to raise funds to start the HYIP. They agreed to obtain that money from Applied Capital by factoring New Energy's purported purchase from Grizzly Drilling, and Legato Staffing's immediate repurchase from New Energy, of a drilling rig for $550,000.00. See Fourth Complaint ¶ 15, at 3-4; Presley Depo. at 18:5-9; Gibson Depo. at 36:6-38:2.

Herman and Presley contacted Applied Capital, representing that they wanted to obtain funding for New Energy to purchase a drilling rig from Grizzly Drilling and that, after acquiring the rig from Grizzly Drilling, New Energy would immediately resell the rig to Legato Staffing, which would then use the rig on New Energy's property to drill for natural gas. See Burkhard Aff. ¶ 3, at 1-2. Applied Capital tentatively agreed to finance the transaction by means of purchase order financing and factoring: Applied Capital would wire $550,000.00 to Grizzly Drilling upon its agreement to deliver the rig in exchange for Legato Staffing's execution of an estoppel agreement and its agreement to pay New Energy's invoice -- in the amount of $625,000.00 -- directly to Applied Capital within 60 days, and New Energy's assignment of its receivables to Applied Capital. See Fourth Complaint ¶ 15, at 3-4.

On May 10 and 11, 2004, Herman and Presley submitted to Applied Capital documentation, which Gibson provided, concerning Legato Staffing's financial resources. See id. ¶ 17, at 4. The documentation represented that Legato Staffing had over ten-million dollars in unrestricted funds and otherwise was in a financially strong position. See id.; Gibson Depo. at 100:5-20. The representations were false: Legato Staffing was not financially strong, had zero unrestricted funds,

-4-

and had a negative net worth. <u>See</u> Gibson Depo. at 100:21-101:17.

As a condition to providing the financing, Applied Capital required that Legato provide credit references. On May 13, 2004, Gibson sent to Applied Capital, by facsimile transmission, two letters containing detailed representations about six- and seven-figure purchases of inventory and equipment that Legato had made on credit in the recent past. For example, Gibson represented that Legato had purchased $600,00.00 in loose diamonds and watches from Ambrose or his company, Shine, Inc., in October 2003. These representations were false. <u>See</u> Fourth Complaint ¶¶ 20-24, at 5; Gibson Depo. at 92:15-94:23, 97:7-99:25, 100:12-102:14; Requests for Admission, Nos. 4-5, 7-32; Burkhard Aff. ¶ 6, at 3.

Applied Capital contacted the credit references by telephone, using the telephone numbers that Gibson had provided. The credit references confirmed the false information that Gibson had provided. For example, Gibson had asked Ambrose to tell Applied Capital that Gibson or Legato had purchased $600,000.00 in loose diamonds and watches from Ambrose or Shine, Inc. in October 2003, even though this transaction did not occur. <u>See</u> Fourth Complaint ¶¶ 22, 25-27, at 5-6; Gibson Depo. at 92:15-94:23, 97:7-99:25; Requests for Admission, Nos. 15-20; Burkhard Aff. ¶ 6, at 3.

Gibson, Presley, and Scogin executed and submitted to Applied Capital documentation to memorialize the sale of the rig from Grizzly Drilling to New Energy, and from New Energy to Legato Staffing. <u>See</u> Burkhard Aff. ¶ 8, at 4. In this documentation, these Defendants represented: (i) that they personally had inspected the rig; and (ii) that within two business days following the wiring of the $550,000.00 from Applied Capital to Grizzly Drilling, Grizzly Drilling would deliver the rig to Legato Staffing at New Energy's lease property in Wyoming. <u>See</u> <u>id</u>. Implicit, if not explicit, in these representations was the fundamental representation that the rig existed. <u>See</u> <u>id</u>. ¶

-5-

8, at 4-5. The Defendants knew that these representations were false; they had not inspected the rig, and they did not deliver it to New Energy's lease property. <u>See</u> Presley Depo. at 29:20-22; 41:4-15; Scogin Depo. at 37:17-38:9; Gibson Depo. at 43:15-16; 44:16-21; 83:15-84:24.

Grizzly Drilling did not own a drilling rig. <u>See</u> Scogin Memo, Exhibit 2, Deposition of Charles Newton at 19:1-21:5; 28:12-31:16; 34:6-39:25 (taken November 30, 2006)("Newton Depo."). Scogin's uncle owned the "EMSCO" drilling rig that the documentation submitted to Applied Capital identified. <u>See</u> <u>id.</u> at 19:1-21:5; 28:12-31:16; 34:6-39:25. Scogin contacted his uncle about buying the rig in 2003. <u>See</u> <u>id.</u> at 36:11-13. At that time, Scogin obtained pictures and a list of the rig's specifications, which in turn were provided first to Presley and then to Applied Capital. <u>See</u> <u>id.</u> at 37:12-25; Presley Depo. at 35:2-13; 101:5-103:1. Scogin, however, did not purchase or possess the rig. <u>See</u> Newton Depo. at 19:1-21:5; 28:12-31:16; 34:6-39:25. Scogin's uncle sold the rig to a third party in June 2004. <u>See</u> <u>id.</u> at 20:8-10.

The Defendants intentionally deceived Applied Capital, misrepresenting Legato Staffing's financial resources and creditworthiness, the existence of the rig, and the bona fides of the transaction generally. <u>See</u> Fourth Complaint ¶¶ 30, 34-56, at 7-11. Applied Capital reasonably relied on the Defendants' misrepresentations to its detriment in agreeing to finance the purchase of the non-existent rig. <u>See</u> Burkhard Aff. ¶¶ 7, 9-10 at 3-5. Applied Capital wired $550,000.00 to Grizzly Drilling on May 19, 2004. <u>See</u> <u>id.</u> ¶ 10, at 5.

On May 27, 2004, Presley sent an e-mail to Applied Capital, representing that the rig had been delivered to the lease property on May 26, 2004. <u>See</u> Presley Memo, Exhibit 6, E-mail Exchange between Ed Presley and Mark Burkhard (dated May 27, 2004)("May 27, 2004 E-mail"). Presley knew that this representation was false. <u>See</u> Presley Depo. at 39:4-10; 41:4-15. Applied Capital relied on this misrepresentation to its detriment. <u>See</u> Fourth Complaint ¶¶ 32, 34-56, at 8-11.

Gibson, Herman, Presley, and Scogin did not intend to carry out the course of action outlined in the Closing Agreement. <u>See</u> Fourth Complaint ¶ 31, at 7. The $550,000.00 was not used to pay Grizzly Drilling for the purchase of the rig. <u>See</u> Scogin Depo. at 47:12-14; 49:23-24. Instead, Scogin wired $450,000.00 of the proceeds to New Energy. <u>See id.</u> at 47:12-14. Wire transfers and other payments were made out to Herman, Gibson, Gibson's girlfriend, Amy Arial, and the credit references. <u>See</u> Gibson Memo, Exhibit 4, New Energy Co., LLC Find Report (May 20-July 31, 2004); Scogin Memo, Exhibit 5, Grizzly Drilling, Inc. Corporate Checking Statement (dated April 8-June 7, 2004).

Legato Staffing defaulted on the $625,000.00 payment that was due to Applied Capital by July 10, 2004. <u>See</u> Fourth Complaint ¶ 33, at 8; Burkhard Aff. ¶ 12, at 6. To date, Applied Capital has not received payment. <u>See</u> Fourth Complaint ¶ 33, at 8; Burkhard Aff. ¶ 12, at 6. New Energy is in bankruptcy, <u>see</u> Burkhard Aff. ¶ 12, at 6, and Applied Capital believes Legato Staffing to be insolvent, <u>see</u> Scogin Memo at 9.

Presley has testified regarding the conditions that existed before the parties entered into the Closing Agreement. Presley has testified: (i) that he never had absolute proof that the drilling rig existed, <u>see</u> Presley's Motion, Exhibit A, Presley Depo. at 30:18-19; (ii) that Applied Capital did not seem interested in confirming the rig's existence, <u>see id.</u> at 58:9-11; and (iii) that it was explained to Applied Capital that the funds being wired to Grizzly Drilling were going to be used to fund involvement in the HYIP, <u>see id.</u> at 59:17-25, 91:8-24.

## PROCEDURAL BACKGROUND

Applied Capital agreed on January 16, 2006, to take $1,400,000.00 in settlement of its claims against New Energy and Presley.  <u>See</u> Plaintiff's Motion to Strike, Exhibit 1, Email exchange between Jim Scott and Thomas Throne (dated January 16, 2006)(Doc. 189).  The settlement was

conditioned upon payment being within thirty days, i.e., by February 18, 2006.  See id.  A private placement of several millions of dollars in bonds issued by New Energy would generate the funds to pay the settlement.  See id. ¶ 3, at 2-3.  The financing would not only permit the settlement of Applied Capital's claims, but also fund New Energy's coal gas methane drilling program.  See id.

The financing did not occur during this thirty-day period, however, and the $1,400,000.00 payment was not tendered to Applied Capital.  See id.  Applied Capital represents that, over the past year, and most recently in his motion, Presley repeatedly has represented to Applied Capital that the financing "is supposed to happen this week."  Id. ¶ 4, at 3.  For a period of time, Applied Capital remained willing to settle on essentially the same terms, although Presley's Wyoming counsel was advised that the $1,400,000.00 figure would need to be adjusted to account for the cost of the additional delay.  See id.  For this reason, Applied Capital delayed proceeding with discovery until the latter half of 2006.  See id.

Applied Capital represents that it eventually concluded that there was no reasonable prospects of settlement.  See id.  To Applied Capital's knowledge, the financing did not occur. Applied Capital determined that it needed to proceed with this litigation.  See id.

Applied Capital filed its Verified Fourth Amended Complaint on June 30, 2006.  See Fourth Complaint (Doc. 120).  Applied Capital served the Fourth Amended Complaint on Presley on July 24, 2006.  See Presley's Waiver of Service of Summons (Doc. 130).  Applied Capital served the Fourth Amended Complaint on New Energy on June 19, 2006. See New Energy's Waiver of Service of Summons (Doc. 131).  The Clerk entered default under rule 55(a) of the Federal Rules of Civil Procedure against Presley and New Energy on September 20, 2006.  See Entry of Default, filed September 20, 2006 (Doc. 138).  Neither party has moved the Court to set aside the default.

Applied Capital served Requests for Admissions on Presley on August 8, 2006.  See

-8-

Certificate of Service (Doc. 129). Presley did not respond to Applied Capital's Requests for Admissions. Presley states that Applied Capital noticed him for a deposition, but the weather would not allow Applied Counsel's counsel to fly to Casper, Wyoming on the day requested. See Presley's Motion ¶ 2, at 1-2. Applied Capital re-noticed him for his deposition, but Presley complains that further depositions of him would cause him to drive 300 miles round trip to attend the deposition or to come to New Mexico. See id. ¶ 2, at 1.

Presley further represents that the Bankruptcy Court in Wyoming denied Applied Capital's request for a Chapter 11 trustee for New Energy and gave New Energy a Chapter 7 trustee instead. See id. ¶ 4, at 2-3. In his order, however, the Bankruptcy Judge gave instructions that Applied Capital could come back under rule 60 to request that this status be changed. See id., Exhibit C. Presley states that, at this time, Applied Capital plans to request again, under rule 60, for Chapter 11 status and ask the Bankruptcy Court to convert New Energy's matter to a dismissal when the funds hit the trust account. See id.

Presley also represents that Applied Capital has additional counsel in Casper by the name of Donn, McCall, Brown, Drew & Massey that is in regular contact with counsel for the buyer of his leases, S. Thomas Throne of the Throne Law Office of Sheridan, Wyoming. See Presley's Motion, ¶ 3, at 2. Presley states that Mr. Throne has kept him up to date about the source of the funds to pay a settlement and that arrangements have been put in place that Applied Capital will be paid the settlement from the proceeds of the sale in an amount in full as agreed upon between Applied Capital and Presley. See id. Presley represents that it has been reported to him that those funds are very close at hand, yet Applied Capital still wishes to litigate against him. See id. Presley states that Mr. McCall is waiting for the funds to hit the trust account and that Mr. McCall, on behalf of Applied Capital, will file another pleading with the bankruptcy court in Wyoming to try to have

the New Energy matter reversed from a Chapter 7 to a dismissal so that the funds can be paid to Applied Capital and others.  See id.  Presley represents that this sale will allow the transaction to be completed and for everyone to get their money.  See id. ¶ 3 at 2.  Presley states that it has been reported that the funds were to be available Monday, February 12, 2007.  See id.  ¶ 4, at 3.

Applied Capital moves, pursuant to rule 56 of the Federal Rules of Civil Procedure, for summary judgment against Presley and New Energy on Applied Capital's Civil Conspiracy, Fraud, Breach of Contract, and Unjust Enrichment claims, as well as on Presley's and New Energy's liability for punitive damages.  See Presley Memo, ¶ 1, at 1.  Applied Capital concurrently moved for summary judgment against all of the remaining Defendants: Scogin/Grizzly Drilling, Presley/New Energy, Gibson, and Ambrose.  The Court notes that the analysis in each of these motions overlaps to an extent, but also varies in certain respects.  For this reason, and also to comply with the local rules' page limitations on exhibits, Applied Capital has filed separate motions and supporting memoranda for each Defendant or Defendant group.

Instead of filing a response to Applied Capital's motion for summary judgment, Presley, pro se, filed a motion on February 12, 2007, asking the Court to grant him a dismissal from this action or for such other relief that the Court deems fit.  See Presley's Motion at 1.  Presley asserts that Applied Capital has, through counsel, filed "[l]iterally reams of pleadings . . . ," including a motion for sanctions and a motion for summary judgment against him, while there is a settlement agreement "in principle" between Applied Capital and Presley upon the table.  Id. ¶ 2, at 1-2. Presley states that he has offered and Applied Capital has accepted a 1.4 million dollar amount in full settlement to release him of all his claims.  See  Presley's Motion, ¶ 6 at 3.  Presley attached a copy of his deposition and the pleadings from the Bankruptcy proceedings involving New Energy that Applied Capital's counsel authored.  See id., Exhibit A, Exhibit B.  Presley contends that these findings

-10-

corroborate his representations of fact.  See id. ¶ 4, at 2-3.  Presley contends that the funds for the settlement could be in the trust account to pay the settlement by the time his motion to dismiss is filed with the Court via the United States mail.  See id.

Presley represents that he has always said that he was going to pay Applied Capital the agreed amount of the settlement, because he was the one that personally guaranteed the transaction that "went south."  Id. ¶ 6, at 4.  Presley states that, in the contract with Applied Capital, the Court will see that Applied Capital is entitled to a direct judgment against him personally if default occurs; that Applied Capital will not have to litigate against him; and that Applied Capital has him "by the nap[e] of the neck."  Id. ¶ 7, at 4.  Presley states that he has no money to go up against Applied Capital's very able counsel and that he is not qualified to take him on.  See id. ¶ 8, at 4.   Presley represents that he is putting forth "every effort" to get the funds in Wyoming to settle with Applied Capital.  See id.  Presley also states that he waives no right in his motion and does not admit any wrongdoing.  See id. ¶ 9, at 4.  Presley admits, however, that he guaranteed the deal that "went south," and says that he has an agreed settlement with Applied Capital and that Applied Capital will be paid "very soon."  Id.

In conclusion, Presley prays that the Court grant his motion to dismiss or, in the alternative, grant him such relief as the Court should deem fit for this matter.  See id. at 4.  Presley states that he does not know what the Court "can do," but states that the reasons he has set forth in his motion demonstrate that Applied Capital and Presley have an "agreement in principal."  See id.  Presley argues that the Court should order Applied Capital to settle and to stop wasting the Court's valuable time on this matter.  See id.

Applied Capital filed its motion for summary judgment and supporting memoranda on February 2, 2007.  See Plaintiff's Motion (Doc. 181); Presley Memo (Doc. 182).  Presley filed his

Motion to Dismiss on February 12, 2007.  <u>See</u> Presley's Motion.  Applied Capital filed its response

to Presley's motion on February 20, 2007, asking the court to strike Presley's Motion to Dismiss.

<u>See</u> Plaintiff's Motion to Strike (Doc. 189).  On March 27, 2007, Applied Capital filed a Notice of

Completion, (Doc. 197), giving notice that briefing on Presley's motion to dismiss and Applied

Capital's motion to strike had been completed.  Presley has not filed a reply for his motion to

dismiss or a response to the motion to strike.  No party has made a jury demand in this case.  <u>See</u>

Tr. 6:10-14 (taken July 31, 2007)(Court & Bohnhoff).

## <u>LAW REGARDING MOTIONS TO STRIKE</u>

Rule 12(f) of the Federal Rules of Civil Procedure provides:

Upon motion made by a party before responding to a pleading or, if no responsive
pleading is permitted by these rules, upon motion made by a party within 20 days
after the service of the pleading upon the party or upon the court's own initiative at
any time, the court may order stricken from any pleading any insufficient defense or
any redundant, immaterial, impertinent, or scandalous matter.

"Rule 7(a) defines the following to be pleadings: a complaint and an answer; a reply to a

counterclaim denominated as such; an answer to a cross-claim, if the answer contains a cross-claim;

a third-party complaint, if a person who was not an original party is summoned under the provisions

of Rule 14; and a third-party answer, if a third-party complaint is served." <u>United States v. Cos</u>,

05CR1619 at *2 (D.N.M. May 4, 2006)(Browning, J.). Under rule 7(a), motions and other papers

are not pleadings.  <u>See</u> Fed.R.Civ.P. 7(a).  "[T]here is no provision in the Federal Rules of Civil

Procedure for motions to strike motions and memoranda." <u>McGuire-Pike v. Ameri-CK, Inc. et al.</u>,

04CV705 at *4 (D.N.M. July 23, 2006)(Browning, J.)(quoting <u>Searcy v. Soc. Security Admin.</u>, 956

F.2d 278, *2 (Table)(10th Cir. 1992)(unpublished). See 2 J. Moore, <u>Moore's Federal Practice</u> §

12.37[2], at 12-100.1 (3d ed. 2005)("Only material included in a 'pleading' may be the subject of

a motion to strike, and courts have been unwilling to construe the term broadly. Motions, briefs, or

memoranda, objections, or affidavits may not be attacked by the motion to strike.").

## LAW REGARDING THE STANDING OF A PARTY IN DEFAULT

The granting of a Motion for Default Judgment has two distinct phases: (i) the entry of default by the Clerk of the Court which does not constitute a judgment but is rather an order precluding the defaulting party from making any further liability defense; and (ii) the actual default judgment which is a final judgment that terminates the litigation and decides the dispute. See Fed.R.Civ.P 55(a), (b); Emmit v. Dickey, 188 Fed. Appx. 681, *1 (10th Cir. 2006)(discussing the existence of a distinction between entry of default and default judgment); 46 Am. Jur. 2d Judgments § 233.  The distinction between the two phases is important for the purpose of determining the rights of a party in default.  Furthermore, the history of default judgment plays an important role in understanding the caselaw that interprets the rights of a party in default.

Before the adoption of the Federal Rules of Civil Procedure in 1938, a default judgment could be obtained either at law or in equity.  See  C. Wright, A. Miller, M. Kane, 10A Fed. Prac. & Proc. Civ 3d § 2681 (stating that prior to the adoption of the federal rules in 1938, a default judgment could be obtained either at law or in equity.)  In equity, a default judgment was referred to as a decree "pro confesso."  Id.  Under the original Federal Equity Rules, a decree pro confesso could be had if a defendant failed to answer within the imposed time limits.  See id.  "[A]fter the entry of the decree pro confesso, and while it stood unrevoked, [defendants] were absolutely barred and precluded from alleging  anything in derogation of, or in opposition to, the said decree, and that they are equally barred and precluded from questioning its correctness here on appeal, unless on the face of the bill, it appears manifest that it was erroneous and improperly granted."  Thomson v. Wooster, 114 U.S. 104, 114 (1885).

This early Supreme Court opinion has since been cited on a number of occasions to

determine the rights of a defendant in default. <u>See</u> <u>Taylor v. City of Ballwin</u>, 859 F.2d 1330, 1333

n.7 (8th Cir. 1988); <u>Caribbean Produce Exch. v. Caribe Hydro-Trailer, Inc.</u>, 65 F.R.D. 46, 48

(D.P.R. 1974). Some confusion exists, however, as to what rights defendants are entitled after the

entry of default versus after a default judgment. In <u>Thomson v. Wooster</u>, it appears that, although

the word "entry" is used, the Court's use of the words "decree of pro confesso" instead of "bill of

pro confesso" suggests that the said bar and preclusion apply after the final default judgment is

ordered. Some of the case law, however, interpreting the case, including those cited by the Applied

Capital in its Motion to Strike ¶ 3, at 2, interpret <u>Thomson v. Wooster</u> to mean that, "once a default

is entered, a defendant on default has no further standing to contest the factual allegations of the

plaintiff's claim for relief." <u>Caribbean Produce Exch. v. Caribe Hydro-Trailer, Inc.</u>, 65 F.R.D. at

48. <u>See</u> <u>Taylor v. City of Ballwin</u>, 859 F.2d at 1333 n.7.

     The United States Court of Appeals for the Tenth Circuit has stated that, "[a]fter the entry

of default, [d]efendants were not entitled to raise merits-based argument before the district court."

<u>Olcott v. Delaware Flood Co.</u>, 327 F.3d 1115, 1125 (10th Cir. 2003)(citing <u>Cartier v. Jackson</u>, 59

F.3d 1046, 1048 (10th Cir. 1995)). In <u>Olcott v. Delaware Flood Co.</u>, however, the defendant raised

his merits-based claim after the final default judgment was entered. <u>See</u> <u>Olcott v. Delaware Flood</u>

<u>Co.</u>, 327 F.3d at 1124 (stating that the defendant's argument -- that evidence introduced at a prior

set-off hearing established that their actions were legitimate and proper under the contract --

required the Court to interpret the underlying contract, and thus was a merit-based argument that the

district court's default judgment foreclosed).[2] Because the Tenth Circuit uses the term "default"

_____

     [2]The Tenth Circuit did not specifically define the term "merits-based argument" in its
opinion. The United States Court of Appeals for the Fifth Circuit, however, gives more insight on
the term in <u>Nishimatsu Construction Co., Ltd. v. Houston Nat'l Bank</u>, 515 F.2d 1200 (5th Cir.
1975), stating that "[a] default judgment is unassailable on the merits but only so far as it is

but the procedural posture of the case involved a "default judgment," this case, therefore, does not provide clear guidance whether the Tenth Circuit intends to limit the defendant's ability to raise merits-based arguments after entry of default judgment or after final default judgment.

The plain language of the Tenth Circuit's opinion in Olcott v. Delaware Flood Co. states that a defendant may not raise a merit-based argument "after entry of default"; thus, this Court is inclined to conclude that a defendant is not entitled to raise a merit-based argument after entry of default and before entry of default judgment. Besides the language in Thomson v. Wooster and in Olcott v. Delaware Flood Co., the Court believes that there are also policy rationales which support such a rule. Default is available when the adversary process has been halted by an unresponsive party. See Davis v. Kaiser, 12 Fed. Appx. 902, *1 (9th Cir. 2001). A default judgment should be used to protect a diligent party so he is not faced with interminable delay or continued uncertainty as to his rights. See id. Until the defendant has dealt with the default, the Court should not give that party the benefit of the Court entertaining its merit-based arguments.

## LAW REGARDING SETTLEMENTS

A district court has authority, while a case is pending before it, to enforce settlement agreements reached by litigants. See United States v. Hardage, 982 F.2d 1491, 1496 (10th Cir. 1993). The Tenth Circuit reviews the district courts' use of such authority only for abuse of discretion. See id. at 1495.

---

supported by well-pleaded allegations, assumed to be true." Id. at 1205 (citing Thomson v. Wooster 114 U.S. 106, 105 (1885). Furthermore, "[t]he defendant, by his default, admits the plaintiff's well-pleaded allegations of fact, is concluded on those facts by the judgment, and is barred from contesting on appeal the facts thus established." Nishimatsu Const. Co., Ltd. v. Houston Nat'l Bank, 515 F.2d at 1205 (citing Thomson v. Wooster 114 U.S. at 110 (1885)). A merit-based argument, therefore, appears to be an argument contesting the plaintiff's well-pleaded allegations. Id. at 1205.

-15-

A settlement agreement is a contract. See Republic Res. Corp. v. ISI Petroleum West Caddo Drilling Program 1981, 836 F.2d 462, 465 (10th Cir. 1987)("We construe a settlement stipulation in the same manner as a contract to determine how it should be enforced.")(citation omitted). Thus, when determining whether a court will enforce a settlement agreement, a court applies state contract law. See United States v. McCall, 235 F.3d 1211, 1215 (10th Cir. 2000)("Issues involving the formation, construction and enforceability of a settlement agreement are resolved by applying state contract law.")(citing Carr v. Runyan, 89 F.3d 327, 331 (7th Cir. 1996)). New Mexico public policy favors settlement agreements. See Navajo Tribe of Indians v. Hanosh Chevrolet-Buick, Inc., 106 N.M. 705, 707, 749 P.2d 90, 92 (1988).

New Mexico courts presume that, when parties have settled a dispute, they "intended a complete accord and satisfaction of their respective claims . . . ." Bennett v. Kisluk, 112 N.M. 221, 223-24, 814 P.2d 89, 91-92 (1991).

In applying this strong public policy in favor of settlement, New Mexico courts are bound by unambiguous language in settlement agreements. See Burden v. Colonial Homes, Inc., 79 N.M. 170, 173, 441 P.2d 210, 213 (1968)(citation omitted).   "[W]here material facts concerning the existence or terms of an agreement to settle are in dispute, the parties must be allowed an evidentiary hearing." United States v. Hardage, 982 F.2d at 1496-97. A court must have before it a sufficient factual development -- consisting of sworn testimony subject to cross-examination, sworn affidavits, and legal memoranda -- to enforce a settlement agreement. See id.

The United States Court of Appeals for the Sixth Circuit has held, however, that an evidentiary hearing is not required where an agreement is clear and unambiguous, and no issue of fact is present. See Aro Corp. v. Allied Witan Co., 531 F.2d 1368, 1372 (6th Cir. 1975). Because settlement agreements are highly favored, a party seeking relief from a settlement has the burden

of persuasion. See Marrujo v. Chavez, 77 N.M. 595, 599, 426 P.2d 199, 201 (1967); Gonzales v. Atnip, 102 N.M. 194, 195, 692 P.2d 1343, 1344 (Ct. App. 1984). An oral settlement agreement is enforceable. See Herrera v. Herrera, 126 N.M. 705, 708-710, 974 P.2d 675, 678-680 (Ct. App. 1999).

Mutual mistake is a ground for contract reformation in New Mexico. See State ex rel. State Highway & Transp. Dep't v. Garley, 111 N.M. 383, 388, 806 P.2d 32, 37 (1991). A court is permitted to reform a contract upon finding "a mutual mistake; that is where there has been a meeting of minds, an agreement actually entered into, but the contract, deed, settlement, or other instrument, in its written form, does not express what was really intended by the parties thereto." C.R. Anthony Co. v. Loretta Mall Partners, 112 N.M. 504, 511, 817 P.2d 238, 245 (1991)(citing Cleveland v. Bateman, 21 N.M. 675, 158 P. 648 (1915)). A court may also avoid a contract upon finding mutual mistake:

> The legal grounds for reformation based upon mutual mistake are to be distinguished from those which entitle a party to avoid the contract based on mistake. To avoid a contract based on mutual mistake, the party adversely affected by the mistake must show that: (1) The mistake goes to a basic assumption on which the contract was made; (2) the mistake has a material effect on the agreed exchange of performances; and (3) the mistake is not one for which that party bears the risk.

Restatement (Second) of Contracts § 152; State ex rel. State Highway & Transp. Dep't v. Garley, 111 N.M. 383, 806 P.2d 32 (1991)(discussing distinction).

## LAW REGARDING SUMMARY JUDGMENT

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The

opposing party may not rest upon mere allegations and denials in the pleadings, but must set forth specific facts showing that there is a genuine issue for trial.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)(citing Fed. R. Civ. P. 56(e)).  An issue of fact is "genuine" if the evidence is significantly probative or more than merely colorable such that a jury could reasonably return a verdict for the non-moving party.  Id. at 249-50 (citations omitted).  Mere assertions or conjecture as to factual disputes are not enough to survive summary judgment.  See Branson v. Price River Coal Co., 853 F.2d 768, 771-72 (10th Cir. 1988).  The court may consider only admissible evidence when ruling on a motion for summary judgment.  See World of Sleep, Inc. v. La-Z-Boy Chair, Co., 756 F.2d 1467, 1474 (10th Cir. 1985)(citing Fed. R. Civ. P. 56(e)).

A plaintiff moving for summary judgment "must prove each element essential of the claims upon which it seeks judgment by undisputed facts." Cabo Distrib. Co., Inc.  v. Brady, 821 F.Supp. 601, 607 (N.D. Cal. 1992).  "The party opposing the motion must present sufficient evidence in specific, factual form for a jury to return a verdict in that party's favor." Munoz v. St. Mary-Corwin Hosp., 221 F.3d 1160, 1164 (10th Cir. 2000)(citations and internal quotations omitted).  The mere existence of a scintilla of evidence in support of the plaintiff's position is not sufficient; there must be evidence on which the fact finder could reasonably find for the plaintiff.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 248.

The non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Celotex Corp. v. Catrett, 477 U.S. at 324 (internal quotations omitted).

> Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which

-18-

that party will bear the burden of proof at trial.

Id. at 322-23.  "In a response to a motion for summary judgment, a party cannot rest on ignorance of the facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial."  Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988).  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-86 (1986). See Biester v. Midwest Health Servs., Inc., 77 F.3d 1264, 1266 (10th Cir.1996).  A court must, however, look at the record in the light most favorable to the party opposing summary judgment. See Smith v. Denver Pub. Sch. Bd., 41 F.3d 1516, *3 (Table)(10th Cir. 1994).

Before a district court may grant summary judgment and dismiss a case because a party fails to respond to a summary judgment motion in violation of a local rule, the Tenth Circuit requires the district court to address the following factors: "[i] the degree of actual prejudice to the defendant; [ii] the amount of interference with the judicial process; [iii] the culpability of the litigant. . . ." Hancock v. Okla. City, 857 F.2d 1394, 1396 (10th Cir.1988)(citing Meade v. Grubbs, 841 F.2d 1512 (10th Cir.1988)).  The district court may dismiss a case for failure to respond to a summary judgment motion "only when these aggravating factors outweigh[] the judicial system's strong predisposition to resolve cases on their merits."  Hancock v. Okla. City, 857 F.2d at 1396.

With regard to pro se litigants, the Tenth Circuit has cautioned district courts not to dismiss their suits on summary judgment merely because they have failed to comply with the technical requirements involved in defending such a motion.  See Woods v. Roberts, No. 94-3159, 1995 WL 65457, at *2 (10th Cir. 1995).  "District courts must take care to insure that pro se litigants are provided with proper notice regarding the complex procedural issues involved in summary judgment proceedings."  Jaxon v. Circle K Corp., 773 F.2d 1138, 1140 (10th Cir. 1985)(internal quotations

and citations omitted). "The rights of pro se litigants require careful protection where highly technical requirements are involved, especially when enforcing those requirements might result in a loss of the opportunity to prosecute or defend a lawsuit on the merits." Id.

## NEW MEXICO LAW REGARDING CIVIL CONSPIRACY

"A civil conspiracy requires a combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means." Los Alamos Nat'l Bank v. Martinez Surveying Servs., LLC, 2006-NMCA-081, ¶ 21, 139 P.3d 201, 207 (internal quotations and citations omitted). The purpose of a civil-conspiracy claim is to "impute liability to make members of the conspiracy jointly and severally liable for the torts of any of its members." Seeds v. Lucero, 2005-NMCA-067, ¶ 12, 113 P.3d 859, 862 (internal quotations and citations omitted). In Seeds v. Lucero, the New Mexico Court of Appeals listed the elements of a civil conspiracy and compared a civil conspiracy to a criminal conspiracy:

> Civil conspiracy consists of showing [i] that a conspiracy between two or more individuals existed; [ii] that specific wrongful acts were carried out by the defendants pursuant to the conspiracy; and [iii] that the plaintiff was damaged as a result of such acts. Unlike a conspiracy in the criminal context, a civil conspiracy by itself is not actionable, nor does it provide an independent basis for liability unless a civil action in damages would lie against one of the conspirators. Without an actionable civil case against one of the conspirators, however, an agreement, no matter how conspiratorial in nature, is not a separate, actionable offense.

Id. ¶ 18, 113 P.3d at 863-64 (internal quotations and citations omitted). "[A]n agreement by itself, without an independent, unlawful act, is not an improper means." Los Alamos Nat'l Bank v. Martinez Surveying Servs., LLC, 2006-NMCA-081, ¶ 21, 139 P.3d at 207.

With regard to corporate employees and employers, courts in other jurisdictions have held that the intra-corporate conspiracy doctrine establishes that "an agent is not liable for conspiring with the principal when the agent is acting in an official capacity on behalf of the principal." Berg

& Berg Enter., LLC v. Sherwood Partners, Inc., 131 Cal. App. 4th 802, 817 (2005).

> A corporate employee cannot conspire with his or her corporate employer; that
> would be tantamount to a person conspiring with himself or herself.  Moreover, since
> a corporation can act only through its employees, the element of concert is missing
> in the "aiding and abetting" context just as it would be in a conspiracy context. Had
> the Legislature intended to place all employees charged with the duty of making
> personnel decisions at risk of personal liability, it would have done so by language
> more direct and less susceptible to doubt.

Janken v. GM Hughes Elec., 46 Cal. App. 4th 55, 78 (1996). The intra-corporate conspiracy doctrine

is a bar to liability, however, only when the agent acted solely in an official capacity; if the agent

acted for his own benefit, there may be liability. See EEOC v. MTS Corp., 937 F. Supp. 1503, 1513

n.3 (D.N.M.1996)(Hansen, J.)(citing Nevada state law and stating, that "[a]gents and employees of

a corporation cannot conspire with their corporate principal or employer where they act in their

official capacities on behalf of the corporation and not as individuals for their individual

advantage."); Zic v. Italian Gov't Travel Office, 130 F. Supp. 2d 991, 997 (N.D. Ill. 2001)(stating

that the intra-corporate conspiracy doctrine does not apply where an individual agent acts out of self-

interest; Nelson v. Fontenot, 784 F. Supp. 1258, 1261 (E.D. Tex. 1992)(noting that, while a

corporation cannot conspire with itself, a conspiracy may be established where individual defendants

are named and those defendants act outside the scope of their employment for personal

reasons)(citing Garza v. City of Omaha, 814 F.2d 553, 556 (8th Cir. 1987)); Everest Investors 8 v.

Whitehall Real Estate Ltd. P'ship XI, 100 Cal. App. 4th 1102, 1107 (2002)). The intra-corporate

conspiracy doctrine also does not apply where the corporation conspires with a third party. See Zic

v. Italian Gov't Travel Office, 130 F. Supp. 2d at 997 (citing Mehl v. Navistar Int'l Corp., 670 F.

Supp. 239, 241 (N.D. Ill. 1987)).

## NEW MEXICO LAW REGARDING FRAUDULENT MISREPRESENTATION

To establish fraudulent misrepresentation, a party must demonstrate: "(i) a misrepresentation

-21-

of fact, (ii) either knowledge of the falsity of the representation or recklessness on the part of the party making the misrepresentation, [iii] intent to deceive and to induce reliance on the misrepresentation, and [iv] detrimental reliance on the misrepresentation." <u>Cyprus Amax Minerals Co. v. Duran Sand & Gravel, Inc.</u>, No. 03-1473, 2006 WL 4079084, at *10 (D.N.M. May 31, 2006)(Browning, J.)(citing <u>Williams v. Stewart</u>, 2005-NMCA-061, ¶ 34, 112 P.3d 281, 290). <u>See Saylor v. Valles</u>, 2003-NMCA-037, ¶ 21, 63 P.3d 1152, 1158; UJI 13-1633 NMRA. The party asserting fraudulent misrepresentation must prove each of those elements by clear-and-convincing evidence. <u>See Cyprus Amax Minerals Co. v. Duran Sand & Gravel, Inc.</u>, 2006 WL 4079084, at *10 (citing UJI 13-1633 NMRA). New Mexico Uniform Jury Instruction 13-1633 indicates that a party may recover damages that fraudulent misrepresentation proximately causes. <u>See Williams v. Stewart</u>, 2005-NMCA-061, ¶ 34, 112 P.3d at 290. "[A] plaintiff alleging fraud may recover such damages as are the direct and natural consequences of the reliance on a fraudulent representation." <u>Id.</u> (quoting <u>Indus. Supply Co. v. Goen</u>, 58 N.M. 738, 743, 276 P.2d 509, 512 (1954)).

## NEW MEXICO LAW REGARDING UNJUST ENRICHMENT

"New Mexico has long recognized actions for unjust enrichment." <u>Ontiveros Insulation Co. v. Sanchez</u>, 2000-NMCA-051, ¶ 11, 3 P.3d 695, 698-99 (citing <u>Tom Growney Equip., Inc. v. Ansley</u>, 119 N.M. 110, 112, 888 P.2d 992, 994 (Ct. App. 1994)). To prevail on an unjust enrichment claim, a party must demonstrate that: "[i] another has been knowingly benefitted at one's expense [ii] in a manner such that allowance of the other to retain the benefit would be unjust." <u>Ontiveros Insulation Co. v. Sanchez</u>, 2000-NMCA-051, ¶ 11, 3 P.3d at 698-99. "The theory has evolved largely to provide relief where, in the absence of privity, a party cannot claim relief in contract and instead must seek refuge in equity." <u>Id.</u> ¶ 11, 3 P.3d at 698-99. <u>See Credit Inst. v. Veterinary Nutrition Corp.</u>, 2003-NMCA-010, ¶ 21, 62 P.3d 339, 344; <u>Hydro Conduit Corp. v. Kemble</u>, 110

-22-

N.M. 173, 175, 793 P.2d 855, 857 (1990).  The New Mexico Supreme Court has stated that "[t]he general equity jurisdiction of the trial court is not available, although properly pleaded, because appellee in fact had an adequate remedy at law."  General Tel. Co. of Southwest v. State Tax Comm'n, 69 N.M. 403, 408 367 P.2d 711, 715 (1962).  See Sims v. Sims, 122 N.M. 618, 624 930 P.2d 153, 159 (1996) (stating "equity will not act if there is a complete and adequate remedy at law). Cf. Lopez v. Kase, 1999 -NMSC- 011, ¶ 6, 975 P.2d 346, 348 (stating that the New Mexico Supreme Court "generally will not grant equitable relief by way of an extraordinary writ when there is an adequate remedy available to the petitioner at law, absent unusual and compelling circumstances.).

## NEW MEXICO LAW REGARDING PUNITIVE DAMAGES

"To be liable for punitive damages, a wrongdoer must have some culpable mental state, and the wrongdoer's conduct must rise to a willful, wanton, malicious, reckless, oppressive, or fraudulent level."  Eckhardt v. Charter Hospital of Albuquerque, Inc., 124 N.M. 549, 562, 953 P.2d 722, 735 (Ct. App. 1997).   Punitive damages are an appropriate sanction for fraudulent misrepresentation.  See Naranjo v. Paull, 111 N.M. 165, 172, 803 P.2d 254, 261 (Ct. App. 1990)(citing Hale v. Basin Motor Co., 110 N.M. 314, 795 P.2d 1006 (1990)).  When punitive damages are sought, the following factors should be considered: "[i] the character of the defendant's act; [ii] the nature and extent of the harm to the plaintiff that the defendant caused or intended to cause; and [iii] the wealth of the defendant."  Stanton v. Gordon Jewelry Corp., 108 N.M. 160, 161, 768 P.2d 888, 889 (1989).

## LAW REGARDING DEFAULT/SUMMARY JUDGMENT AND DAMAGES

This motion comes before the Court at an unusual stage of the proceedings.  Presley and New Energy have not filed an answer to the Fourth Complaint and the Clerk of the Court entered default against them on September 20, 2006. (Doc. 138)  Rather than moving for a default judgment,

however, Applied Capital moves for summary judgment.  The Court will thus analyze the law both for default and for summary judgment.

### 1.   Default Judgment.

If the Court treats the motion as one for a default judgment, the Court may enter judgment for liquidated damages, but will need a hearing for unliquidated damages.  If the amount is unliquidated, the Court will need to set a separate hearing and, if possible, should give notice to Presley and New Energy.  Thus, the primary issue is whether the damages that Applied Capital seeks are liquidated or unliquidated.

### a.   New Mexico Law.

With respect to awarding damages upon the issuance of a default judgment, New Mexico and federal law are essentially the same.  Rule 1-055B of the New Mexico Rules of Civil Procedure, and established case law, "clearly states that the trial court must hold a hearing to determine the amount of any unliquidated damages before it may enter a default judgment." DeFillippo v. Neil, 2002-NMCA-085, ¶ 19, 51 P.3d 1183, 1188 (citing Armijo v. Armijo, 98 N.M. 518, 520, 650 P.2d 40, 42 (Ct. App. 1982)("[W]here the claim for damages is unliquidated, it would be an abuse of discretion not to have a hearing and to put plaintiff to the test of presenting evidence to support the claim for damages.")).

While rule 1-055B does not expressly require that notice of such a hearing be given to the defaulting defendant, "the damages hearing must be regarded as a hearing on the application for default judgment and [] written notice must be given if the [defaulting] party has appeared in the action." Rodriguez v. Conant, 105 N.M. 746, 749, 737 P.2d 527, 530 (1987).  At a hearing to assess damages after the entry of a default, the defaulting defendant has the right to cross-examine the plaintiff's witnesses and to introduce affirmative evidence on the mitigation of damages.  See

<u>Gallegos v. Franklin</u>, 89 N.M. 118, 123, 547 P.2d 1160, 1165-66 (Ct. App. 1976).

"A punitive damage claim is not admitted by a default.  Neither is punitive damages provided for in Rule 55(b)."  <u>Id.</u> 89 N.M. at 125, 547 P.2d at 1167 (remanding to the trial court to hold a hearing at which the parties may present evidence regarding compensatory and punitive damages).

### b.      Federal Law.

Rule 55(b)(2) of the Federal Rules of Civil Procedure provides:

> If, in order to enable the court to enter judgment or to carry it into effect, it is necessary to take an account or to determine the amount of damages or to establish the truth of any averment by evidence or to make an investigation of any other matter, the court may conduct such hearings or order such references as it deems necessary.

Fed. R. Civ. P. 55(b)(2).  "A court may enter a default judgment without a hearing only if the amount claimed is a liquidated sum or one capable of mathematical calculation." <u>H.B. Hunt v. Inter-Globe Energy, Inc.</u>, 770 F.2d 145, 148 (10th Cir. 1985)(citing <u>Venable v. Haislip</u>, 721 F.2d 297, 300 (10th Cir. 1983)).  If the damages sum is not certain or capable of easy computation, the court may hold the hearing or inquiry it deems necessary.  <u>See</u> <u>Beck v. Atlantic Contracting Co.</u>, 157 F.R.D. 61, 64 (D. Kan. 1994).  "Similarly, attorney's fees may not be awarded without a hearing to determine the amount." <u>H.B. Hunt v. Inter-Globe Energy, Inc.</u>, 770 F.2d at 148.

"Entry of default precludes a trial on the merits."  <u>Olcott v. Delaware Flood Co.</u>, 327 F.3d 1115, 1119 n.3 (10th Cir. 2003).  Rule 55(b)(2) does not contain an inherent jury requirement; rather, it preserves the right to a jury "when and as required by any statute of the United States." <u>Olcott v. Delaware Flood Co.</u>, 327 F.3d at 1124.  The "[d]efendants do not have a constitutional right to a jury trial following entry of default." <u>Id.</u>  On the other hand, when the plaintiff has made a jury demand, the plaintiff may not unilaterally waive the demand.  <u>Cf.</u> <u>Mitchell v. Bd. of County Comm'rs of the County of Santa Fe</u>, No. 05CV1155, at **18-23 (D.N.M. May 9, 2007)(Browning,

J.)(discussing why a plaintiff may not unilaterally waive his jury demand for the purpose of the damages hearing under Fed. R. Civ. P. 38(d) when a defendant not appearing in that case has not agreed to that waiver).

Regarding punitive damages, "[a] plaintiff cannot satisfy the certainty requirement simply by requesting a specific amount. [The plaintiff] must also establish that the amount requested is reasonable under the circumstances." Beck v. Atl. Contracting Co., 157 F.R.D. at 65. A damages hearing may not be required before entering a punitive damages award, however, when the court is familiar with the defendant's conduct and otherwise has sufficient information with which to make a reasonable determination. See James v. Frame, 6 F.3d 307, 310-11 (5th Cir. 1993).

With regard to multiple defendants, "when one of several defendants who is alleged to be jointly liable defaults, judgment should not be entered against him until the matter has been adjudicated with regard to all defendants, or all defendants have defaulted." Such an approach avoids inconsistent liability determinations among joint tortfeasors. H.B. Hunt v. Inter-Globe Energy, Inc., 770 F.2d at 147 (citing Frow v. DeLaVega, 82 U.S. (15 Wall.) 552 (1872)).

### 2.    **Summary Judgment.**

If the Court treats Applied Capital's motion as one for summary judgment, as it is labeled, then it is clear that the Court has the power to enter judgment on liability. The law is less clear about the Court's ability to enter summary judgment on damages. There does not, however, appear to be anything in the rules or in the caselaw that requires a court to treat damages issues differently from other factual issues, or that mandates a trial even where there is no genuine issue of material fact.

### a.    **New Mexico Law.**

Concerning the relationship between the awarding of damages and the granting of summary judgment, New Mexico and federal law also largely track each other. Rule 1-056C of the New

Mexico Rules of Civil Procedure states that "[a] summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages."  NMRA 1-056C.  In <u>Construction Contracting & Management, Inc. v. McConnell</u>, 112 N.M. 371, 815 P.2d 1161 (1991), the Supreme Court of New Mexico implicitly acknowledged rule 1-056C's applicability by holding that, because partial summary judgment was granted as to the issue of liability only, absent revision or rescission of the partial summary judgment ruling, all that remained for the jury was to determine the extent of damages.  <u>See</u> <u>id.</u> at 375, 815 P.2d at 1165.

### b.     Federal Law.

Rule 56(c) of the Federal Rules of Civil Procedure contains the same language as rule 1-056C: "A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages."  Fed. R. Civ. P. 56(c).  In <u>Schnall v. Amboy National Bank</u>, 279 F.3d 205 (3rd Cir. 2002), the United States Court of Appeals for the Third Circuit relied on rule 56(c) in holding that the plaintiff was entitled to partial summary judgment on the issue of liability and in remanding the case to determine the amount of damages to be awarded.  <u>See</u> 279 F.3d at 219; <u>Granite Rock Co. v. Bay Area Bldg. Material Teamsters Local 216</u>, No. 89-15062, 1991 WL 133590, at *4 (9th Cir. July 22, 1991)(discussing rule 56(c)'s operation and the holding of a trial to determine damages after the granting of partial summary judgment on the issue of liability).  Again, however, there does not appear to be anything in the language of rule 56 or the caselaw that requires the trial court to treat damages issues differently from other factual issues, or that mandates a trial even where there is no genuine issue of material fact.

### <u>NEW MEXICO LAW REGARDING JOINT CONTRACTS</u>

Under New Mexico law, joint contracts create joint and several liability.  N.M.S.A. § 38-4-3 provides:

> All contracts, which by the common law are joint only, shall be held and construed to be joint and several; and in all cases of joint obligations or assumptions by partners and others, suit may be brought and prosecuted against any one or more of the parties liable thereon, and when more than one person is joined as defendant in any such suit, such suit may be prosecuted, and judgment rendered against any one or more of such defendants.

N.M.S.A. § 38-4-3.  See Economy Rentals, Inc. v. Garcia, 112 N.M. 748, 762, 819 P.2d 1306, 1320 (1991)(citing N.M.S.A. § 38-4-3 and Restatement (Second) of Contracts §§ 288, 289 (1981) in discussing and defining joint contracts).

"Where there are more promisors than one in a contract, some or all of them may promise jointly as a unit, or some or all of them may each promise severally, or some or all of them may promise jointly and severally."  Restatement (First) of Contracts § 16.  A several promise may be defined as follows: "Where two or more parties to a contract promise separate performances, to be rendered respectively by each of them, [. . .] each is severally bound for the performance which he promises and is not bound jointly with any of the others."  Douglas v. Bergere, 94 Cal. App. 2d 267, 270, 210 P.2d 727, 729-30 (1949)(quoting Restatement (First) of Contracts § 113).  "A joint and several contract is a contract with each promisor and a joint contract with all, so that parties having a joint and several obligation are bound jointly as one party, and also severally as separate parties at the same time."  12 Williston on Contracts § 36:1 (4th ed.) (internal quotations omitted).

> The Restatement (Second) of Contracts provides that where two or more parties to a contract promise the same performance to the same promisee, each is bound for the whole performance of the contract, whether his duty is expressed as joint, several, or joint and several.  It should be noted that the question whether two promisors promise the same or separate performances is distinct from the question whether two promisors of the same performance are bound by joint or by several duties or by both, although the two questions are sometimes confused.  The first question, what performances are promised, is entirely a question of interpretation of the promises, while the second question, distinguishing between joint and several duties, is primarily remedial and procedural.

Id. (quoting Restatement (Second) of Contracts §§ 288, 289)(internal quotations omitted).  "[W]hen

uncertainty arises concerning the meaning of a contract, the language used by the parties is to be considered in the light of the surrounding circumstances and of the practical and mutual construction placed thereon as shown by their acts and conduct before any controversy has arisen between them." Douglas v. Bergere, 94 Cal. App. 2d at 270, 210 P.2d at 730.

## ANALYSIS

There is no disputed issue of material fact that Presley, individually and on behalf of his company, New Energy, conspired with Gibson, Herman, Scogin and Gibson's, Presley's, and Scogin's respective companies to defraud Applied Capital into wiring Grizzly $550,000.00 in connection with a purchase transaction involving a fictitious drilling rig, and that Presley, on behalf of New Energy, breached the contract that memorialized the transaction, known as the Closing Agreement. There also is no disputed issue of material fact that Presley and these other Defendants defrauded Applied Capital, and that, at Scogin's, Presley's, Herman's, and Gibson's behest, Grizzly Drilling, New Energy, and non-party Legato Staffing, breached the Closing Agreement. Although, there is no disputed issue of material fact that Presley, personally and on behalf of New Energy, received $450,000.00 of the $550,000.00 that Applied Capital wired to Grizzly Drilling, the Court need not determine whether it would be unjust for them to retain this amount, because it finds that Presley and New Energy conspired with their co-defendants to defraud Applied Capital. It is unnecessary for the Court to grant Applied Capital equitable relief when it has adequate remedy at law for its claims. See Lopez v. Kase, 1999-NMSC-011, ¶ 6, 975 P.2d at 348; Ontiveros Insulation Co. v. Sanchez, 2000-NMCA-051, ¶ 12, 3 P.3d at 699.

## I.     THE COURT WILL NOT STRIKE PRESLEY'S MOTION.

Presley states that it is his understanding that a motion to dismiss may be filed at any time in the proceeding, even if the defendant has not answered the initial complaint. See Presley's

Motion, ¶ 1, at 1.  Applied Capital asks the Court to strike Presley's motion, because Presley is in default and has no standing to contest the factual allegations of the complaint or to assert affirmative defenses.  <u>See</u> Plaintiff's Motion to Strike, ¶ 1, at 1-2.  While the Court is cognizant of the standing issue in this case, that point is not material to the Court's decision not to strike Presley's motion.

Motions to strike are reserved for striking pleadings.  <u>See</u> Fed.R.Civ.P. 12(f); Fed.R.Civ.P 7(a)(defining pleadings to include: a complaint and an answer; a reply to a counterclaim denominated as such; an answer to a cross-claim, if the answer contains a cross-claim; a third-party complaint, if a person who was not an original party is summoned under the provisions of Rule 14; and a third-party answer, if a third-party complaint is served).  Under rule 7(a), motions and other papers are not pleadings. "[T]here is no provision in the Federal Rules of Civil Procedure for motions to strike motions and memoranda." <u>McGuire-Pike v. Ameri-CK, Inc. et al.</u>, 04CV705 at *4 (D.N.M. July 23, 2006)(Browning, J.) <u>Searcy v. Soc. Security Admin.</u>, 956 F.2d 278, *5(Table)(10th Cir. 1992)(unpublished). <u>See</u> 2 J. Moore, <u>Moore's Federal Practice</u> § 12.37[2], at 12-100.1 (3d ed. 2005)("Only material included in a 'pleading' may be the subject of a motion to strike, and courts have been unwilling to construe the term broadly. Motions, briefs, or memoranda, objections, or affidavits may not be attacked by the motion to strike.").  Accordingly, the Court will not strike Presley's motion because such action is not appropriate under the Federal Rules of Civil Procedure.

Applied Capital also argues that the Court should strike Presley's motion because it does not comply with the Court's local rules.  Presley has attached to his motion in excess of 120 pages of exhibits, violating the fifty-page limit set forth in D.N.M. LR-CV 10.5.  <u>See</u> Presley's Motion. (Doc.189).  Moreover, Presley has not highlighted or otherwise marked those portions of his exhibits that he wishes to bring to the Court's attention, as D.N.M. LR-CV 10.6 requires.  Presley failing to follow required procedure, however, is not outweighed by the rules set forth in Fed.R.Civ.P. 12(f)

and Fed.R.Civ.P 7(a), which restrict the Court's striking ability to pleadings.  And beyond these rules, the Court is also reluctant to strike or disregard Presley's motion on procedural grounds given that he is proceeding pro se.  Accordingly, the Court will not strike Presley's motion on procedural grounds.

## II.     PRESLEY DOES HAVE STANDING TO FILE HIS MOTION TO DISMISS EVEN THOUGH DEFAULT WAS ENTERED AGAINST HIM.

Entry of default was entered against Presley and New Energy on September 20, 2006. See Doc. 138.  The Court has not, however, entered final default judgment.  On February 12, 2007 Presley filed a Motion to Dismiss. See Doc. 188. The Court is faced with the question whether Presley had standing to file his motion, and furthermore, if he did have standing, whether the Court should review his motion on the merits.  The Court finds that Presley did have standing.

In Olcott v. Delaware Flood Co., the Tenth Circuit stated that, "[a]fter entry of default, [d]efendants were not entitled to raise merit based argument before the district court." 327 F.3d 1115, 1125 (10th Cir. 2003).  The context of Olcott v. Delaware Flood Co., however, suggests that merit-based arguments in that case were raised after final default judgment.  See id. at 1124. Furthermore, the Eighth Circuit has stated that, "once a default is entered, a defendant on [sic] default has no further standing to contest the factual allegations of plaintiff's claim for relief." Taylor v. City of Ballwin, 859 F.2d 1330, 1333 n.7 (8th Cir. 1988).

While the distinction between "entry of default" and "default judgment" is not always made clear, the Tenth and the Eighth Circuit's plain language appears to deprive  defendants of their standing to contest factual allegations after the entry of default.

The Court must then determine whether Presley's argument is a merits-based argument.  The Tenth Circuit's opinion in Olcott v. Delaware Flood Co. does not specifically define that term.  The

Court of Appeals for the Fifth Circuit, however, provides further insight on the term in Nishimatsu Construction Company, Ltd. v. Houston Nat'l Bank, 515 F.2d 1200 (5th. Cir. 1975), stating that "[a] default judgment is unassailable on the merits but only so far as it is supported by well-pleaded allegations, assumed to be true." Id. at 1205 (citing Thomson v. Wooster, 114 U.S. 106, 105 (1885)). Furthermore, "[t]he defendant, by his default, admits the plaintiff's well-pleaded allegations of fact, is concluded on those facts by the judgment, and is barred from contesting on appeal the facts thus established." Nishimatsu Const. Company, Ltd. v. Houston Nat. Bank, 515 F.2d at 1205 (citing Thomson v. Wooster 114 U.S. at 110 (1885)). A merit-based argument, therefore, appears to be an argument contesting the plaintiff's well-pleaded allegations. Id. at 1205. In one sense, Presley is similar to the defendant in Olcott v. Delaware Flood Co., in asking the Court to interpret an agreement between the parties after default judgment was entered. See Presley's Motion ¶ 6, at 3; Olcott v. Delaware Flood Co., 327 F.3d at 1125. On the other hand, the agreements in the two cases are different. The agreement in Olcott v. Delaware Flood Co. involved the contract at issue in the case. Presley, on the other hand, is asking the Court to interpret the settlement agreement between himself and Applied Capital. See Presley's Motion ¶ 6, at 3. To do so, the Court would have to interpret the terms of the agreement, but it is not one that is at issue in the case, and does not contest the allegations of the Plaintiffs' case. Rather, Presley's argument is similar to accord and satisfaction, saying, even if all the allegations are true, the case has been settled. While the term "merits-based argument" is not specifically defined in the default judgment context by the Tenth Circuit, the Court concludes that Presley's motion does not contend the allegations of Applied Capital's Fourth Amended Complaint or raise a merits-based argument. While the Court acknowledges that the situation in Olcott v. Delaware Flood Co. may be similar to Presley's situation, Presley's argument regarding the existence of a settlement, is not a merits-based

argument. While the Court cannot say that Presley properly filed his motion or has litigated this case properly, the Court concludes that he has standing to raise the settlement of the case.  The Court will therefore review Presley's motion on the merits.

### III.   PRESLEY DID NOT SHOW GOOD CAUSE FOR SETTING ASIDE THE DEFAULT, AND HIS MOTION SHOULD BE DENIED.

Although Presley had standing to file his motion to dismiss,  he did not take the proper procedural steps to set aside the entry of default.  See Fed. R.Civ.P.(55)(c).  After a clerk enters a default, the defendant is required to move the court to set aside his default by showing good cause for such relief.  See id.  The only document Presley has filed with the Court is his Motion to Dismiss.  See Presley's Motion (Doc. 188).

The Court is mindful that Presley is proceeding pro se  and will construe his filings liberally.  A pro se plaintiff is entitled to a liberal construction of his pleadings and other filings. See Haines v. Kerner, 404 U.S. 519, 520-21, (1972). This rule of construction "means that if the court can reasonably read the pleadings to state a valid claim on which the plaintiff could prevail, it should do so despite the plaintiff's failure to cite proper legal authority, his confusion of various legal theories, his poor syntax and sentence construction, or his unfamiliarity with pleading requirements." Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir.1991).

On the other hand, the Court must be mindful that it does not cross the line from being the judge to being the pro se party's advocate.  It is not the proper function of the district court to assume the role of advocate for the pro se litigant. See Bainum v. Sedgwick County Comm'rs, 27 Fed.Appx. 965, *2 (10th Cir. 2001). We "will not supply additional facts, nor will we construct a legal theory for plaintiff that assumes facts that have not been pleaded." Dunn v. White, 880 F.2d 1188, 1197 (10th Cir. 1989).

Thus, the Court will construe Presley's motion liberally as a motion to set aside the default. In his motion, however, Presley must set forth good cause for such relief. See Fed.R.Civ.P. 55(c). "The principal factors in determining whether a defendant has met the good cause standard are (1) whether the default was the result of culpable conduct of the defendant, (2) whether the plaintiff would be prejudiced if the default should be set aside, and (3) whether the defendant presented a meritorious defense." Hunt v. Ford Motor Co., 65 F.3d 178, *4 (Table)(10th Cir. 1995)(citing In re Dierschke, 975 F.2d 181, 183 (5th Cir.1992)). "These factors are not 'talismanic' and the court may consider other factors." Hunt v. Ford Motor Co., 65 F.3d at *4 (citing In re Dierschke, 975 F.2d at 184). Moreover, "the court need not consider all the factors." Hunt v. Ford Motor Co., 65 F.3d 178, *4. If the default was the result of the defendant's culpable conduct, the district court may refuse to set aside the default on that basis alone. See id.; Alan Neuman Prod., Inc. v. Albright, 862 F.2d 1388, 1391 (9th Cir.1988), cert. denied, 493 U.S. 858, (1989). But cf. Berthelsen v. Kane, 907 F.2d 617 (6th Cir.1990) (holding that, because the businessman failed to show that he would be prejudiced by reopening the case and because his associate had a meritorious defense to allege failure to perform under the stock purchase agreement, default judgment should have been set aside, even though the associate had willfully evaded service of process); Fed. Deposit Ins. Corp. v. Francisco Inv. Corp., 873 F.2d 474 (1st Cir.1989)(holding that the district court abused its discretion in denying the guarantor's motion to set aside nonfinal default judgment where the guarantor had failed to appear upon assurances from the officer of the debtor corporation, had at least a partial potentially meritorious defense, and the FDIC, suing on a note acquired from the bank, would not be prejudiced by delay caused by the default). Generally, a defendant's conduct is considered culpable if he has defaulted willfully or has no excuse for the default. See Hunt v. Ford Motor Co., 65 F.3d at *4; United States v. Timbers Preserve, Routt County, Colo., 999 F.2d 452, 454 (10th

Cir.1993); <u>Meadows v. Dominican Republic</u>, 817 F.2d 517, 521 (9th Cir. 1987) (receiving actual notice of complaint and failing to respond is culpable conduct);  6 J. Moore,  <u>Moore's Federal Practice</u> § 55.10[1] at p. 55-74, n. 24 (2d ed. 1994).

In considering these factors, the Court must first consider whether default was the culpable conduct of Presley.  Presley was made aware of his need to answer Applied Capital's complaint on July 24, 2006 when he signed a waiver of service.  <u>See</u> Waiver of Service, filed August 17, 2006 (Doc. 130).  Presley was also made aware of the need for New Energy to answer Applied Capital's complaint on June 19, 2006 when he signed a waiver of service on its behalf.  <u>See</u> Waiver of Service, filed August 17, 2007 (Doc. 131).  The waivers of service that Presley signed state: "I understand that a judgment may be entered against me if an answer or motion under Rule 12 is not served upon you within 60 days after the date these documents were sent." Waiver of Service, filed August 17, 2006 (Doc. 130); Waiver of Service, filed August 17, 2007 (Doc. 131).  Presley did not file anything with the Court until February 12, 2007.  <u>See</u> Presley's Motion, (Doc. 188).  Presley, therefore, was fully aware of the need to answer within the given time limitation and chose not to respond timely.

The Court must also consider whether the setting aside of the default judgment would harm the non-defaulting party.  Applied Capital filed this suit on January 28, 2005.  <u>See</u> Complaint (Doc. 1).  Neither Presley nor New Energy answered Applied Capital's complaint.  Default was entered by the Clerk of the Court over one year ago.  <u>See</u> Clerk's Entry of Default, filed September 20, 2006 (Doc. 138).  On January 11, 2007 Applied Capital filed a Motion to Compel Presley to comply with discovery requests.  <u>See</u> Plaintiff's Motion to Compel and for Sanctions Against Defendant Presley (Doc. 164).  Once again, Presley failed to comply with the Court's deadlines in producing documents and appearing to complete his deposition.  <u>See id.</u> ¶¶ 2,3,4,5 at 1-2.  Presley did not file

any document with the Court until almost five months after the entry of default against him.  See
Presley's Motion, filed February 12, 2007 (Doc. 188).   This litigation has been long and
complicated.  Presley's failure to comply with Court deadlines has contributed to the complication
and duration of this suit.  If the Court were to set aside the default, the duration and complication
of this case could be exacerbated.  Applied Capital could incur further legal fees and be forced to
prolong its ability to recover from Presley beyond the two and half years it has already spent in this
litigation.  Applied Capital, therefore, could be prejudiced by setting aside the entry of default.
Nevertheless, because Applied Capital has not moved for a default judgment and has instead sought
a summary judgment, it does not appear that Applied Capital will suffer prejudice, because it seeks
a judgment on the merits rather than a judgment by default.

Finally, the Court has to consider whether Presley and New Energy have a meritorious
defense.  See  Hunt v. Ford Motor Co., 65 F.3d 178, *4 (Table)(10th Cir. 1995).  Presley's primary
claim in his Motion to Dismiss is that Applied Capital has accepted his settlement agreement.  See
Presley's Motion, ¶ 6, at 3.  Before addressing whether a settlement agreement would constitute
good cause to set aside entry of a default, the Court must determine whether an actual settlement
agreement exists between Presley and Applied Capital.  For a defense to be meritorious, it needs to
be of such merit as to allow the Court to reasonably infer that allowing the defense to be litigated
could foreseeably alter the outcome of the case.  See Kirtland v. Fort Morgan Auth. Sewer Svs., Inc.,
524 So.2d 600 (Ala. 1988).  The concept of a meritorious defense is designed to allow a matter to
be resolved on its merits where there are meritorious matters to be considered.  See Bell v. Bell,
App.W.D., 849 S.W.2d 194 (Mo. Ct. App 1993).  Presley has not explained how any portion of the
100-plus page transcript of his October 18, 2006 deposition is material to his motion.
Notwithstanding Presley's pro se status, it is not reasonable for him to expect or ask the Court to

search through all of his attachments to find some support for his arguments. <u>See</u> D.N.M.LR- 10.6 (requiring a party to bring to the court's attention the relevant parts of his or her exhibits by highlighting or by some like manner).

Nevertheless, the Court has read the entire deposition. Presley suggests, <u>see</u> Presley's Motion ¶ 3 at 2-3, that the deposition corroborates his claim that his dispute with Applied Capital is ready to be settled. <u>See</u> Presley Depo, 29:3-15. Presley states that he is "taken back" by the fact that Applied Capital has one lawyer coming at him with "both barrels loaded" and, at the same time, he has another Applied Capital lawyer in Wyoming constructing pleadings in another court asking it to hold off on a certain decision or reverse a prior decision to allow time for the sale of the leases to bring in the funds to pay all creditors in full. <u>See</u> Presley's Motion, ¶ 5 at 3. Presley states that he does not see what the purpose of this litigation is unless Applied Capital wants to get a judgment in the Court which is so exorbitant with punitive damages that it kills the deal with his buyers. <u>See</u> <u>id.</u> ¶ 3, at 2. Presley states that, if his sale falls apart, no one will get any money, which could be an unintended consequence. <u>See</u> <u>id.</u> Presley argues that this litigation has taken on all the attributes of the formation of "a circular firing squad." <u>Id.</u> ¶ 6 at 3-4.

Presley stated in his Motion and in his deposition that Applied Capital has accepted his settlement offer of $1.4 million as a full settlement of its claims. <u>See</u> Presley's Motion, ¶¶ 3, 6, 9 at 2-4; Presley's Depo. 29:3-15. Specifically, Presley stated,

> We all know in this room what's going on outside these doors <u>to try</u> and bring--to try and bring this to a conclusion as it relates to me and what's going on now with Throne and the buyer asked that and so on and so forth to bring money in to settle this with Applied Capital. And we also have an agreement--Mr. Scott and I have an agreement <u>in principle upon the approval of that money</u>. . . [t]hat Applied Capital gets $1.4 million. And we mutually release ourselves from each other from beginning of the world until the day it's paid, and we stop all litigation.

Presley Depo, 29:3-15 (emphasis added). Presley states that the money for the settlement is to be

supplied by the proceeds of a sale which he believed to be "very close at hand" on February 12, 2007, when he filed his motion.  <u>See</u> Presley's Motion, ¶ 3 at 2.

Presley's understanding of the settlement agreement is countered--or clarified--by the evidence presented by Applied Capital, which suggests there is no longer a settlement agreement between the parties.  <u>See</u> Plaintiff's Motion to Strike, ¶ 3 at 2.  Applied Capital argues that, while it agreed on January 16, 2006, to accept 1.4  million dollars in settlement of its claims against New Energy and Presley, the settlement was conditioned upon payment being within 30 days, <u>i.e.</u> by February 18, 2006.  <u>See</u> Plaintiff's Motion to Strike (Exhibit 1).  Presley does not dispute this condition.

"[W]here material facts concerning the existence or terms of an agreement to settle are in dispute, the parties must be allowed an evidentiary hearing."  <u>United States v. Hardage</u>, 982 F.2d 1491, 1496 (10th Cir. 1993).  A court must have before it a sufficient factual development -- consisting of sworn testimony subject to cross-examination, sworn affidavits, and legal memoranda -- to enforce a settlement agreement.  <u>See id.</u>  While the Court believes that there may not be any material dispute in the facts regarding the settlement, the Court nonetheless set a hearing on Presley's motion to dismiss so that, before deciding it, Presley had a full opportunity to provide a completely sufficient factual basis for his contentions that a settlement agreement existed.

Presley, however, failed to appear at a hearing that the Court held on July 31, 2007, to argue his Motion to Dismiss.  <u>See</u> Transcript of Hearing 2:14-25 (Court & Bohnhoff).  The Court gave Presley a chance to present further evidence to the Court to support his motion, and he chose not to appear.  <u>See id.</u>  Presley has not asked for another hearing to present further guidance on the settlement, and the Court does not believe another hearing would benefit any of the parties or the Court.  The Court believes it should proceed to decide the issue on the record before it.

On the record before the Court, while Presley makes a few statements to the effect that there was a settlement, he elsewhere, in his deposition, concedes that there was a settlement "in principle". Presley's Motion ¶ 3, at 2 (stating "that arrangements have been put in place that Plaintiff will be paid the settlement from the proceeds of said sale in an amount in full as agreed upon by and between Plaintiff and Defendant and that those funds are now very close at hand");  id. at ¶ 6 at 3 (stating that, "I have offered him $1.4 million and he has accepted that amount as a full settlement and will release me of all claims he has against me and I against him.");  id. ¶ 9, at 4 (stating, "I guaranteed the deal that went south and agree that Plaintiff and I have an agreed settlement and he will be paid very soon."); Presley Depo. at 29:8-15 (stating "[a]nd we also have an agreement--Mr. Scott and I have an agreement in principle upon the approval of that money ").  This concession is consistent with Applied Capital's characterization of the settlement.  Applied Capital agreed to settle if the payment was made at a specific time; that condition did not, or has not occurred.  At best, there was a condition subsequent that was not satisfied. See F &D Property Co. v. Alkire, 385 F.2d 97, 101 (10th Cir. 1967)(stating that unless landlord satisfied the condition subsequent in the lease, the terms of the lease regarding termination could not be carried out).  While there may have been a settlement on terms, and even if there was an agreement on the terms, there never was a contract, because the condition subsequent--a payment--was never made.

In the record before the Court, the existence of the settlement agreement is neither unclear nor disputed.  Presley failed to appear before the Court to support his allegations, and  has not shown good cause for the Court to set aside the entry of default or to dismiss the case.  Accordingly, the Court will deny his motion and proceed to review Applied Capital's motion on the merits.

**IV.     THE RECORD BEFORE THE COURT DOES NOT REVEAL A GENUINE ISSUE OF MATERIAL FACT ON ANY ISSUE RELATED TO LIABILITY.**

The Court has carefully reviewed the record.  Given that Presley and New Energy have not filed a timely answer to the Verified Fourth Amended Complaint, Presley and New Energy have admitted all of the material allegations of the Verified Fourth Amended Complaint, except those regarding the amount of Applied Capital's damages.  See Fed. R. Civ. P. 8(d)("Averments in a pleading to which a responsive pleading is required, other than those as to the amount of damage, are admitted when not denied in the responsive pleading.").  Cf. Olcott v. Delaware Flood Co., 327 F.3d 1115, 1119 n.4 (10th Cir. 2003)(discussing that entry of summary judgment was appropriate after entry of default under rule 55(a) because "the court had not yet entered judgment by default pursuant to Fed. R. Civ. P. 55(b)"); Board of Trustees of the Boilermake Vacation Trust v. Skelly, Inc., 389 F.Supp.2d 1222, 1225 (N.D. Cal. 2005)(holding that a defendant against whom the clerk of court entered default under Fed. R. Civ. P. 55(a) for failure to answer was "deemed to have admitted the well-pleaded averments of the complaint except those as to the amount of damages" for purposes of default judgment).

Moreover, because Presley has not responded to Applied Capital's Request for Admissions, he has admitted the substance of each request.  See Fed. R. Civ. P. 36(a)("The matter is admitted unless, within 30 days after service of the request, or within such shorter or longer time as the court may allow or as the parties may agree to in writing, subject to Rule 29, the party to whom the request is directed serves upon the party requesting the admission a written answer or objection addressed to the matter, signed by the party or by the party's attorney.").  Indeed, Presley, by not filing a written opposition to the motion for summary judgment, could be deemed to have consented to the granting of the motion.  See D.N.M.LR-Civ. 7.1(b) ("The failure of a party to file and serve

-40-

a response in opposition to a motion within the time prescribed for doing so constitutes consent to grant the motion."); D.N.M.LR-Civ. 7.6(a) ("A response must be served within fourteen (14) calendar days after service of the motion.").  Furthermore, because Presley has not filed a timely written response contesting any of the paragraphs in Applied Capital's statement of undisputed facts, the Court can take the facts as Applied Capital has stated them.  See Fourth Amended Complaint.

There are specific rules related to requirements for summary judgment with which neither Presley nor New Energy has made any effort to comply. "A party opposing the motions must file a written memorandum containing a short, concise statement of the reasons in opposition to the motion with authorities." D.N.M.LR-Civ. 56.1(b).

> A memorandum in opposition to the motion must contain a concise statement of the material facts as to which the party contends a genuine issue does exist. Each fact in dispute must be numbered, must refer with particularity to those portions of the record upon which the opposing party relies, and must state the number of the movant's fact that is disputed. All material facts set forth in the statement of the movant will be deemed admitted unless specifically controverted.

Id.

Nevertheless, because the Tenth Circuit has encouraged district courts to decide motions for summary judgment on the merits, see Woods v. Roberts, No. 94-3159, 1995 WL 65457, at *2 (10th Cir. 1995); Hancock v. Okla. City, 857 F.2d 1394, 1396 (10th Cir. 1988, Jaxon v. Circle K Corp., 773 F.2d 1138, 1140 (10th Cir. 1985),  because Presley is proceeding pro se, and because he filed a motion to dismiss that perhaps could be construed liberally as a response to the motion for summary judgment, the Court will consider Applied Capital's motion on the merits rather than defaulting Presley for procedural violations.  In the end, however, Presley has not contested any of Applied Capital's factual assertions.  As such, the issues are not in dispute and what remains for decision is whether Applied Capital is entitled to judgment as a matter of law.

## V.     PRESLEY AND NEW ENERGY CONSPIRED WITH THE OTHER DEFENDANTS TO DEFRAUD APPLIED CAPITAL.

The uncontested allegations in Applied Capital's complaints, see Fed. R. Civ. P. 8(d); the unanswered requests for admission, see Fed. R. Civ. P. 36(a); and the documents and deposition testimony attached to Applied Capital's summary judgment motion demonstrate, as a matter of undisputed material fact, that Presley, individually and acting on behalf of New Energy, conspired with Herman, (acting on behalf of New Energy), Scogin (acting on behalf of Grizzly Drilling), and Gibson (acting on behalf of Legato), to defraud Applied Capital into wiring Grizzly Drilling $550,000.00 for the purchase of a non-existent drilling rig.[3]  See Herman Depo. at 14:2; Scogin Depo. at 19:8-10; 21:10-15; Presley Depo. at 16:25-18:9; 18:5-9; 62:18-64:8; Gibson Depo. at 36:6-38:2; Fourth Complaint at ¶¶ 7, 9, 12, 15, 31, at 2-3, 7.

Presley agreed with Gibson, Herman, and Scogin to fraudulently induce Applied Capital to enter into the rig transaction and also to breach the Closing Agreement; the $550,000.00 wire transfer from Applied Capital would be used not to buy, as represented, a drilling rig from Grizzly Drilling but rather to make payments to the co-conspirators and fund the HYIP program.  See Presley's Memo, Presley's Depo. at 16-28:22.  The deposition testimony of Presley provides the most detailed explanation of this scheme.  See Presley Depo. at 15:18-19:24.

---

[3]The Court will not consider, for purposes of this motion, whether the Defendants conspired to breach the Closing Agreement.  In the Verified Fourth Amended Complaint for Fraud, Negligent Misrepresentation, Unjust Enrichment, Breach of Contract, Violation of the New Mexico Unfair Trade Practices Act, and Civil Conspiracy, Applied Capital premised its civil conspiracy claim on only one wrongful act: fraudulent misrepresentation.  See Fourth Complaint ¶¶ 64-71, at 13-14. Applied Capital did not, in the Verified Fourth Amended Complaint, state that its civil conspiracy claim was also based on breach of contract.  See id. ¶¶ 14-71, at 3-14.  The Court believes it would be unfair and prejudicial to allow Applied Capital to assert now that its civil conspiracy claim rests upon both fraudulent misrepresentation and breach of contract.  The Court will therefore not consider whether the Defendants conspired to breach the Closing Agreement.

In conclusion, the undisputed facts show that Presley, acting on behalf of New Energy, conspired with Herman, acting on behalf of New Energy; Gibson, acting on behalf of Legato; Scogin, acting on behalf of Grizzly Drilling; Ambrose and; Voyles acting on behalf of Heritage Commercial Services to defraud Applied Capital out of $550,000.00 in the rig transaction and to breach the Closing Agreement.

## VI.   PRESLEY, NEW ENERGY, AND THEIR CO-CONSPIRATORS DEFRAUDED APPLIED CAPITAL.

Because Presley and New Energy conspired with Herman, Gibson and Legato, and Scogin and Grizzly Drilling, Presley is liable for not only his own fraudulent misrepresentations but also for those of his fellow co-conspirators.  See Seeds v. Lucero, 2005-NMCA-067, ¶ 18, 113 P.3d at 863; Ettenson v. Burke, 2001-NMCA-003, ¶ 12, 17 P.3d at 445 ("The purpose of a civil conspiracy claim is to impute liability to make members of the conspiracy jointly and severally liable for the torts of any of its members.").

Presley's and his co-conspirators' fraudulent misrepresentations can be grouped into several categories.  First, to obtain the $550,000.00 from Applied Capital, Gibson, Presley, and Herman sent Applied Capital several documents representing that Legato Staffing had substantial assets and intimating that it was capable of making the $625,000.00 payment that the Closing Agreement contemplated. See Fourth Complaint ¶ 17, at 4; Gibson Depo. at 100:5-101:17. On May 10, 2004, Presley sent to Applied Capital, by telefacsimile transmission, a statement by Gibson, representing that Legato owned an unencumbered bank account with a balance of ten million dollars.  See Fourth Complaint ¶ 17, at 4; Gibson Depo at 100:5-20.  On May 11, 2004, Herman sent Applied Capital, by telefacsimile transmission, a purported HSBC Bank statement for this account, again confirming the balance of ten million dollars.  See id., Exhibit 4, Letter from HSBC to Francis Gibson (dated

April 27, 2004).  On May 12, 2004, Gibson wrote Applied Capital that Legato was "on sound financial footing." Fourth Complaint, Exhibit 4, Letter from Francis Gibson to Jim Scott (dated May 12, 2004). Those representations were false.  Legato Staffing was not financially strong, it had no unrestricted funds, and it had a negative net worth.  See Gibson Depo. at 100:21-101:17.

Second, Gibson and Presley misrepresented that they had inspected the drilling rig.  On May 18, 2004 Gibson represented to Applied Capital that Legato Staffing "has conducted all such inspections of the [drilling  rig] as it has deemed necessary and has found the [e]quipment to be complete, in proper working order, and otherwise fully satisfactory to Legato," and that "Legato has not relied upon any representation by New Energy or any other person with respect to the condition of the equipment."  Fourth Complaint, Exhibit 6, Letter from Mark Burkhard to Francis Gibson (dated May 19, 2004) at 1-2.   Similarly, in the Bill of Sale that Gibson attached to his acknowledgment, he represented that the drilling rig was of Legato Staffing's selection and was found to be in satisfactory condition upon inspection.  See Letter from Mark Burkhard to Francis Gibson (dated May 19, 2004), Exhibit B, Bill of Sale ("Bill of Sale").  Gibson,  in his deposition, however, admitted that he had not seen the rig and stated that, in contradiction to his representation to Applied Capital, he accepted assurances regarding the rig that he received from New Energy's Herman and Presley.  See Gibson Depo. at 43:15-16; 44:16-21; 83:15-84:24.  Additionally, while Presley now admits that he never saw the drilling rig and does not know if it exists, see Presley Depo. at 29:20-22, he represented in Grizzly Drilling's May 5, 2004 invoice to New Energy that he or his authorized representative had inspected the rig, see Burkhard Aff. ¶ 8, at 4; Burkhard Aff., Exhibit B, Purchase Order ("Purchase Order").

Third, Gibson, Presley and Scogin misrepresented that Grizzly Drilling owned the drilling rig identified in Presley's correspondence with Applied Capital, in the Closing Agreement, and in

the Bill of Sale attached to Gibson's May 18, 2004 acknowledgment. See Fourth Complaint ¶ 17, at 4; Fourth Complaint, Exhibit 3, Closing Agreement; Gibson Depo. at 100:5-20; Bill of Sale; Purchase Order. Scogin did not own the drilling rig that was the purported subject of the transaction with Applied Capital. See Newton Depo. at 19:1-21:5; 28:12-31:16; 34:6-39:25. Scogin gave Presley photographs and specifications of the drilling rig in May 2004. See Presley Depo. at 35:2-13; 101:5-103:1. The specifications were incorporated into the transaction documents and Presley e-mailed the photographs to Applied Capital. See Closing Agreement; Presley Memo, Exhibit 5, E-mail from Ed Presley to Jim Scott (dated December 14, 2004). Scogin obtained photographs and specifications from his uncle, who did own the rig. See Newton Depo. at 19:1-21:5, 28:12-31:16; 34:6-39:25. In 2003 Scogin contacted his uncle about purchasing the rig; Scogin obtained the photographs and specifications at that time. See id. at 36:11-13; 37:12-25. Scogin never purchased or possessed the drilling rig, and his uncle sold it to a third party in June 2004. See id. at 19:1-21:5; 28:12-31:16; 34:6-39:25.

Fourth, in paragraph 5 of the Closing Agreement, Gibson, Presley, and Scogin misrepresented that Grizzly Drilling would deliver the rig to New Energy's project site within two days following Applied Capital's transfer of funds. See Burkhard Aff. ¶ 8 at 4. On May 27, 2004, Presley perpetuated this misrepresentation by assuring Applied Capital, via email, that the rig had been delivered to the New Energy site. See May 27, 2004 E-mail. Scogin acknowledges that the rig was not delivered; he asserts that, shortly after Applied Capital transferred the funds, Presley instructed him not to deliver the drilling rig. See Scogin Depo. at 37:17-38:9. At that time, however, Legato Staffing held title to the drilling rig, and Presley had no authority to give such an instruction. See Closing Agreement. Moreover, the Grizzly Drilling rig did not exist. See Newton Depo. at 19:1-21:5; 28:12-31:16; 34:6-39:25. Nevertheless, the timing of Presley's instruction to

-45-

Scogin, and Presley's misrepresentations on May 27, 2004, is further evidence of the conspirators' shared intent not to abide by the Closing Agreement.

Finally, Gibson, Presley and Scogin misrepresented to Applied Capital that the subject of the Closing Agreement was the financing of a bona fide purchase of a drilling rig to be used on New Energy's drilling project. See Closing Agreement. No Grizzly Drilling rig existed, and the money was not to be used on the drilling project. See Scogin Depo at 47:12-14; 49:23-24; Newton Depo. at 19:1-21:5; 28:12-31:16; 34:6-39:25. The co-conspirators agreed, in advance, that Scogin would provide New Energy $450,000.00 out of the $550,000.00 that Applied Capital wired, that they would distribute a portion of the $450,000.00 among themselves, and that they would  use the balance to fund the HYIP. See Fourth Complaint ¶¶ 15, 31, at 2-3, 7; Scogin Depo. at 47:12-14; Presley Depo. at 17:10-18:9; New Energy Co., LLC Find Report; Grizzly Drilling Inc. Corporate Checking Statement.

Applied Capital relied on the misrepresentations about Legato Staffing's financial condition in determining whether Legato Staffing would be capable of paying the $625,000.00 invoice that Applied Capital was purchasing in exchange for transferring the $550,000.00. See Burkhard Aff. ¶ 7, at 3. Applied Capital also relied on the representations about the existence, inspection, and delivery of the drilling rig, because the rig was an asset that could be located and liquidated in the event of a default. See id. ¶ 9, at 4-5. Applied Capital relied further on the bona fides of the transaction in deciding that Grizzly Drilling, Legato Staffing, and New Energy were legitimate companies with which it could do business. See id. ¶ 10, at 5. Based on the Defendants' misrepresentations, Applied Capital extended $550,000.00 in credit to Legato Staffing. Applied Capital has been damaged, because the debt remains unpaid. See id. ¶ 12, at 6. Based on the foregoing, the Court concludes that Applied capital is entitled to summary judgment on the

-46-

fraudulent misrepresentation issue.

Moreover, because there is no factual dispute concerning the amount that was fraudulently obtained from Applied Capital, see Celotex Corp. v. Catrett, 477 U.S. at 322 (ruling that summary judgment should be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law), and noting that the defrauded amount is a sum certain, see H.B. Hunt v. Inter-Globe Energy, Inc., 770 F.2d at 148 (stating that a court can enter default judgment without a hearing if the amount claimed is liquidated or capable of mathematical calculation), the Court will award $550,000.00 in damages to Applied Capital on its fraudulent misrepresentation claim against Presley and New Energy, see Closing Agreement at 1-2 (stating that Applied Capital may elect to make the advance of the drilling rig purchase price, $550,000.00). There does not appear to be any caselaw that requires a hearing and/or trial on damages where the amount of damages is certain and undisputed.  No party has made a jury demand in this case, and while rule 56 allows a partial summary judgment on liability and leaves for another day the resolution of damages where damages are contested, it does not state that the general rules regarding summary judgment do not apply to damages when they are undisputed.

## VII.   NEW ENERGY, LEGATO STAFFING, AND GRIZZLY DRILLING BREACHED THE CLOSING AGREEMENT.

Preliminarily, the Court notes that Gibson, Presley, and Scogin are not parties to the Closing Agreement and that therefore they cannot be held liable for its breach.  See Ettenson v. Burke, 2001-NMCA-003, ¶ 25, 17 P.3d at 449 ("As a general rule, [the CEO] cannot be held personally liable for the debts of the corporation or for its breach of contract."); Closing Agreement at 1 (stating that the Closing Agreement is made by and among Applied Capital, Grizzly Drilling, Legato Staffing, and New Energy). New Energy, Grizzly Drilling and Legato Staffing breached the Closing

-47-

Agreement.  First, Legato Staffing did not pay Applied Capital $625,000.00 by July 10, 2004.  See Burkhard Aff. ¶ 12, at 6.  Second, in violation of paragraph 5 of the Closing Agreement, the drilling rig was not delivered to New Energy's lease site.  See Scogin Depo. at 37:17-38:9.  Third, the $550,000.00 wire from Applied Capital was not used to pay, and was not intended to be used to pay, Grizzly Drilling for the purchase of a drilling rig.  See id. at 47:12-14; 49:23-24; Newton Depo. at 19:1-21:5; 28:12-31:16; 34:6-39:25; Fourth Complaint ¶¶ 15, 31 at 2-3, 7; Presley Depo. at 17:10-18:9.  Furthermore, Scogin wired $450,000.00 of the sum Applied Capital provided to New Energy.  See Fourth Complaint ¶¶ 15, 31, at 2-3, 7; Scogin Depo. at 47:12-14; Presley Depo. at 17:10-18:9.  Bank records reflect that transfers and other payments were then made out to Herman ($58,600.00), Gibson ($60,500.00), Gibson's girlfriend, Amy Arial ($14,500.00), and the credit references ($25,000.00).  See New Energy Co., LLC Find Report; Grizzly Drilling, Inc. Corporate Checking Statement.  Presley kept the balance of the $450,000.00 for use in arranging the HYIP.  See Presley Depo. at 17:10-18:9.

These actions breached the material terms of the Closing Agreement, see UJI 13-823 NMRA (instructing that failure to perform substantial obligations of the contract constitutes breach), and damaged Applied Capital, see Burkhard Aff. ¶ 12, at 6.  The non-existence and non-delivery of the drilling rig damaged Applied Capital, because there was no asset available to liquidate to satisfy Legato Staffing's payment obligation.  See id.  Moreover, Applied Capital would not have entered into the transaction if it had known that no rig existed and the sale was a sham.  Considering the above, the Court will enter summary judgment in favor of Applied Capital on the breach of contract issue.

The Court will not, at this stage, however, award Applied Capital damages on its breach of contract claim.  See Fed. R. Civ. P. 56(c) ("A summary judgment, interlocutory in character, may

be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages."); Fed. R. Civ. P. 55(b)(2) (allowing the court to hold whatever hearing or inquiry it deems necessary in order to determine damages after entry of default); NMRA 1-056C (same); NMRA 1-055B.  The Court believes that a question exists concerning what portion of Applied Capital's breach-of-contract damages should be assigned to New Energy.  See Celotex Corp. v. Catrett, 477 U.S. at 322 (ruling that summary judgment should be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law).  The Court also notes the amount of breach-of-contract damages that should be apportioned to New Energy is not a sum certain.  See H.B. Hunt v. Inter-Globe Energy, Inc., 770 F.2d at 148 (stating that a court can enter default judgment without a hearing if the amount claimed is liquidated or capable of mathematical calculation).

The apportionment task is an issue here because the Court cannot find, on the record before it, that the Closing Agreement was a joint contract.  Parties to a contract that jointly promise to perform may be held jointly and severally liable for failure to do so.  See N.M.S.A. § 38-4-3.  The Court believes, however, that the Closing Agreement is more accurately described as a single contract containing multiple parties' several, rather than joint, promises, and that, as such, Grizzly Drilling, Legato Staffing, and New Energy cannot be held jointly and severally liable for breach. See Douglas v. Bergere, 94 Cal. App. 2d at 270, 210 P.2d at 729-30 ("Where two or more parties to a contract promise separate performances, to be rendered respectively by each of them, . . . each is severally bound for the performance which he promises and is not bound jointly with any of the others.").  According to the Closing Agreement, Grizzly Drilling promises to transfer title to the drilling rig to New Energy and to deliver the rig to Legato Staffing, New Energy promises to transfer title to the rig and provide a bill of sale to Legato Staffing, and Legato Staffing promises to provide

-49-

an estoppel letter and $625,000.00 to Applied Capital.  <u>See</u> Closing Agreement at 2-3.  The Court finds that, based on the language of the Closing Agreement, the nature of these promises is several, not joint.  The Court thus concludes that it cannot hold Grizzly Drilling, Legato Staffing, and New Energy jointly and severally liable for breach of the Closing Agreement and that the damages Applied Capital has suffered as a result of breach must be apportioned among Grizzly Drilling, Legato Staffing, and New Energy.  The Court will deny Applied Capital's request for summary judgment insofar as its seeks an award of damages for breach of contract.

## VIII.   THE COURT NEED NOT DECIDE WHETHER PRESLEY AND NEW ENERGY WERE UNJUSTLY ENRICHED.

To prevail on its unjust enrichment claim against Presley and New Energy, Applied Capital need show only that "(i) [Presley/New Energy] has been knowingly benefitted at [Applied Capital's] expenses (ii) in a manner such that allowance of [Presley/New Energy] to retain the benefit would be unjust."  <u>Ontiveros Insulation Co., Inc. v. Sanchez</u>, 2000-NMCA-051, ¶ 11, 3 P.3d 695, 698.  Bank accounts for New Energy and Grizzly Drilling reflect the following transactions: Applied Capital wired $550,000.00 to Grizzly Drilling on May 19, 2004; Scogin wired $450,000.00 to New Energy on May 20, 2004; Presley wired $50,5000.00 to Gibson and $14,500 to Arial on May 20, 2004; and Presley wired another $10,000.00 to Gibson on May 26, 2004.  <u>See</u> Grizzly Drilling, Inc. Corporate Checking Statement; New Energy Co., LLC Find Report.  Scogin left $100,000.00 in Grizzly Drilling's account.  <u>See</u> Grizzly Drilling, Inc. Corporate Checking Statement.

The undisputed facts show that Presley and New Energy received $313,900.00 of the $550,000.00 that  Applied Capital wired to Grizzly Drilling.  Although there is no disputed issue of material fact that Presley and New Energy  were unjustly enriched, the Court need not determine whether it would be unjust for them to retain the money because it finds that Presley and New

-50-

Energy conspired with his co-defendants to defraud Applied Capital.  It is unnecessary for the Court

to grant Applied Capital further equitable relief when it has adequate remedy at law for its claims.

See Sims v. Sims, 122 N.M. 618, 624, 930 P.2d 153, 159 (1996); General Tel. Co. of Southwest v.

State Tax Comm'n., 69 N.M. 403, 408, 367 P.2d 711, 715 (1962).

## IX.     THE COURT WILL NOT AT THIS STAGE DECIDE WHETHER PRESLEY AND NEW ENERGY ARE LIABLE TO APPLIED CAPITAL FOR PUNITIVE DAMAGES.

Based on the undisputed record before it, the Court finds that Presley and New Energy's

actions, and the actions of its co-conspirators, in misleading Applied Capital into engaging in the

drilling rig transaction, were willful, wanton, malicious, and fraudulent.  The Court believes that an

award of punitive damages to punish Presley and New Energy may be appropriate.  See Eckhardt

v. Charter Hosp. of Albuquerque, Inc., 124 N.M. at 562, 953 P.2d at 735 ("To be liable for punitive

damages, a wrongdoer must have some culpable mental state, and the wrongdoer's conduct must

rise to a willful, wanton, malicious, reckless, oppressive, or fraudulent level."); Naranjo v. Paull, 111

N.M. at 172, 803 P.2d at 261 (holding that punitive damages are an appropriate sanction for

fraudulent misrepresentation).  The Court notes that no party has filed a jury demand, so the Court

may be in as good a position, as it will ever be, to decide, on this record, whether punitive damages

are appropriate.

Nevertheless, while the Court finds that the conduct of Presley and New Energy was willful,

wanton, malicious, and fraudulent, it will not, at this juncture, award punitive damages.  The Court

has not been provided information on the amount and reasonableness of the punitive damages

Applied Capital seeks from Presley and New Energy.  Without such information, the Court cannot

make a punitive damages award.  The Court will therefore deny Applied Capital's request for

summary judgment on punitive damages and will determine whether to make an award, and the

amount of any award, after an evidentiary hearing.

With respect to attorneys' fees, based on the language contained within the Closing Agreement, the Court finds that Applied Capital is entitled to its reasonable attorneys' fees and expenses as the prevailing party against New Energy. The Closing Agreement states in relevant part:

> If any party(ies) to this Agreement retain counsel in connection with the interpretation, defense, or enforcement of this Agreement, the prevailing party(ies) shall recover its/their reasonable attorney's fees and expenses from the unsuccessful party(ies). . . . For the purposes of this paragraph, a party shall be the "prevailing party" if after the commencement of litigation and/or arbitration as to this Agreement it recovers any funds whatsoever from another party(ies), whether by settlement or judgment.

Fourth Complaint, Exhibit 3 ¶ 16 at 5. Under the plain language of the Closing Agreement, Applied Capital is the "prevailing party." Applied Capital has retained counsel "in connection with the . . . enforcement of this Agreement. . . ." While the Court cannot determine contract damages against New Energy at this time, Applied Capital has proved that New Energy breached its contract with it. Moreover, under different theories, Applied Capital has "recover[ed] any funds whatsoever" from New Energy. Accordingly, Applied Capital is the prevailing party and is entitled to attorneys' fees from New Energy for any attorneys' fees incurred in its litigation against New Energy.

**IT IS ORDERED** that the Plaintiff Applied Capital, Inc.'s Motion for Partial Summary Judgment Against Defendants Edward L. Presley and New Energy Co., LLC on Applied Capital's Civil Conspiracy, Fraud, Breach of Contract and Unjust Enrichment Claims is granted in part and denied in part. Summary judgment on liability is granted to Applied Capital and against Defendants Presley and New Energy on Applied Capital's claims for civil conspiracy and fraudulent misrepresentation. Summary judgment liability is granted to Applied Capital and against Defendant New Energy for the claim of breach of contract. The Court also enters summary judgment in favor

of Applied Capital on the issue of whether Presley and New Energy acted willfully, wantonly, maliciously, and fraudulently.  Further, the Court awards Applied Capital $550,000.00 against New Energy and Presley individually.  The Court notes that the outstanding Defendants are jointly and severally liable to Applied Capital for the $550,000.00.  See Saiz v. Belen Sch. Dist., 113 N.M. at 400, 827 P.2d at 115 (stating that joint and several liability applies to intentional torts).  The Court also grants summary judgment to Applied Capital and against New Energy on the issue of attorneys' fees; New Energy must pay Applied Capital's reasonable attorneys' fees and expenses in accordance with the Closing Agreement.  The Court denies summary judgment to Applied Capital on its request for breach-of-contract damages against Presley, and on the award and amount of punitive damages against Defendants Presley and New Energy.


_____
UNITED STATES DISTRICT JUDGE


*Parties and Counsel:*

Henry M. Bohnhoff
Bryan Jerdone Davis
   Rodey, Dickason, Sloan, Akin
     & Robb, P.A.
Albuquerque, New Mexico

          *Attorneys for the Plaintiff*

Francis Gibson
Hailey, Idaho

          *Defendant pro se*

Michael Alarid, Jr.
  The Alarid Law Firm, P.C.
Albuquerque, New Mexico

     *Attorneys for Defendants Gary Bellinger*

Gerald Lee Scogin, Jr.
Lawrenceville, Illinois

     *Defendant pro se*

Justin Herman
Pittsburgh, Pennsylvania

     *Defendant pro se*

New Energy Co. LLC
Sheridan, Wyoming

     *Defendant pro se*

Robert A. Johnson
  Johnson & Nelson, P.C.
Albuquerque, New Mexico

     *Attorneys for Defendants Kirk Voyles and*
     *Heritage Commercial Services, Inc.*

Brian Ambrose
Laguna Beach, California

     *Defendant pro se*

Edward Presley
New Energy Co. LLC
Sheridan, Wyoming

     *Defendant pro se*