# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

APPLIED CAPITAL, INC.,

      Plaintiff,

vs.                                 No. CIV 05-0098 JB/ACT

FRANCIS GIBSON; GARY BELLINGER;
BRIAN AMBROSE; KIRK VOYLES;
HERITAGE COMMERCIAL SERVICES, INC.;
GERALD LEE SCOGIN, JR.; GRIZZLY DRILLING, INC.;
JUSTIN HERMAN, NEW ENERGY CO., L.L.C., and
EDWARD L. PRESLEY,

      Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on: (i) the Plaintiff's Request for Evidentiary Hearing on the Issue of the Amount of Punitive Damages to be Awarded Against Defendants Francis Gibson, Edward L. Presley and New Energy Company, L.L.C., and Motion for Entry of Final Judgment, filed February 20, 2008 (Doc. 242)("Motion"); and (ii) Objection to Applied Capital's Request for Punitive Damages, Defendant's Motion to Deny Applied Capital's Request for Evidentiary Hearing and Motion for Expedited Ruling on the Matter, filed March 5, 2008 (Doc. 243)("Objection"). The Court held an evidentiary hearing on May 8, 2008. The primary issues are: (i) whether the Court should provide an expedited ruling on Plaintiff Applied Capital, Inc.'s motion; (ii) whether the Court should hold an evidentiary hearing on the amount of punitive damages; (iii) whether the Court should grant Applied Capital punitive damages and, if so, the amount of punitive damages against Defendants Francis Gibson, New Energy Co., L.L.C., and Edward L. Presley; (iv) whether the Court should dismiss the breach of contract claim against New Energy without

prejudice; and (v) whether the Court should dismiss the remaining claims without prejudice. The Court grants Applied Capital's motion in part and denies it in part, and sustains Presley's objection in part, overrules his objection in part, and denies his motion.  The Court will hold an evidentiary hearing and rule on this motion as soon as it reasonably can do so given its current trial schedule. The Court will award punitive damages against Gibson, Presley, and New Energy.  The Court will award punitive damages against Gibson, Presley, and New Energy.  The Court will award Applied Capital $1,100,000.00 in punitive damages against Gibson. The Court will award Applied Capital $710,000.00 in punitive damages against Presley and against New Energy. $710,000.00 of the punitive damages award against all three Defendants -- the entire punitive damages award against Presley and New Energy will be joint and several.  Any payments that Gibson makes towards the punitive damages awards will first be allocated towards the joint-and-several $710,000.00 punitive damage award.  Once the joint-and-several $710,000.00 award is satisfied, then Gibson's payments will be credited towards his remaining individual liability for $390,000.00.  The Court believes this award is reasonable and reflects Gibson's aggravated role in the scheme to defraud Applied Capital. The Court will grant pre-judgment interest on the compensatory damages awarded to Applied Capital in $500,000.00, but will not grant pre-judgment interest on the punitive damages award.  The Court will also award post-judgment interest in accordance with 28 U.S.C. § 1961.  The Court will dismiss the breach-of-contract claim against New Energy without prejudice.  The Court will dismiss all remaining claims with prejudice.

## FACTUAL BACKGROUND

Presley is the sole owner of New Energy.  New Energy filed for bankruptcy in the United States Bankruptcy Court for the District of Wyoming in 2004.  See Motion, Exhibit 2, Trustee's

Motion for Fifth Extension of Time to Assume or Reject Unexpired Leases of Nonresidential Real Property and Related Executory Contract (Including Notice of Time to Objection ¶ 1, at 1, in In re: New Energy Co., LLC, No. 04-22426 (U.S. Bankr. D. Wyo. January 16, 2008)("Doc. 242-3")("Fifth Extension"). The Wyoming bankruptcy proceedings are under Chapter 11. See id. ¶ 1, at 1. The bankruptcy proceedings are still pending.

On November 30, 2004, Presley and New Energy entered into an agreement with Mint Condition, LLC, to sell New Energy's coal-bed methane mineral leases ("coal-bed methane leases") in the Auzqui field. See Motion, Exhibit 3, Motion for Order Approving Sale of Property Outside the Ordinary Course of Business and Notice of Opportunity to Object at 6, in In re: New Energy Co., LLC, No. 04-22426 (U.S. Bankr. D. Wyo. January 16, 2008)(Doc. 242-4). The agreement provided not only for approximately $5.65 million in cash payments, but also that New Energy would receive ten-percent interest in the entity that would be acquiring and developing the coal-bed methane leases. See id. at 3. On June 2, 2005, New Energy filed a motion in the bankruptcy case, seeking an order approving a sale of its coal-bed methane leases for a minimum consideration of approximately $3.7 million. See Motion ¶ 8, at 5. There is correspondence from Presley, dated December 7, 2007, indicating a potential source of $50,000,000.00 financing to develop New Energy's coal bed methane lease. See Motion, Exhibit 1, Letter from Ed Presley to Jim Headrick (dated December 7, 2007).

In his Objection, Presley represented that CIG Operations LLC had at one time been interested in funding the drilling and development of New Energy's coal-bed methane leases. See Objections at 4. Presley represented that CIG was fully informed, that all the "ugliness" was disclosed to it, and that its initial written letters had no problem with the debt and the creditors. Id.

Presley asserted that Chris Alster, as lawyer, then took over the negotiations and all hope evaporated.  See id. Mr. Alster, who no longer is a practicing attorney but who remains an agent for CIG, decided to alter the original deal's structure for funding.  See id. at 3-4.

CIG is now out of the picture.  See id. at 3.  Presley represented that, if he and the mineral-asset owner had allowed the restructured deal to go forward, CIG would have left Applied Capital with no participation in the funding.  See id. at 3-4.  Presley states that he informed Applied Capital's Vice President Mark Burkhard that the CIG deal was gone before he received Applied Capital's current motion.  See id. at 4.

In his Objection, Presley also represented that he had another private equity-fund manager that was scheduled to arrive in Sheridan, Wyoming on or about March 15, 2008.  See id. at 7.  Presley further represented that he disclosed this development to Burkhard, to the Trustee, and to the counsel for Western Energy Partners, New Energy's largest creditor, on February 27, 2008.  See id.  Presley represented that he does have personal knowledge of the capability of the private equity fund that came to Sheridan around March 15, 2008.  See id.

The status of funding for New Energy's properties is difficult for the parties and for the Court to measure with accuracy.  As set forth in Applied Capital's Motion, the Trustee asked for additional time from the Bankruptcy Court to conclude the funding and to obtain monies for the creditors.  See Motion ¶ 8, at 5.  In the motion, the trustee stated, in substance, his continued belief that he can locate a party that is willing to pay substantial consideration for the lease.  See Fifth Extension ¶¶ 10(a)-10(b), at 3-4.  The mineral owners filed an objection, and the Bankruptcy Court held a hearing on February 28, 2008.  See Objections at 6; Attachment VII, Order Scheduling Hearing in In re: New Energy Co., LLC, No. 04-22426 (U.S. Bankr. D. Wyo. February 15, 2008).

In that hearing, the Trustee was not granted the 120 days requested to allow CIG Operations to come into the deal, but was granted only ninety days. See Objections at 6. This extension will be the final extension that the Bankruptcy Court will grant if no funding has developed. See id. The expected expiration date of this last extension was around April 15, 2008. See id.

On the morning of February 28, 2008, the Trustee and Presley spoke via teleconference with Michael Kessler, counsel to Fairway Energy LLC, inquiring as to where Fairway Energy is with its funding. See id. Mr. Kessler reported that Fairway Energy had prospects and might possibly be able to fund around the middle of March 2008. See id. Presley could not represent, however, with personal knowledge, what Fairway Energy had at the time he filed his Objection; Presley could only pass on the representations that Mr. Kessler made to him and that the Trustee made to him on the morning of February 28, 2008. See id. at 6-7.

Presley represents that the private equity fund has proven its capability to fund the transaction, and Presley has an agreement with the equity fund under another entity name, which will facilitate the payments to debtors and creditors per the Matrix. See id. at 7. Presley could not, however, at the time that he filed his response, represent to the Court what Applied Capital's request for $1.1 million in punitive damages, if awarded, would do to the funding from Fairway or from the private equity fund. See id.

**PROCEDURAL BACKGROUND**

Applied Capital did not originally name New Energy as a Defendant, because, at the time it filed its action, the company was the subject of the bankruptcy proceedings in Wyoming. See Motion ¶ 10, at 5. By order entered on March 31, 2006, the Bankruptcy Court lifted the statutory stay of civil actions against New Energy and permitted Applied Capital to assert a claim against

New Energy in this New Mexico action.  See In re: New Energy Co., LLC, Order Granting Applied

Capital Inc. Relief from Automatic Stay at 24 ("Stay Order").  When Applied Capital was granted

relief from the bankruptcy proceeding to litigate this matter in the federal court in New Mexico, the

Honorable Peter L. McNiff, United States Bankruptcy Judge for the District of Wyoming, stated in

his order that Applied Capital could not move on any judgment gained from the federal court in New

Mexico against any property of New Energy and Presley until Applied Capital came back to his

bankruptcy court.  See id.

On April 25, 2006, Applied filed a Proof of Claim in Case No. 04-22426.  See Proof of

Claim at 1.  The amount of Applied Capital's claim in the bankruptcy court is $902,213.16.  See id.

Applied Capital explains that the figure was based on Applied Capital's security interest in New

Energy's coal-bed methane leases, among other collateral, which secured payment of New Energy's

and Legato Staffing and Integration Services, LLC's obligations under the Closing Agreement for

the sale of the now-known-to-be-fictitious drilling rig.  Neither New Energy nor any other party has

objected to Applied Capital's Proof of Claim, filed in Case No. 04-22426.  See Motion at 6.

Thereafter, on May 30, 2006, Applied Capital filed its Third Amended Complaint in this

Court, adding claims against New Energy.  See Doc. 115.  Under the terms of the March 31, 2006

Order in the New Energy Chapter 11 proceeding, No. 04-22426, once judgment is entered in this

case, Applied Capital must submit that judgment to the Bankruptcy Court for its approval.  See Stay

Order at 24.

Applied Capital subsequently filed its Fourth Amended Complaint on June 30, 2006, which,

in addition to asserting claims against Presley, added a claim against New Energy for breach of the

May 10, 2004 Closing Agreement.  See Verified Fourth Amended Complaint for Fraud, Negligent

-6-

Misrepresentation, Unjust Enrichment, Breach of Contract, Violation of the New Mexico Unfair Trade Practices Act, and Civil Conspiracy at ¶¶ 9-10, 50-53, at 2-3, 10-11 (Doc. 120)("Fourth Amended Complaint").

Applied Capital's claims against Defendants Gary Bellinger, Brian Ambrose, Kirk Voyles, Heritage Commercial Services, Inc., Gerald Lee Scogin, Jr., and Justin Herman have been resolved by either settlement or stipulated judgment.  See Motion ¶ 1, at 1.  As to the remaining Defendants -- Gibson, Presley, New Energy, and Grizzly Drilling -- the Court has granted summary judgment in favor of Applied Capital on some of its claims and denied summary judgment on the other claims. See Memorandum Opinion and Order, filed September 27, 2007 (Doc. 236);  Memorandum Opinion and Order, filed September 27, 2007 (Doc. 235); Memorandum Opinion and Order, filed August 31, 2007 (Doc. 228).

In his response to this motion, Presley first addresses why he did not participate in the scheduled hearing on his Motion to Dismiss, filed February 12, 2007 (Doc. 188).  See Objection at 2.  The Court held that hearing on July 31, 2007.  See Memorandum Opinion and Order at 1-2, filed September 27, 2007 (Doc. 236).  Presley represents that he was not aware of the Court's scheduled hearing on Applied Capital's motions for summary judgment.  See id. at 2.  It appears that, during the moves he and his company made during the time of this litigation, the post office did not forward the Court's mailings to him.  See id. The post office forwarded, however, Applied Capital's filings. See id.

Presley concedes that he can see from the record that there were many mailings from the Court that were returned during that period.  See id.  Presley spoke to Applied Capital's counsel about his failure to receive materials from the Court.  See Objections, Attachment 1, E-mail from

Ed Presley to Hank Bohnhoff (dated October 24, 2007)("I never received a copy of your prior summary judgment. . . .  Also, please note my new mailing address hereinbelow.").  In a response, Applied Capital's counsel stated:

> Thank you for providing me with your new address.  I am not sure why you would not have received a copy of the Court's summary judgment ruling, since you received a copy of Applied Capital's motion for entry of judgment which was mailed to your old address.  In any event, if you wish to receive copies of orders and other papers from the Court, you should notify the court clerk of your new address.

E-mail from Hank Bohnhoff to Ed Presley (dated October 24, 2007).  Id.  The situation was corrected.  See Objections at 2.  Presley, after reading the Court's Memorandum Opinion and Order (Doc. 236), concedes that he "sees that the Court afforded Defendant ample opportunity to represent his Motion to Dismiss and Defendant failed to do so.  For not informing the Court and Plaintiff of the address correction Defendant apologizes and assumes full responsibility for that oversight."  Objections at 2.

On September 27, 2007, the Court filed a Memorandum Opinion and Order granting Applied Capital partial summary judgment with respect to Presley and New Energy.  See Doc. 236.  Specifically, the Court granted summary judgment against Gibson, Presley, New Energy, and Grizzly Drilling on Applied Capital's conspiracy and fraud claims, and awarded compensatory damages in favor of Applied Capital and against each of these Defendants, jointly and severally, in the amount of $550,000.00.  See Memorandum Opinion and Order, filed September 27, 2007 (Doc. 236);  Memorandum Opinion and Order, filed September 27, 2007 (Doc. 235); Memorandum Opinion and Order, filed August 31, 2007 (Doc. 228).  In addition, the Court has granted summary judgment against all four of the remaining Defendants on the factual issue that they acted willfully, wantonly, maliciously, and fraudulently; against New Energy and Grizzly Drilling on Applied

-8-

Capital's claim for breach of contract and for costs and attorneys fees; and against Grizzly Drilling

on Applied Capital's claim for unjust enrichment.  See Memorandum Opinion and Order at 52-53,

filed September 27, 2007 (Doc. 236);  Memorandum Opinion and Order at 30, filed September 27,

2007 (Doc. 235); Memorandum Opinion and Order at 32, filed August 31, 2007 (Doc. 228).

The Court has denied summary judgment against Gibson, Legato Staffing, Presley, and

Scogin on Applied Capital's claim for breach-of-contract damages.  See Memorandum Opinion and

Order at 47-48, filed September 27, 2007 (Doc. 236); Memorandum Opinion and Order at 28-29,

filed September 27, 2007 (Doc. 235); Memorandum Opinion and Order at 27-28, filed August 31,

2007 (Doc. 228).  The Court granted summary judgment against Grizzly Drilling and New Energy

on Applied Capital's claim for breach-of-contract damages.  See Memorandum Opinion and Order

at 47-48, filed September 27, 2007 (Doc. 236); Memorandum Opinion and Order at 28-29, filed

September 27, 2007 (Doc. 235); Memorandum Opinion and Order at 27-28, filed August 31, 2007

(Doc. 228).  The Court denied an award of a specific amount of punitive damages, and costs and

attorneys fees against Gibson and Presley on Applied Capital's claim for punitive damages.  See

Memorandum Opinion and Order at 51, filed September 27, 2007 (Doc. 236); Memorandum

Opinion and Order at 30, filed September 27, 2007 (Doc. 235). These claims remain pending.  On

page 26 of the Court's Memorandum Opinion and Order as to Presley, the Court stated:

> Regarding punitive damages, "[a] plaintiff cannot satisfy the certainty requirement
> simply by requesting a specific amount. [The plaintiff] must also establish that the
> amount requested is reasonable under the circumstances." Beck v. Atl. Contracting
> Co., 157 F.R.D. at 65.  A damages hearing may not be required before entering a
> punitive damages award, however, when the court is familiar with the defendant's
> conduct and otherwise has sufficient information with which to make a reasonable
> determination.  See James v. Frame, 6 F.3d 307, 310-11 (5th Cir. 1993).
>
> With regard to multiple defendants, "when one of several defendants who is alleged
> to be jointly liable defaults, judgment should not be entered against him until the

matter has been adjudicated with regard to all defendants, or all defendants have defaulted."  Such an approach avoids inconsistent liability determinations among joint tortfeasors.  H.B. Hunt v. Inter-Globe Energy, Inc., 770 F.2d at 147 (citing Frow v. DeLaVega, 82 U.S. (15 Wall.) 552 (1872)).

Memorandum Opinion and Order at 26 (Doc. 236).  The Court further explained that it "ha[d] not been provided information on the amount and reasonableness of the punitive damages Applied Capital seeks. . . . [W]ithout such information, the Court cannot make a punitive damages award." Id. at 51.

Presley does not suggest that the Court's ruling, that he engaged with Gibson, Herman, and Scogin in a conspiracy to defraud Applied Capital, was incorrect.  In his Objections, Presley states:

> Defendant is not now nor will he make any request to use the "not receiving notice of the hearing" because of the local Post Office blunder as a defense or request for relief from the ruling of the Court in its Memorandum and Order.  The Court made the appropriate ruling given what it had before it at the time and those are now settled matters accepted by Defendant.  The Judgment by the Court against Defendant is just and fair and Defendant accepts the amounts found for Plaintiff by the Court.  Again, Defendant apologizes to the Court and Plaintiff for not correcting the address problem and making this case more difficult on that matter for the Court and Plaintiff as was reflected in the Court's Memorandum and Finding of the Court (Doc-236).

Objections at 2.

On October 16, 2007, Applied Capital filed Plaintiff's Motion for Entry of Final Judgment, see Doc. 239, but then withdrew that motion on November 5, 2007, see Doc. 240. On January 16, 2008, the trustee in New Energy's pending Wyoming bankruptcy case, No. 04-22426, filed a motion for a fifth extension of time to assume or reject New Energy's mineral leases.  See Fifth Extension at 1.

Presley suggests that Burkhard knew, before Applied Capital filed this motion on February 20, 2008, that CIG Operations had withdrawn its financing proposal.  See Objections at 4.  Applied

Capital maintains that Burkhard did not know about the withdrawal at the time the motion was filed. See Reply to Defendant Presley's March 5, 2008 Objection and Motions at 2 n.2, filed March 13, 2008 (Doc. 244). Applied Capital represents that Presley did not disclose this development to Burkhard until the telephone call that took place on February 25, 2008. See id.

On February 20, 2008, Applied Capital again filed a motion for miscellaneous relief, which is the motion that is currently before the Court. See Doc. 242. Applied Capital has determined that it does not wish to pursue all of its remaining claims to a final judgment. See Motion ¶ 4, at 2. To bring this action to a conclusion in what it believes is the most expeditious and efficient manner, Applied Capital requests that the Court schedule an evidentiary hearing on the amount of punitive damages to be awarded against Gibson, Presley, and New Energy. See Motion at 1. In addition, pursuant to rules 41(a)(2) and 58(d) of the Federal Rules of Civil Procedure, Applied Capital moves the Court to enter final judgment. See id.

Specifically, Applied Capital seeks: (i) entry of final judgment on those claims on which the Court has granted summary judgment, and an award of $550,000.00 compensatory damages in Applied Capital's favor; (ii) an evidentiary hearing followed by an award of punitive damages, set forth in the final judgment, against Presley, New Energy, and Gibson, in the amount of $1,100,000.00, jointly and severally, twice the amount of the compensatory damages awarded against them; (iii) dismissal without prejudice of Applied Capital's breach-of-contract claim against New Energy; and (iv) dismissal with prejudice of the remaining claims asserted in Applied Capital's complaints. See Motion ¶ 4, at 2-3.

On March 5, 2008, Presley filed an Objection to Applied Capital's Request for Punitive Damages, Defendant's Motion to Deny Applied Capital's Request for Evidentiary Hearing and

Motion for Expedited Ruling on the Matter.  See Doc. 243.  Presley is proceeding pro se.  See id. at 1.  Thus, the Court will treat Presley's filing as a response to Applied Capital's February 20, 2008 Request for Evidentiary Hearing and Motion for Final Judgment.

Presley does not oppose any portion of Applied Capital's motion other than the procedural request for an evidentiary hearing on punitive damages and the substantive request for a $1.1 million punitive damage award.  See Objections at 3-8.  Presley concedes that he has said many times before this motion that funding is close at hand and that the funding has not come.  See id. at 8.  Presley contends that a review of the matrix that Presley attaches to his Objection shows that everyone, except Applied Capital, has agreed to the figures thereon.  See Objections at 5; Attachment III, Matrix for all Creditors and Debt for NEW Energy and Ed Presley ("Matrix").

Presley represents that Western Energy Partners, who is the largest creditor, has agreed to the $1.95 million figure, which is less than the amount owed given interest and legal fees accruing.  See Objections at 5.  Western Energy agreed to settle for the amount of dollars it paid to New Energy, an amount which Presley also personally guaranteed.  See id.  Presley represented that this arrangement is necessary to be able to deliver to the funding source clear-and-clean title to the assets.  See id.

Presley represents that putting these kind of deals together and getting them funded is not an easy task.  See id. at 8.  Presley concedes that much time has been lost over these years to so-called "funding sources" that were not capable of performing.  Id.  Presley states that, over the course of time, he and Fairway Energy have grown in knowledge on how to now extract proper information from a funding source to examine its capabilities.  See id.

Presley states that he, or his company with his team, has the intellectual knowledge to

perform the duties to which he is agreeing, and to fulfill the drilling and development for the funding source.  See Objections at 4.  Presley states that he is getting a five-million dollar advance against his future profits of that drilling-and-development program to retire all debt and pay creditors.  See id.  Presley argues that he has indemnified all debt that is on the bankruptcy matrix and that all debt must be paid to clear him and to enable him to be the owner/operator of the Auzqui project unencumbered.  See id. at 4; Matrix at 4 (dated December 4, 2007).  In addition, Presley has to deliver to the funding source up to forty 5000' deep coal-bed methane leases producing wells on line selling natural gas at a turn-key price of $1.2 million each, for a total drilling-and-development cost of $48 million dollars.  See Objections at 4-5.

New Energy has not responded to the motion.  Presley, who is not a member of the bar, cannot represent New Energy.  See Reply ¶ 1, at 1.

At the May 8, 2008 hearing, Presley withdrew his objection to the Court holding an evidentiary hearing on Applied Capital's motion.  See Transcript of Hearing (taken May 8, 2008)("Tr.") at 5:15-21 (Presley).[1]  Burkhard testified that the $902,2313.14 figure on Applied Capital's Proof of Claim in the Wyoming Bankruptcy Court includes the original $550,000.00 amount plus fees incurred pursuant to the agreement and attorney's fees.  See id. at 12:6-14 (Bohnhoff & Burkhard).  Burkhard testified that the amount of Applied Capital's accumulated claim in the Bankruptcy Court is around twelve million dollars.  See id. at 12:15-18 (Bohnhoff & Burkhard).  Burkhard explained that Applied Capital arrives at the sum of twelve million dollars because of late charges, of ".1944 [(basically approximately .2 percent)]  per day fee" against any

---

[1] The Court's citations to the transcript of the hearing refer to the Court Reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

reserve shortfall and compounds daily.  Id. at 12:19-13:1-3 (Bohnhoff & Burkhard).  Burkhard testified that Applied Capital has accumulated approximately $540,000.00 in attorney's fees, as of April 30, 2008.  See id. at 13:7-10 (Bohnhoff & Burkhard).

In explaining why there was so much accumulated interest, Applied Capital stated that it was not giving a loan to the Defendants; rather, it "was purchasing the invoice from New Energy to Legato to buy the drilling rig, and Legato owed New Energy $625,000[.00] under that invoice." Id. at 78:11-13 (Bohnhoff). Burkhard testified that Applied Capital pledged approximately 1,100 acres of coal-bed methane leases as collateral.  See id. at 16:8-20 (Bohnhoff & Burkhard).  Burkhard testified that Presley told him CIG Operations was willing to pay either five million or six million dollars to settle obligations, it would get the leases and property out of bankruptcy, and the remainder of any money available and pledged would be used to develop the property.  See id. at 21:12-25 (Bohnhoff & Burkhard).

Applied Capital argued that it was seeking punitive damages in twice the amount of compensatory damages to recover some of the lost interest it has suffered over the past four years. See id. at 75:12-17 (Bohnhoff).  Applied Capital acknowledged that it did not know whether Presley was part of recruiting false credit references.  See id. at 73:10-15 (Court & Bohnhoff).  Applied Capital noted that it could have asked for a multiple of three, four, or five times the amount of compensatory damages, but explained that its goal is to end the litigation.  See id. at 75:18-25 (Bohnhoff).  Applied Capital contended that the figure for which it is asking is "essentially the minimum number that will approximate compensation to Applied Capital to make itself whole." Id. at 76:1-3 (Bohnhoff).  Applied Capital argued that, because Presley and New Energy have had a full opportunity to oppose its motion for summary judgment, and that Presley chose not to finish

-14-

his deposition, Presley's conduct has been reprehensible.  See id. at 76:6-14 (Bohnhoff).  Applied

Capital asserted that it was entitled to prejudgment interest as a matter of course.  See id. at 79:23-

80:5 (Court & Bohnhoff).  Applied Capital represented that it made a decision to drop the attorney's

fee claim because those fees "would be wrapped up in the punitive damages award."  Id. at 83:18-20

(Bohnhoff).

Applied Capital requested that the Court, if it were not inclined to award $1.1 million in

punitive damages against Presley and New Energy, permit it to submit a revised proposed final

judgment and submit an attorney's fee application within twenty days of the final judgment.  See

id. at 103:17-22 (Bohnhoff).

## LAW REGARDING PUNITIVE DAMAGES

Awards of punitive damages must satisfy two separate groups of requirements.  First, in a

diversity case, the award must be consistent with state law.  Second, while punitive damages may

be awarded to further a state's legitimate interests, any award may not violate defendants'

constitutional rights to due process.

### 1.    Supreme Court of the United States.

"Punitive damages may properly be imposed to further a State's legitimate interest in

punishing unlawful conduct and deterring its repetition."  BMW of N. Am., Inc. v. Gore, 517 U.S.

559, 568 (1996).  Thus, "[o]nly when an award can fairly be categorized as 'grossly excessive' in

relation to these interests does it enter the zone of arbitrariness that violates the Due Process Clause

of the Fourteenth Amendment."  Id.  The Supreme Court explained in BMW of North America, Inc.

v. Gore that "[p]erhaps the most important indicium of the reasonableness of a punitive damage

award is the degree of reprehensibility of the defendant's conduct."  517 U.S. at 575.  "The second

and perhaps most commonly cited indicum of an unreasonable or excessive punitive damages award is its ratio to the actual harm inflicted on the plaintiff." Id. at 581. Exemplary damages must bear a "reasonable relationship" to compensatory damages. Id. The Supreme Court has rejected that "the constitutional line is marked by a simple mathematical formula, even one that compares actual and potential damages to the punitive award." Id. at 583. The third indicia of excessiveness is "comparing the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct." Id. at 584.

In Cooper Industries, Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424 (2001), the Supreme Court noted that, "[a]lthough compensatory damages and punitive damages are typically awarded at the same time by the same decisionmaker, they serve distinct purposes." Id. at 433. The purpose of punitive damages is "quasi-criminal" and serve as "private fines intended to punish the defendant and to deter future wrongdoing." Id. (internal quotations omitted). The Supreme Court acknowledged in Cooper Industries, Inc. v. Leatherman Tool Group, Inc. that "the relevant constitutional line is inherently imprecise" between appropriate punitive damage awards and those that are "grossly disproportional." 532 U.S. at 434. The Supreme Court reiterated that the relevant criteria examines "the degree of the defendant's reprehensibility or culpability . . . the relationship between the penalty and the harm to the victim caused by the defendant's actions . . . and the sanctions imposed in other cases for comparable misconduct." Id. at 435 (citations omitted).

"The Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor." State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 417 (2003). The Supreme Court noted in State Farm Mut. Auto. Ins. Co. v. Campbell that the third BMW of North America, Inc. v. Gore factor is "the difference between the punitive

damages awarded by the jury and the civil penalties authorized or imposed in comparable cases."

538 U.S. at 418.  The Supreme Court explained that, in evaluating the third factor, it has "looked

to criminal penalties that could be imposed[, because] . . . [t]he existence of a criminal penalty does

have bearing on the seriousness with which a State views the wrongful action." Id. at 428.  See

Phillip Morris USA v. Williams, --- U.S. ---, ---, 127 S.Ct. 1057, 1063 (2007)(considering the

Constitution's procedural limitations on states' systems for awarding punitive damages awards).

### 2.        New Mexico and Other Jurisdictions.

N.M.R.A. 2007, UJI 13-1827 states:

> The amount of punitive damages must be based on reason and justice taking into
> account all the circumstances, including the nature of the wrong and such
> aggravating and mitigating circumstances as may be shown.  The amount awarded,
> if any, must be reasonably related to the injury and to any damages given as
> compensation and not disproportionate to the circumstances.

N.M.R.A. 2007, UJI 13-1827.  "'[P]erhaps the most important indicum of the reasonableness of a

punitive damages award is the degree of reprehensibility of the defendant's conduct.'"  Aken v.

Plains Elec. Generation and Transmission Co-op., Inc., 2002-NMSC-021, ¶ 21, 49 P.3d 662 (quoting

BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 575 (1996)).

In most jurisdictions, a court is not barred from awarding punitive damages in cases where

there is no evidence of the defendant's net worth.  "[E]vidence of financial worth is admissible and

may be considered by the jury in its determination of the amount to be awarded as punitive damages,

but evidence of worth is not a requisite to such award." Rinaldi v. Aaron, 314 So.2d 762, 765 (Fla.

1975).  See, e.g., Fahrenberg v. Tengel, 291 N.W.2d 516, 527 (Wis. 1980)(stating that "[f]ailure to

show net worth does not invalidate the award of punitive damages, but eliminates one factor by

which the reasonableness of the award can be gauged."); Carrick v. McFadden, 533 P.2d 1249, 1254

(Kan. 1975)(noting that "we are cited to no rule of law requiring that evidence of the defendants' financial worth be introduced before an issue of punitive damages may be submitted to the jury."); Punitive damages: relationship to defendant's wealth as factor in determining propriety of award, 87 A.L.R.4th 141.  The Honorable Robert Brack, United States District Judge, has held that punitive damages may be awarded as part of a default judgment where there has been no inquiry into the defendant's wealth.  See FTS Distrib. v. Sandia Tobacco Manufacturers, Inc., No. CIV 06-0704 RB/WDS, Memorandum Opinion and Order at 4, in, filed October 11, 2007(D.N.M.)(Brack, J.)(Doc. 109)(ruling that default judgment was appropriate against plaintiffs/counter-defendants and requesting the defendant /counter-claimant is directed to submit an affidavit itemizing money owed and damages); id., Final Judgment ¶¶ 2, 5, at 3-4, in FTS Distributors v. Sandia Tobacco Manufacturers, Inc., No. CIV 06-0704 RB/CEG, filed November 6, 2007 (Doc. 112)(awarding punitive damages in the amount of twice the compensatory damages award).

The New Mexico courts have not specifically addressed the question whether an award of punitive damages is conditioned on consideration of evidence of the defendant's wealth.  N.M.R.A. 2007, UJI 13-1827, however, does not condition the award of punitive damages on consideration of evidence of the defendant's wealth.  In New Mexico, while not a prerequisite, evidence of a defendant's wealth is admissible for purposes of fixing the amount of punitive damages.  See Ruiz v. S. Pac. Transp. Co., 97 N.M. 194, 202, 638 P.2d 406, 414 (Ct. App. 1981)("New Mexico has adopted the general rule admitting evidence of a defendant's wealth for purposes of fixing the amount of punitive damages, if awarded.").

In Weidler v. Big J Enterprises, Inc., 1998-NMCA-021, 953 P.2d 1089, the Court of Appeals of New Mexico affirmed a $500,000.00 punitive damages award even though the ratio of punitive

damages to actual damages was eight to one.  See id. ¶¶ 13, 41-50, 953 P.2d at 1095, 1100-1102.

The Court of Appeals stated: "We do not believe that the ratio here of eight to one is impermissibly

large.  It falls well within the ratios contemplated by the court in BMW."  1998-NMCA-021, ¶ 48,

953 P.2d at 1102.  Cf. Chavarria v. Fleetwood Retail Corp., 2006-NMSC-046, ¶¶ 35-39, 143 P.3d

717 (remanding issue of punitive damages award of $250,000.00, because "it appeared that the trial

court reduced the initial punitive damages award under the mistaken belief that it reflected an

unconstitutionally large ratio between compensatory and punitive damages, [but] only the trial court

knows the precise reasons for the reduction."); Aken v. Plains Elec. Gen. and Transmission Coop.,

Inc., 2002-NMSC-021, ¶ 24, 49 P.3d at 671 (affirming punitive damages award 3.5 times the amount

of compensatory damages award); Allsup's Convenience Stores, Inc. v. N. River Ins. Co., 1999-

NMSC-006,  ¶  49,  976  P.2d  1,  18  (affirming  multi-million  dollar  award  with  a

punitive/compensatory damages ratio of 7.4:1).

In Gallegos v. Citizens Insurance Agency, 108 N.M. 772, 779 P.2d 99 (1989), the Supreme

Court of New Mexico explained that, "[w]ith respect to punitive damages, when they awarded

against two or more defendants they must be separately determined as to each."  108 N.M. at 728,

779 P.2d at 105.  In Gallegos v. Citizens Insurance Agency, "[a] separate verdict form was provided

with respect to compensatory and punitive damages to be awarded against each defendant."  108

N.M. at 727, 779 P.2d at 104.  "In a motion for clarification of the verdict, and for remittitur, [two

of the] defendants . . .  questioned whether the jury meant to assess each defendant individually or

whether the $2,000 compensatory and the $8,000 punitive assessments were against both."  Gallegos

v. Citizens Ins. Agency, 108 N.M. at 728, 779 P.2d at 105.  The Supreme Court of New Mexico

determined that there was sufficient evidence of bad faith to justify the submission of a jury

instruction on punitive damages.  See Gallegos v. Citizens Ins. Agency, 108 N.M. at 731, 779 P.2d at 108.

## NEW MEXICO LAW REGARDING PREJUDGMENT INTEREST

Under New Mexico law, prejudgment interest is awarded under either N.M.S.A. 1978, § 56-8-3 or N.M.S.A. 1978, § 56-8-4(B).  See Sunwest Bank v. Collucci, 117 N.M. 373, 377, 872 P.2d 346, 350 (1994).  N.M.S.A. 1978, § 56-8-3 "allows prejudgment interest in cases on money due by contract, money received to the use of another and retained without the owner's consent, and money due on the settlement of matured accounts."  Sunwest Bank v. Collucci, 117 N.M. at 377; 872 P.2d at 350. "Prejudgment interest is awarded as a matter of right only when a party has breached a duty to pay a definite sum of money or the amount due under the contract can be ascertained with reasonable certainty by a mathematical standard fixed in the contract or by established market prices."  Sunwest Bank v. Collucci, 117 N.M. 373, 378, 872 P.2d 346, 351 (1994).

N.M.S.A. 1978, § 56-8-4(B) provides:

> The court in its discretion may allow interest of up to ten percent from the date the complaint is served upon the defendant after considering among other things: [(i)] if the plaintiff was the cause of unreasonable delay in the adjudication of the plaintiff's claims; and [(ii)] if the defendant had previously made a reasonable and timely offer of settlement to the plaintiff.

Id.  Cf. Kelley v. City of Albuquerque, No. CV03-507 JB/ACT, Memorandum Opinion and Order at 6, filed April 12, 2006 (Doc. 123)(An "award of prejudgment interest rests firmly within the sound discretion of the trial court.")(citing Caldwell v. Life Ins. Co. of N. Am., 287 F.3d 1276, 1287 (10th Cir. 2002)).  The "trial court must consider the equities in each case before awarding prejudgment interest pursuant to [N.M.S.A. 1978 §] 56-8-3, even when interest is otherwise awardable as a matter of right."  Sunwest Bank v. Collucci, 117 N.M. at 378; 872 P.2d at 351.

-20-

"Prejudgment interest serves two purposes, promoting early settlements and compensating persons; however, it was never intended to encompass an award of punitives." Coates v. Wal-Mart Stores, Inc., 1999-NMSC-013, ¶ 55, 976 P.2d 999, 1011 (1999).  The Court of Appeals of New Mexico observed in Weidler v. Big J Enterprises, Inc., 1998-NMCA-021, 953 P.2d 1089, that

> [t]he effect of allowing prejudgment interest on punitive damages would be to compound that recovery.  Since the jury has already fixed the amount of damages deemed to be an appropriate penalty, to allow interest on that amount would be "nothing more than an arbitrary award of punitive damages over and above the amount determined by the court to be appropriate punishment.

Id. ¶ 53, 953 P.2d at 1103 (discussing award of prejudgment interest under N.M.S.A. 1978, § 56-8-4(B)).  "Thus, prejudgment interest is an award to discourage recalcitrance and unwarranted delays in cases which should be more speedily resolved; an award to ensure that just compensation to the tort victim is not eroded by the dilatory tactics of the tortfeasor." Id. ¶ 52, 953 P.2d at 1102.  "Therefore, it is in the nature of a sanction wholly separate from any punitive damages awarded." Id. ¶ 52, 953 P.2d at 1102.  The effect of "[a]dding prejudgment interest to a punitive damages award would change what the jury determined to be appropriate punishment, and, thus, undermine the principle of punitive damages." Kaveny v. MDA Enterprises, Inc., 2005-NMCA-118, ¶ 29, 120 P.3

## LAW REGARDING AWARD OF POST-JUDGMENT INTEREST

28 U.S.C. § 1961(a) provides that "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court." Id. "Interest shall be computed daily to the date of payment . . . and shall be compounded annually." 28 U.S.C. § 1961(b).  "Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding  the date of the judgment." 28 U.S.C. § 1961(a).

-21-

## ANALYSIS

While the Court would have liked to have issued a ruling sooner, the Court's trial schedule in March, April, and May, Presley's pro se status, and this case's prior problems with notice, did not permit resolution of the final matters until early May.  Moreover, the Court agreed with Applied Capital that an evidentiary hearing was appropriate.  Finally, the Court agrees with Applied Capital that some punitive damages are appropriate against the three Defendants, but not in the amount or manner that Applied Capital seeks.

## I.    THE COURT FINDS APPLIED CAPITAL'S AGENTS MORE CREDIBLE THAN PRESLEY ON AREAS WHERE THEIR TESTIMONY CONFLICTS.

The Court must now evaluate the representations and arguments of an adjudged fraudfeasor, Presley.  The Court notes that there were some differences in the way that Applied Capital and Presley presented facts at the evidentiary hearing on the punitive damages issue.  Because the Court has already made some findings against Presley and the other Defendants, it tends to credit, where there is a conflict, Applied Capital's arguments and testimony of its agent over that of the Defendants.  This crediting is primarily because the Court has already adjudged the Defendants as having committed a fraud against Applied Capital.

## II.    THE COURT WILL HOLD AN EXPEDITED HEARING.

In his Objection, Presley makes motions and arguments against Applied Capital's requests for relief.  Presley appropriately requested that the Court expedite a ruling on this matter.  Presley emphasized that time was of the essence, because of the Bankruptcy Court's most recent ruling and because of a private equity-fund manager coming to Sheridan in March.  Presley represented that, if this matter could not be resolved in March, the source of funding to pay the debtors and creditors might be taken from all the parties.  Applied Capital did not oppose Presley's request that the

hearing be expedited.

The Court had a number of trials set back to back in March, April, and May.  While two jury trials proceeded to verdict, one in March and one in April, the others went away.  The Court could not, however, quickly set this matter for a hearing and thus resolution.  Because of prior problems with notice in this case, and because Presley is proceeding pro se, the Court felt it necessary to give the parties at least two weeks notice before the hearing.  Given those parameters, the May 8, 2008 hearing was the earliest date that the Court could have the hearing on Applied Capital's motion and on the issues related to that motion.

**III.   THE COURT SCHEDULED AN EVIDENTIARY HEARING TO HEAR EVIDENCE ON THE ISSUES WHETHER TO AWARD PUNITIVE DAMAGES AND THE AMOUNT, IF ANY, OF PUNITIVE DAMAGES AGAINST GIBSON, PRESLEY, AND NEW ENERGY.**

Initially, Presley, proceeding pro se, requested that the Court deny Applied Capital's request for an evidentiary hearing.  The reason Presley contended that the Court should not have an evidentiary hearing was because the Court had all the information to decide Applied Capital's motion and because he did not have the funds to travel to Albuquerque, New Mexico in person to argue his objection.  Presley also argued that Applied Capital did not need an evidentiary hearing.  Presley contended that the Court should not hold an evidentiary hearing and that the Court should instead hold a telephone hearing that presumably would be limited to argument.  Applied Capital objected to a telephonic hearing.  At the May 8, 2008 hearing, Presley withdrew his objection to the evidentiary hearing.  See Tr. at 5:15-21 (Presley).

An evidentiary hearing was necessary, because Applied Capital presented documentary evidence of the fair market value of New Energy's assets and thus Presley's wealth at the hearing.  Applied Capital represented that, while it would present the documents attached to its motion, it

would also present other documentary evidence.  Moreover, the Court anticipated, correctly, that, at any hearing in which Presley participates pro se, he will not confine himself to legal argument and would also make factual representations.  In anticipation of that situation, Applied Capital had reserved the right to cross-examine Presley on any such statements.

The Court also believed that Gibson, Presley, and New Energy should have an opportunity at a hearing to present evidence on their net worth, or any other issue relevant to the amount of a punitive damages award that the Court has not already resolved with its summary judgment rulings. In his Objections, Presley quoted the Court's statements in its Memorandum Opinion and Order: "[T]he Court has not been provided information on the amount and reasonableness of the punitive damages Applied Capital seeks. . . . Without such information, the Court cannot make a punitive damages award."  Memorandum Opinion and Order at 51 (Doc. 236).  Presley stated that "Defendant will take the above instructions from the Court in making the arguments for its Objections and Motions herein."  Objections at 3.  Accordingly, despite Presley stating that he did not want an evidentiary hearing, the Court believed that he needed one, too, to make factual representations.

The Court also did not think that a telephone hearing is an effective substitute.  Applied Capital argued, with some force, that it could not effectively cross-examine Presley over the telephone.  See Reply ¶ 6, at 5.  The Court did not require Applied Capital to conduct its cross-examination over a telephone.

Presley stated that the Bankruptcy Court in Wyoming allows teleconferences and that, if the Court would allow him to participate in the hearing via teleconference, he had no objection to participating in such a hearing.  See Objections at 7.  Applied Capital had no problem with a

teleconference.  The Court allowed Presley to appear via videoconference.

Accordingly, the Court granted an evidentiary hearing on the issue of the amount of punitive damages to be awarded against Gibson, Presley, and New Energy.  The Court allowed Presley to attend by videoconference.

## IV.  THE COURT WILL AWARD APPLIED CAPITAL PUNITIVE DAMAGES AGAINST GIBSON, PRESLEY, AND NEW ENERGY.

Presley makes two arguments against the imposition of a $1.1 million punitive-damages award.  Presley first argues that the Court should not impose any punitive damages against him for his and his company's fraud scheme because, if the Court does not limit Applied Capital's recovery, the current deal to finance the coal-bed methane leases drilling-and-development project will fall through and New Energy's other creditors will not get paid anything.  Secondly, Presley contends that the unintended consequences to other creditors and debtors would be great is Applied Capital is allowed to dismantle the debt payment structure that is now in place.  The Court concludes that neither ground is a sound reason to refuse to award punitive damages against Presley.

### A.  THE COURT DOES NOT BELIEVE THAT THE IMPACT OF AN AWARD OF PUNITIVE DAMAGES ON OTHER PARTIES TO THE FUNDING DEAL SHOULD PRECLUDE AN AWARD.

Presley states that he has allocated much of the value of the lease and any drilling program to other parties, so that only $750,000.00 remains available to pay Applied Capital.  See Matrix at 1.  Presley notes that Applied Capital already is recovering more than other creditors and debtors are recovering.  See Objections at 6.

It is probably the case that Presley should not be dividing up proceeds from the sale of an asset that is pledged as security for a debt New Energy owes to Applied Capital without first obtaining Applied Capital's consent.   More importantly for this motion, however, Presley's

argument is not a defense to an award of punitive damages.  Under New Mexico law, Presley's and the other Defendants' ability to pay is a secondary consideration in the punitive damages decision. See Aken v. Plains Elec. Generation and Transmission Coop, Inc., 2002-NMSC-021, ¶ 21, 49 P.3d at 670 (stating that the most "important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct," because the "purpose of punitive damages is to punish wrongdoer and deter wrongdoer and others in a similar situation from engaging in such conduct in the future.").

Presley emphasizes that the unintended consequences to other creditors and debtors could be great if Applied Capital is allowed to dismantle the debt-payment structure now in place.  Presley reminds the Court that there are other people who would have to be pushed aside to make way for Applied Capital.  Presley maintains that what Applied Capital proposes will kill the golden goose and leave everyone, including Applied Capital, with nothing.  See Objections at 5 ("What Applied Capital proposes will kill the golden goose and leave everyone, including Applied Capital, with nothing.").  Presley argues:  "It is not reasonable to award Plaintiff punitive damages given all the unintended damage that will occur to these folks that have supported in good faith this project." Objections at 5.

Presley maintains that he does not offer the information about the status of the funding source to make a defense against Applied Capital's request for $1.1 million in punitive damages. Presley argues instead that a ruling awarding Applied Capital punitive damages would result in hurting innocent people other than New Energy and Presley.  Presley states that, of all the Defendants in the case, he is the only one that has the means to pay what the Court awarded in its September 2007 Order.  See Objections at 5 (stating that "Presley is the only source of any recovery

for Applied Capital; the other defendants are nothing but window dressing and will probably never be able to pay their judgments."). Presley maintains that it is not reasonable to award Applied Capital punitive damages given all of the unintended damage that will occur to these persons that have supported this project in good faith.

Presley maintains anything above and beyond the amount that the Court has already awarded Applied Capital will cause hardship to innocent people who do not need to be hurt. Presley states that, if the funding does not come through, it will not matter if Applied Capital is awarded millions of dollars. Presley expresses that he is objecting to protect what all the parties may have that brings some measurable relief to all involved and asks the Court, under the reasonableness doctrine, not to grant Applied Capital's request for punitive damages in the amount of $1.1 million. See Objections at 8.

There are at least three problems with Presley's advancement of these other interests. First, Presley presents no competent evidence to support this argument. He presents no evidence establishing the amount of the claims of New Energy's other creditors or that those creditors have agreed to his distribution "matrix." He also presents no evidence -- e.g., statements by the lenders or investors -- to support his speculation that the contemplated financing transaction will fail if the Court awards punitive damages.

Second, Presley states that most of these other potentially impacted people are vendors for the future drilling-and-development project, or are people who have put money into this project to keep it alive while waiting for the funding to come in. The Bankruptcy Court in Wyoming has probably instructed Applied Capital to come back to that court to protect the interests of all creditors in both cases. While Presley is not yet under the protections of a bankruptcy dismissal order, the

principle behind Judge McNiff's instruction to return to his court before execution of any judgment here may eventually help Presley achieve the clean-and-clear result for the project and success for all.

Third, and fundamentally, Presley is making an argument that, if anything, is most appropriately directed to the Bankruptcy Court in Wyoming. This Court's limited task is to determine whether punitive damages are warranted and what would be a just punitive-damages award under New Mexico law. The competing demands of other creditors is largely irrelevant to this issue. Once the judgment in this Court is sent to the Bankruptcy Court in Wyoming, it will be, at that time and in that venue, appropriately considered, in a more informed manner, given the other creditors' competing claims. While Applied Capital submits that, given that the Wyoming Bankruptcy Court has dismissed Presley's Chapter 7 proceeding, No. 04-22389, the competing demands of his personal creditors are entitled to no weight at all, the Court will leave that issue for the Bankruptcy Court.

Presley also argues that he must be "cleaned and cleared for any of the project to be successful for all." Objection at 6. The Court is not certain what Presley means. If, however, Presley is saying that the entities that are proposing to finance the coal-bed methane leases drilling-and-development project are insisting that, for the financing to take place, Presley must be freed of all individual debts and obligations. Presley again has presented no proof. The Court also discounts such an assertion. While a party acquiring or financing an interest in a mineral lease might want to do so free and clear of encumbrances -- e.g., the acquiring or financing entity would want New Energy to be able to convey the mineral lease free and clear of any lien -- the existence of any judgments recorded against New Energy's owner should be immaterial. And if Presley is arguing

-28-

that an award of punitive damages against him will scare off investors, because they will not want to do business with someone who has been found liable for fraud and assessed punitive damages, it is too late to avoid that problem.

Specifically, Presley has not presented evidence that the financing transaction will fail if he is compelled to cede to Applied Capital more of the profit that he personally expects to realize from the deal. Presley discloses significant differences between Applied Capital and the other creditors, most of whom apparently are "vendors for the future drilling and development project." Objection at 5. In Presley's proposal, Applied Capital stands to gain nothing from the project. Such a result seems unfair, given that none of the other creditors were defrauded out of hundreds of thousands of dollars by Presley and New Energy.

### B. THE COURT WILL AWARD PUNITIVE DAMAGES AGAINST GIBSON, PRESLEY, AND NEW ENERGY.

The Court already has determined that Gibson, Presley, and New Energy acted willfully, wantonly, maliciously, and fraudulently. See Memorandum Opinion and Order at 29, filed September 27, 2007 (Doc. 236); Memorandum Opinion and Order at 51, filed September 27, 2007 (Doc. 235). The Court has also already found that these Defendants concocted a brazen scheme to defraud Applied Capital. Their audacious misconduct justifies serious monetary sanctions.

These three Defendants therefore should be liable to Applied Capital for punitive damages. Accordingly, the Court will award punitive damages in favor of Applied Capital and against Gibson, Presley, and New Energy. The question remaining regarding punitive damages is about the amount of the award.

C.     THE COURT WILL AWARD $1,100,000.00 IN PUNITIVE DAMAGES AGAINST GIBSON.

"The failure of a party to file and serve a response in opposition to a motion within the time prescribed for doing so constitutes consent to grant the motion."  D.N.M.LR-Civ. 7.1(b).  "A response must be served and filed within fourteen (14) calendar days after service of the motion."  D.N.M.LR-Civ. 7.6(a).  Gibson has not responded to Applied Capital's motion or sought an extension of time to respond to Applied Capital's motion.  Accordingly, Gibson's failure to file a response in opposition to a motion within the time prescribed constitutes consent to grant the motion.

While Gibson has consented to Applied Capital's motion, because Gibson is proceeding pro se, the Court has reviewed the merits of Applied Capital's motion.  After conducting a careful review of the record, the Court believes that Applied Capital's motion should also be granted on the merits.

First, the primary factor that the Court will consider is the reprehensibility of Gibson's misconduct.  See Aken v. Plains Elec. Generation and Transmission Co-op., Inc., 2002-NMSC-021, ¶ 21, 49 P.3d at 670 ("[P]erhaps the most important indicum of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct.")(internal quotations omitted).  Gibson's "actions in misleading Applied Capital into engaging in the bogus rig transaction were willful, wanton, malicious, and fraudulent."  Memorandum Opinion and Order at 29, filed September 27, 2007 (Doc. 235).  The Court believes that an award of punitive damages against Gibson will provide both specific and general deterrence.

Second, Gibson's conduct was the most reprehensible.  While it is unclear whether Presley and New Energy solicited Brian Ambrose, Gary Bellinger, and Kirk Voyles to be credit references

for Applied Capital, Gibson did so.  While the Court has already determined that Presley and New Energy committed fraud and made inaccurate representations to Applied Capital, Gibson appears to have been involved in both schemes to defraud, not just the one in which Presley and New Energy were involved.  Accordingly, Gibson engaged in the most reprehensible conduct and all of it.

Thus, while Gibson's net worth is unknown, it is the Court's conclusion that a punitive damages award of $1,100,000.00 against Gibson is justified under the facts of this case regardless of Gibson's wealth or lack thereof.  See, e.g., Fahrenberg v. Tengel, 291 N.W.2d at 527 (stating that "[f]ailure to show net worth does not invalidate the award of punitive damages, but eliminates one factor by which the reasonableness of the award can be gauged."); Carrick v. McFadden, 533 P.2d at 1254 (noting that "we are cited to no rule of law requiring that evidence of the defendants' financial worth be introduced before an issue of punitive damages may be submitted to the jury.").

Fourth, the ratio of $1,100,000.00 to  the compensatory damages award is within a normal range for punitive damages.  See, e.g., Aken v. Plains Elec. Generation and Transmission Coop., Inc., 2002-NMSC-021, ¶ 24, 49 P.3d at 671 (affirming punitive damages award 3.5 times the amount of compensatory damages award); Allsup's Convenience Stores, Inc. v. N. River Ins. Co., 1999-NMSC-006, ¶ 49, 976 P.2d at 18 (affirming multi-million dollar award with a punitive/compensatory damages ratio of 7.4:1).

Fifth, under New Mexico law, "[w]hoever commits fraud when the value of the property misappropriated or taken exceeds twenty thousand dollars ($20,000) is guilty of a second degree felony."  N.M.S.A. 1978, § 30-16-6(F).  The penalty for a second-degree felony is "nine years imprisonment."  N.M.S.A. 1978, § 31-18-15(A)(6).  "The possibility of a jail sentence justifies a substantial punitive damages award." Chavarria v. Fleetwood Retail Corp., 2006-NMSC-046, ¶ 39,

143 P.3d at 729.  Gibson would have faced the possibility of a substantial jail sentence were he to be convicted of fraud over the amount of $20,000.00, and thus, this possibility justifies a substantial award of punitive damages against Gibson.

Now that the evidentiary hearing has concluded, the Court will award Applied Capital punitive damages against Gibson in the amount of $1,100,000.00.

### D.    THE COURT WILL AWARD $710,000.00 IN PUNITIVE DAMAGES AGAINST PRESLEY AND NEW ENERGY.

Under the Court's partial summary judgment orders that the Court has already entered, the Court has allowed Applied Capital to recover all the money that it paid out with interest set by the Court and reasonable attorneys fees it incurred pursuing Presley and New Energy.  The Court has also already found that Presley's and New Energy's conduct was "willful, wanton, malicious, and fraudulent."  The Court believes that some punitive damages against these two Defendants are appropriate.  On the other hand, while the Court does not agree with Presley's request that the Court deny Applied Capital's prayer for an award of punitive damages, the Court is not convinced that the Court should grant Applied Capital the amount of punitive damages it requests.

The same factors that support an award of punitive damages against Gibson support an award against Presley and New Energy.  First, Presley's and New Energy's misconduct was reprehensible.  See Aken v. Plains Elec. Generation and Transmission Co-op., Inc., 2002-NMSC-021, ¶ 21, 49 P.3d at 670 ("[P]erhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct.")(internal quotations omitted).  Presley and New Energy's conduct "was willful, wanton, malicious, and fraudulent."  Memorandum Opinion and Order at 51, filed September 27, 2007 (Doc. 236).  While the Court has already noted that Gibson's conduct was, on the record before the Court, the most reprehensible, it may only be

a lack of proof that puts Presley and New Energy in the same category with Gibson.  In any case, the Court believes that an award of punitive damages against Gibson, Presley, and New Energy will provide both specific and general deterrence.

Second, while Presley's and New Energy's precise net worth is unknown, the Court believes that the coal-bed methane leases are more valuable than the amount of compensatory damages and any punitive damages that the Court would reasonably make against Presley and New Energy. Moreover, it is the Court's conclusion that a punitive damage award of $710,000.00 is justified under the facts of this case regardless of these two Defendants' wealth or lack thereof.  See, e.g., Fahrenberg v. Tengel, 291 N.W.2d at 527 (stating that "[f]ailure to show net worth does not invalidate the award of punitive damages, but eliminates one factor by which the reasonableness of the award can be gauged."); Carrick v. McFadden, 533 P.2d at 1254 (noting that "we are cited to no rule of law requiring that evidence of the defendants' financial worth be introduced before an issue of punitive damages may be submitted to the jury.").  The Court believes that Presley and New Energy should be able to pay, or come reasonably close to paying, the award the Court is making against them.

Third, an amount less than twice the compensatory damages award is within a normal range for punitive damages.  See, e.g., Aken v. Plains Elec. Generation and Transmission Coop., Inc., 2002-NMSC-021, ¶ 24, 49 P.3d at 671 (affirming punitive damages award 3.5 times the amount of compensatory damages award); Allsup's Convenience Stores, Inc. v. N. River Ins. Co., 1999-NMSC-006, ¶ 49, 976 P.2d at 18 (affirming multi-million dollar award with a punitive/compensatory damages ratio of 7.4:1).  An amount less than twice the compensatory damages should also avoid due process problems.  And an award of $710,000.00 does not violate

-33-

Presley's and New Energy's constitutional rights.

Fourth, under New Mexico law, the penalty for a second degree felony is "nine years imprisonment." N.M.S.A. 1978, § 31-18-15(A)(6). "The possibility of a jail sentence justifies a substantial punitive damages award." Chavarria v. Fleetwood Retail Corp., 2006-NMSC-046, ¶ 39, 143 P.3d at 729. Presley could have faced the possibility of a substantial jail sentence were he to be convicted of fraud over the amount of $20,000.00, and thus, this possibility justifies a substantial award of punitive damages against Presley. In view of the evidence in the record, a punitive damages award of $710,000.00 against Presley and New Energy is appropriate.

### E.  THE COURT CONCLUDES THAT PRESLEY AND NEW ENERGY HAVE THE ABILITY TO PAY THE PUNITIVE DAMAGES AWARD AGAINST THEM.

Presley represents that CIG previously had been willing, and a company called Fairway Energy now appears to be willing, to invest at least $50 million in drilling the coal-bed methane leases, presumably in the expectation of generating revenues in excess of that amount. See Objections at 4. Nevertheless, Presley contends that Applied Capital, in its motion, makes erroneous assumptions in its request for punitive damages about his and New Energy's ability to pay any award of punitive damages. See Objections at 4-5. The Court admittedly does not have a firm understanding of New Energy's and thus Presley's net worth. This ambiguity, however, may be because Presley may not be putting all of his cards on the table.

Presley acknowledges that New Energy's mineral lease has significant value. Nevertheless, Presley contends, for several reasons, that the Court cannot use the December 7, 2007 correspondence as a benchmark and the asset as source of funds supporting a large punitive damages claim. First, Presley contends that the Court cannot use the document as Allied Capital suggests

because CIG Operations is no longer in the picture.  Second, Presley contends that it is a wrong conclusion to assume that the Auzqui lease, by itself, would bring a sale price of five-million dollars. Presley states that the lease, on its own, would not bring five-million dollars.  Presley states that, as has always been the case for the project, as reflected in the CIG Operations' letters, there must be a $50,000,000.00 coal-bed methane leases drilling-and-development project.

Presley contends that the figures show that he has already reached into the drilling-and-development profits to retire all debt and creditors.  Presley concedes, however, that there may be some additional profit in the $1.2 million turn-key price to the funder; however, he does not have the resources to allow a heavy encumbrance to jeopardize the development of the Auzqui field.  See Objections, Attachment IV, Turn-Key Well Costs at 1 (undated).

It may be that, under the proposed financing scheme that Presley describes, New Energy's other creditors are to be paid $4.25 million, but that misses the point of Applied Capital's motion. The dispositive question is how much, out of the total revenue to be generated by the coal-bed methane leases drilling-and-development project, Presley and New Energy are to receive.

Presley reveals that he is to receive at least $50 million, although he represents that, out of that amount, he must drill a number of wells.   See Objections at 4-5.  He is not disclosing to the Court, however, what other revenues and profits he expects to receive in the future as a partner or other co-investor with the parties who will be acquiring the mineral leases.  Presley's latest agreements with Fairway Energy and/or others presumably contain a provision similar to the one contained in the Mint Condition agreement.  See Attachment II.  Presley should have, at a minimum, disclosed all of the agreements into which he has entered with, and all of the consideration he is to receive from, Fairway Energy, the "private equity fund," and any other entity in connection with the

-35-

proposed sale of the mineral lease and the coal-bed methane leases drilling- and-development project.  By awarding Applied Capital a total of $1,100,000.00 in punitive damages, over and above its compensatory award of $550,000.00, the Court would be requiring Presley to allocate a greater portion of his, and not necessarily New Energy's other creditors', interest in the value of the mineral lease.  Such a reallocation would be a just result.  Thus, the Court believes that Applied Capital has presented sufficient evidence indicating that New Energy has substantial assets.

Applied Capital uses the December 7, 2007 letter from Presley in its arguments and reasonably extrapolates from the exhibit that Presley and New Energy have a valuable asset in the coal-bed methane leases.  See Motion ¶ 8, at 4-5.  Applied Capital assumes, with some justification, after reading the correspondence from CIG Operations and looking at the numbers from the Mint Condition Purchase and Sale Agreement, that there is money available solely to pay the New Energy bankruptcy claims. The Court can also reasonably infer that Presley values the production potential from the leases in excess of that amount.

**F.    THE COURT WILL REQUIRE GIBSON TO SATISFY THE JOINT AND SEVERAL PORTION OF THE PUNITIVE DAMAGES BEFORE HE MAY PAY OFF HIS INDIVIDUAL PORTION OF THE PUNITIVE DAMAGES' AWARD.**

The Court will award Applied Capital $710,000.00 in punitive damages against Gibson, Presley, and New Energy, jointly and severally.  The Court has awarded Applied Capital $1,100,000.00 in punitive damages against Gibson.  Any monies that Gibson pays towards satisfying the punitive damages award will be allocated to the joint and several liability first.  After Gibson has paid off the $710,000.00 joint-and-several award, then any payments by Gibson in excess of that award will be applied towards his individual liability of $390,000.00.

The Court believes that this award is just and proportional to the amount of compensatory

damages that it has awarded to Applied Capital.  The Court also believes that the award reflects

Gibson's aggravated role in the scheme to defraud Applied Capital.  Thus, the punitive damages

award is reasonable.

## V.     THE COURT WILL NOT AWARD ALL THE PRE-JUDGMENT INTEREST THAT APPLIED CAPITAL SEEKS.

The Court believes that Applied Capital is entitled to some pre-judgment interest, but not in

the amount that it seeks.  The Court will award prejudgment interest on the compensatory damages

award.  Applied Capital is not entitled to pre-judgment interest on the punitive damages award.

### A.     THE COURT WILL AWARD PREJUDGMENT INTEREST ON THE COMPENSATORY DAMAGES AWARD.

Applied Capital requests that the Court grant it prejudgment interest on $1,650,000.00

against Gibson, Presley, and New Energy, joint and severally, and on $550,000.00 against Defendant

Grizzly Drilling, at a rate of 10 per cent per annum, starting on January 28, 2005, the date that

Applied Capital filed this lawsuit, to the date of entry of the Final Judgment.  See Motion, Exhibit

5, Final Judgment ¶ 8, at 2.  The Court does not believe that Applied Capital is entitled to

prejudgment interest on any amount as a matter of right.  While the $550,00.00 contract amount is

a definite sum of money under the contract, Applied Capital paid that amount to Grizzly Drilling,

not any of these defendants.  These three defendants did not receive money directly from Applied

Capital.

The Court will, however, exercise its discretion to award Applied Capital prejudgment

interest on the $550,000.00 it has awarded in compensatory damages against the Defendants.  See

N.M.S.A. 1978 § 56-8-4(B)(stating that a court may, in its discretion, award "up to ten percent from

the date the complaint is served upon the defendant after considering among other things: [(i)] if the

plaintiff was the cause of unreasonable delay in the adjudication of the plaintiff's claims; and [(ii)] if the defendant had previously made a reasonable and timely offer of settlement to the plaintiff."). Applied Capital initially filed suit on January 28, 2005. See Doc. 1. Gibson, Presley, and New Energy do not suggest that Applied Capital is the cause of any unreasonable delay of its claims, and the Court does not see anything in the record that suggests Applied Capital is the reason for the delay. The cause of delay has been the failure of Gibson, Presley, and New Energy to participate fully in their defense. Moreover, none of the parties are objecting to the award of compensatory damages, and thus the parties could have resolved much of this dispute earlier. As acknowledged by Presley in his Objection: "Defendant is not now nor will he make any request to use the 'not receiving notice of the hearing' because of the local Post Office blunder as a defense or request for relief from the ruling of the Court in its Memorandum and Order. The Court made the appropriate ruling given what it had before it at that time and those are not settled matters accepted by the Defendant." Objections at 2. Moreover, Presley and New Energy previously promised Applied Capital that they would pay $1,400,000.00 in settlement of the claims. See Memorandum Opinion and Order at 7-8, filed January 27, 2007 (Doc. 236). Furthermore, "Applied Capital represents that, over the past year . . . Presley repeatedly has represented to Applied Capital that the financing is supposed to happen this week." Id. at 8. Applied Capital apparently delayed proceeding with discovery in this case until the latter half of 2006 because of Presley's representations. See id. Eventually, Applied Capital concluded "that there were no reasonable prospects of settlement." Id. The Court finds that Presley's and New Energy's offers of settlements have not been reasonable and resulted in further delay in resolving this lawsuit. Thus, the Court will exercise its discretion to award Applied Capital prejudgment interest.

The Court will not, however, award prejudgment interest on the sum of $1,650,000.00, and will only award prejudgment interest to Applied Capital on the sum of $550,000.00. The prejudgment interest will be calculated at a simple interest rate of 10 per cent per annum, beginning on January 28, 2005 and ending on the date of entry of the Final Judgment in this lawsuit.

### B.   THE COURT WILL NOT AWARD PREJUDGMENT INTEREST ON THE PUNITIVE DAMAGES IT HAS AWARDED APPLIED CAPITAL.

"Prejudgment interest . . . was never intended to encompass an award of punitive . . . [damages]." Coates v. Wal-Mart Stores, Inc., 1999-NMSC-013, ¶ 55, 976 P.2d at 1011. Because "the [Court] has already fixed the amount of damages deemed to be an appropriate penalty, to allow interest on that amount would be nothing more than an arbitrary award of punitive damages over and above the amount determined by the court to be appropriate punishment." Weidler v. Big J Enterprises, Inc., 1998-NMCA-021, ¶ 53, 953 P.2d at 1103 (internal quotations omitted). The Court will not award Applied Capital prejudgment interest on the punitive damages award.

### VI.   THE COURT WILL AWARD APPLIED CAPITAL POST-JUDGMENT INTEREST.

The Court will award Applied Capital post-judgment interest in accordance with 28 U.S.C. § 1961. See 28 U.S.C. § 1961(a)(explaining that "interest shall be allowed on any money judgment in a civil case recovered in a district court.").

### VII.   THE COURT WILL DISMISS THE CONTRACT CLAIM AGAINST NEW ENERGY.

Applied Capital has concluded that it erred in adding its claim for breach of contract against New Energy in this action, because that claim duplicates the claim that it previously had asserted against New Energy in the bankruptcy proceeding. Applied Capital contends that a proof of claim filed in bankruptcy court constitutes prima-facie evidence of the validity and of the amount of the

claim unless a party in interest objects.  See 11 U.S.C. § 502(a); Fullmer v. United States (In re Fullmer), 962 F.2d 1463, 1466 (10th Cir. 1992)("A properly filed proof of claim is prima facie evidence of the validity and amount of the claim."), abrogated on other grounds by Raleigh v. Ill. Dep't of Revenue, 530 U.S. 15, 20 (2000).  Applied Capital maintains its contract claim against New Energy has been established and quantified in the amount of $902,213.16 plus interest, attorney fees, and other charges accruing since April 25, 2006.  See Motion ¶ 11, at 6.

The Court need not decide whether, under the circumstances, it is appropriate for the Court to decide the same or similar claims.  It is sufficient for the Court to find that Applied Capital desires to dismiss this claim and that no party objects.  Accordingly, the Court will dismiss without prejudice Applied Capital's breach-of-contract claims -- Count IV of the Fourth Amended Complaint -- against New Energy.

## VIII.   THE COURT WILL DISMISS THE REMAINING CLAIMS.

Applied Capital's remaining claims are for breach of contract, compensatory damages, punitive damages, and costs and attorneys fees against Grizzly Drilling, and against New Energy for costs and attorney fees.  Applied Capital has determined that it does not wish to continue pursuing these claims to judgment.  Applied Capital therefore has elected to dismiss these claims with prejudice.

## IX.   THE COURT WILL ENTER THE JUDGMENT THAT APPLIED CAPITAL PROPOSES WITH SOME MODIFICATIONS.

Applied Capital's proposed Final Judgment will be entered, with some modifications from the Court.  First, while the Court is awarding the requested punitive damages against Gibson, it is making only $710,000.00 joint and several against Presley and New Energy.  Second, while Applied Capital has requested $1,100,000.00 in punitive damages against Presley and New Energy, the Court

-40-

believes that a lesser amount is appropriate, given that Gibson's role in all facets of the scheme is the most reprehensible conduct.

**IT IS ORDERED** that the Plaintiff's Request for Evidentiary Hearing on the Issue of the Amount of Punitive Damages to be Awarded Against Defendants Francis Gibson, Edward L. Presley and New Energy Company, L.L.C., and Motion for Entry of Final Judgment is granted in part and denied in part. The Court scheduled an evidentiary hearing on the issue of the amount of punitive damages to be awarded against Defendants Frances Gibson, Ed Presley, and New Energy Co., LLC, and allowed Presley to appear by videoconference. The Court will award Applied Capital $1,100,000.00 in punitive damages against Gibson. The Court will award $710,000.00 in punitive damages against Presley and New Energy, jointly and severally. The $710,000.00 award against Presley and New Energy, and $710,000.00 of the $1,100,000.00 award against Gibson will be joint and several. Any monies that Gibson pays towards the punitive damages awards will first be allocated towards the $710,000.00 joint-and-several punitive award. Once the $710,000.00 award is satisfied, then Gibson's payments will be allocated towards his individual liability for $390,000.00. The Court will not award Applied Capital prejudgment interest on the punitive damages award. The Court will award Applied Capital prejudgment interest on the $550,000.00 compensatory damages award at a simple rate of 10 per cent per annum beginning on January 28, 2005 to the date of entry of the Final Judgment in this lawsuit. The Court will award Applied Capital post-judgment interest on all amounts awarded in the judgment. The breach-of-contract claim against New Energy is dismissed without prejudice. All remaining claims are dismissed with prejudice.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Henry M. Bohnhoff
Bryan Jerdone Davis
Rodey, Dickason, Sloan, Akin
  & Robb, P.A.
Albuquerque, New Mexico

     *Attorneys for the Plaintiff*

Francis Gibson
Hailey, Idaho

     *Defendant pro se*

Brian Ambrose
Laguna Beach, California

     *Defendant pro se*

Gerald Lee Scogin, Jr.
Lawrenceville, Illinois

     *Defendant pro se*

Grizzly Drilling, Inc.
c/o Gerald Lee Scogin
Lovell, Wyoming

     *Defendant pro se*

Justin Herman
Pittsburgh, Pennsylvania

     *Defendant pro se*

New Energy Co. LLC
Sheridan, Wyoming

      *Defendant pro se*

Edward Presley
c/o New Energy Co., LLC
Sheridan, Wyoming

      *Defendant pro se*